**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOWARD TOWN CENTER DEVELOPER, LLC, | |
| Plaintiff-Counter Defendant, | Civil Action No. 13-1075 (BAH) |
| v. | Judge Beryl A. Howell |
| HOWARD UNIVERSITY, | |
| Defendant-Counter Plaintiff-Third Party Plaintiff | |
| v. | |
| CASTLEROCK PARTNERS, LLC, | |
| Third Party Defendant. | |

## MEMORANDUM OPINION

For the past five years, the defendant/counter-plaintiff Howard University ("the

defendant") and the plaintiff/counter-defendant ("the plaintiff") have attempted to develop a

parcel of land owned by the defendant across from Howard University Hospital along Georgia

Avenue and V Street in northwest Washington, D.C. *See* Compl. at 1–2, ECF No. 3; Def.'s

Mem. Supp. Mot. Summ. J., ("Def.'s Mem.") at 1, ECF No. 23; Def.'s MSJ. Ex. 3 (the "Ground

Lease") at D-1–D-2, ECF No. 23-3. Those efforts have broken down, resulting in each party

accusing the other of contractual breaches and inequitable conduct. Pending before the Court are

five motions: the plaintiff's Motion for Preliminary Injunction ("Pl.'s PI Mot.") and

Supplemental Motion for Preliminary Injunction ("Pl.'s Suppl. PI Mot."), ECF Nos. 6 and 12;[1]

---

[1] Local Civil Rule 65.1(d) requires a ruling or hearing on applications for preliminary injunctions within twenty-one days of their filing. In this case, following the Court's denial of the plaintiff's Motion for a Temporary Restraining Order, ECF No. 5 ("Pl.'s TRO Mot."), the parties agreed to a lengthier briefing schedule on the plaintiff's Motion

the plaintiff's Amended Motion for Leave to File an Amended Complaint ("Pl.'s Mot. Leave to File"), ECF No. 21; the defendant's Motion for Summary Judgment ("Def.'s MSJ"), ECF No. 23; and the defendant's Motion for a Hearing ("Def.'s Mot. Hrg."), ECF No. 36. For the reasons outlined below, the defendant's Motion for Summary Judgment is granted and the remaining motions are denied.

## I.    BACKGROUND

Although the parties have spilled considerable ink on the background facts and raised numerous legal arguments in this action, the plaintiff is correct that "the main issue [in] this suit is plain—whether [the defendant] improperly terminated agreements with [the plaintiff] before expiration of the applicable cure period for a default . . . ." Compl. at 2. Thus, only those facts necessary for resolution of this central issue are outlined here. Evaluation of the contractual terms for termination and the length of the applicable cure period requires examination of the key provisions in several agreements governing the parties' transactions.[2]

### A.    The Initial Agreements

The defendant and third party defendant CastleRock Partners, LLC ("the TPD") agreed "to build certain mixed use improvements on property [the TPD] was to lease from [the defendant]" in December, 2008. Statement of Undisputed Material Facts in Supp. Mot. Summ.

---

for preliminary injunctive relief that precluded providing a ruling or hearing within twenty-one days. *See* Minute Order dated July 22, 2013; Consent Motion for Extension of Time to Extend Filing Deadlines, ECF No. 10.

[2] The plaintiff and defendant each submitted versions of the documents governing the agreements at issue in this suit. Many of the plaintiff's submissions were heavily redacted and duplicative. *See*, Compl. Ex. A (the "Ground Lease"), ECF No. 3; Compl. Ex. B (the "Development Agreement"), ECF No. 3; Compl. Ex. C (the "Development Amendment"), ECF No. 3; Pl.'s Suppl. PI Mot. Ex. A (the "Ground Lease"), ECF No. 12-2; Pl.'s Suppl. PI Mot. Ex. B (the "Development Agreement"), ECF No. 12-3; Pl.'s Suppl. PI Mot. Ex. C (the "Development Amendment"), ECF No. 12-4; Pl.'s Mot. Leave to File Ex. A (the "Ground Lease"), ECF No. 21-3; Pl.'s Mot. Leave to File Ex. B (the "Development Agreement"), ECF No. 21-4; Pl.'s Mot. Leave to File Ex. C (the "Development Amendment"), ECF No. 21-5; Pl./Counter-Def. & Third Party Pl.'s [sic]. Opp'n Def.'s MSJ ("Pl.'s Opp'n") Ex. B (the "Ground Lease"), ECF No. 31-2; Pl.'s Opp'n Ex. C (the "Development Agreement"), ECF No. 31-3; Pl.'s Opp'n Ex. D (the "Development Amendment"), ECF No. 31-4. For ease of reference, the Court generally refers to the defendant's exhibits when discussing the applicable agreements because those exhibits are unredacted copies of the documents at issue.

J. ("SOF") ¶¶ 2–3.[3]  This agreement required the TPD "to commence construction within twenty-four (24) months after execution of the agreement, i.e., on or before December 11, 2010, and complete the Mandatory Initial Improvements, as defined in the agreement, within thirty-six (36) months after execution of the agreement, i.e., on or before December 10, 2011."  *Id.* ¶ 4.

On January 22, 2010, the TPD reached a series of agreements with the defendant that were subsequently assigned to the plaintiff, including a "ground lease for the real property and the terms of a replacement development agreement, with new, extended construction deadlines." SOF ¶¶ 6; 11.  Of those agreements, the three most relevant documents to resolution of the pending motions are (1) the Ground Lease; (2) the Development Agreement, Def.'s MSJ Ex. 4 ("the Development Agreement"), ECF No. 23-4; and (3) and the Amendment to the Development Agreement, Def.'s MSJ Ex. 7 ("Development Amendment"), ECF No. 23-7.[4]  The same day it signed these agreements with the defendant, the TPD assigned all or its rights and obligations to the plaintiff.  *See* Assignment and Assumption of Ground Lease and Development Agreement, Def.'s MSJ Ex. 5 ("the Assignment"), ECF No. 23-5.  These three agreements are described in more detail below.

### 1. *The Ground Lease*

The first agreement, the Ground Lease, governed the relationship, for a term of ninety-nine years, between the plaintiff and defendant pertaining to the property to be redeveloped.  *See* Ground Lease, *generally*.  Among its many provisions were those pertaining to the rent to be paid, on specific dates, to the defendant.  *See* Ground Lease, Art. 2 § 2.1.  Relevant to this action,

---

[3] Unless otherwise stated, all facts referenced in the SOF are undisputed by the parties.
[4] A fourth document discussed by the parties, the Amendment to the Ground Lease, Def.'s MSJ Ex. 6 ("the Ground Lease Amendment"), ECF No. 23-6, was executed on the same date as the Ground Lease and other documents.  The Ground Lease Amendment memorialized certain changes to the original Ground Lease not relevant to this action, and included a clause noting "[e]xcept as herein expressly amended, the [Ground] Lease shall remain in full force and effect, and the [Ground] Lease, as modified by this Amendment, is hereby ratified and affirmed in all aspects." Ground Lease Amendment ¶ 8.

the plaintiff was required to pay the defendant $525,000 in rent the day the Ground Lease was signed and $1,475,000 on the earlier of "the date on which [the plaintiff] shall make settlement upon a construction loan for the funding of the costs of constructing the Mandatory Project Improvements . . . or March 15, 2011." *See id.* (requiring payment of $1,475,000 in rent on the "Closing Date"); *id.* at 2 ¶ e (establishing definition of term "Closing Date").

The Ground Lease also provided for a "cure period" of ten days "after written notice from [the defendant] to [the plaintiff]" in the event that the plaintiff was "at any time . . . in default with respect to any rental payments or other charges payable by [the plaintiff] under" the Ground Lease. *Id.*, Art. 16 § 16.2. If such a default occurred and was not cured, the Ground Lease allowed the defendant "to terminate [the Ground] Lease and to declare the [Ground] Lease term ended and . . . [the plaintiff] shall have no further claim thereon or thereunder" subject to the defendant providing notice of its intent to do so. *Id.*, Art. 16 § 16.2(a). That notice was to be in writing and "specifying IN BOLD CONSPICUOUS TYPE, that [the defendant] intends to terminate the [Ground] Lease if the Event of Default is not cured within ten (10) days." *Id.*, Art. 16 § 16.2. If the plaintiff failed to cure a default on rent payments within ten days, and written notice was provided, the defendant had "the right, at its sole option, thereafter to elect to terminate this [Ground] Lease and all of the rights of [the plaintiff] in or to the Premises, and in such case no additional notice to [the plaintiff] . . . or right to cure shall be required except that [the defendant] shall give [the plaintiff] . . . written notice of [the defendant's] election to terminate this [Ground] Lease on or before the effective date of such termination." *Id.* Notably, for purposes of the relief sought in the defendant's Motion for Summary Judgment, the Ground Lease further provided that the defendant could recover from the plaintiff in damages, *inter alia*, "the worth at the time of award of any unpaid rent . . . that had been earned and is outstanding at

the time of such termination" and "the reasonable amount of any costs or expenses incurred by [the defendant] in enforcing its rights under this [Ground] Lease after such default." *Id.*, Art. 16 §§ 16.4(a, c).

## 2.    *The Development Agreement*

The second agreement, the Development Agreement, governed the relationship between the plaintiff and the defendant as it pertained to the improvements to be constructed on the land covered by the Ground Lease. *See* Development Agreement at 1. Specifically, the Development Agreement "set forth their agreements and understandings concerning the planning, development and construction of the Project Improvements." *Id.* Among the requirements set forth in the Development Agreement were that: all Project Costs would be borne by the plaintiff, *id.*, Art. III § 3.4; the plaintiff must "commence construction . . . in any event not later than March 15, 2011," *id.*, Art. III § 3.10(a); the development must be substantially complete by March 15, 2013, *id.*, Art. III § 3.10(c)(ii); and payments were to be made to the defendant if certain construction deadlines were not met, *id.*, Art. III § 3.10(c)(iii).

The Development Agreement also defined "Developer Event[s] of Default," which established what constituted a default by the plaintiff. Two of the events constituting a default by the plaintiff are relevant: first, a default occurred if the plaintiff "fails to pay when due to the [defendant] any amount payable by [the plaintiff] hereunder within twenty (20) days after receipt of written notice of such failure," *id.*, Art. V § 5.1(g), and, second, a default under the Ground Lease also constituted a default under the Development Agreement, *id.*, Art. V. § 5.1(h). The Development Agreement warranted that "[n]othing contained herein shall be construed to affect any obligations of [the plaintiff] accruing under the [Ground] Lease, including without limitation

any provisions of the [Ground] Lease for the commencement or continuation of the obligation to pay any rentals thereunder." *Id.*, Art. V. § 5.2(a).

Of particular relevance to the instant action is the Development Agreement's § 5.4, which provided that "[i]n the event the Ground Lease shall be terminated for any reason prior to the Project Improvements Substantial Completion Date . . . [the plaintiff] . . . and the [defendant] . . . each shall have the right, at its sole option, to terminate this [Development] Agreement by written notice to the other party." There is no cure period associated with this provision of the Development Agreement. *See id.*, Art. V. § 5.4. Unlike the Ground Lease, the Development Agreement does not contain any provision requiring payments from the plaintiff to the defendant, except as a penalty for certain defaults. *See* Development Agreement, Art. III § 3.10(c)(iii).

### 3.    *The Development Amendment*

Finally, the Development Amendment addressed concerns among the parties as to the potential costs of environmental remediation that might be incurred in developing the property. *See* Development Amendment, *generally*. Toward that end, the Development Amendment established extensive and detailed requirements pertaining to how the plaintiff and defendant would prepare an investigation report, *id.* ¶ 2; prepare a remediation plan, *id.* ¶ 3; implement the remediation plan, *id.* ¶ 4; indemnify the defendant, *id.* ¶ 5; and how the parties would divide the cost of any remediation, *id.* ¶ 6.[5] Specifically, the defendant was to "reimburse [the plaintiff] through cash payments for, all Remediation Costs . . . (if any) in excess of $750,000." *Id.* ¶ 6(c).

---

[5] The two affidavits and many of the accompanying exhibits filed in connection with this action by the plaintiff discuss the potential cost of environmental remediation at the property in some detail. *See* Aff. of Alan D. Cohen, President, ADC Builders, Inc., ("Cohen Aff.") ¶¶ 3–8, ECF No. 32-8; Cohen Aff. Ex. 1 (communications regarding environmental remediation), ECF No. 32-9; Cohen Aff. Ex. 2 (same), ECF No. 32-10; Aff. of Eric L. Siegel, Co-Vice Manager, Howard Town Center Developer, LLC, ("Siegel Aff.") ¶¶ 4–14, ECF No. 32-1; Siegel Aff. Ex. 1 (duplicate of Cohen Aff. Ex. 1), ECF No. 32-2; Siegel Aff. Ex. 2 (duplicate of Cohen Aff. Ex. 2), ECF No. 32-3. This discussion is irrelevant to the critical issue in this matter, namely, what cure period applied to the payment of rent under the Ground Lease.

Toward that end, the plaintiff and defendant were to "establish an escrow account . . . with an escrow agent . . . reasonably acceptable to the [defendant] and [the plaintiff]; and [the plaintiff] shall deposit into the Escrow Account, when due and payable under the [Ground] Lease, (A) the initial Rent payable under Section 2(a)(i) of the [Ground] Lease (being the sum of $525,000.00); and (B) the second payment of Rent under Section 2(a)(ii) of the [Ground] Lease (being the sum of $1,475,000.00), in each case by direct payment by [the plaintiff], as Tenant under the [Ground] Lease, to Escrow Agent."[6] *Id.* ¶ 6(c)(i). The remainder of the section outlined the manner in which the escrow account was to be kept and how funds could be disbursed from the account. *Id.* ¶¶ 6(c)(i–v).

The next paragraph in the Development Amendment notes that "[e]xcept as otherwise expressly provided herein, the obligations of, and requirements imposed upon, [the plaintiff] (in its capacity as tenant under the Ground Lease) under the Ground Lease and the Development Agreement, including the obligation to indemnify, hold harmless and defend the" defendant and other parties "as contained in the Ground Lease and in the Development Agreement, are incorporated herein as though fully set forth herein." *Id.* ¶ 7. Neither the clause pertaining to the functioning of the escrow agreement nor the clause reaffirming the obligations of the plaintiff mentioned any change to applicable cure periods in the governing documents. *See id.* ¶¶ 6–7. Paragraph 11 of the Development Agreement reaffirmed that "[e]xcept as herein expressly amended, the Development Agreement shall remain in full force and effect and the Development Agreement, as modified by this Amendment, is hereby ratified and affirmed in all aspects." *Id.* ¶ 11.

*       *       *

---

[6] Although the Amendment refers to Sections 2(a)(i) and 2(a)(ii) of the Ground Lease, the parties do not appear to dispute that the Amendment actually refers to Sections 2.1(a) and 2.1(b) of the Ground Lease.

To summarize, the Ground Lease governed, *inter alia*, the payment of rent by the plaintiff to the defendant, *see* Ground Lease Art. 2, while the Development Agreement governed, *inter alia*, the terms of the plaintiff's development of the property and how environmental issues would be remedied, *see* Development Agreement, Art III; IV. The cure period for failure to pay rent due under the Ground Lease was ten days, *see* Ground Lease, Art. 16 § 16.2, while the cure period for missed benchmarks and other issues covered in the Development Agreement varied depending on the type of default, *see* Development Agreement, Art. V. § 5.1. The plaintiff's failure to pay money due under the Development Agreement had a twenty day cure period. *Id.*, § 5.1(g). The Development Amendment reaffirmed that the Development Agreement was still in full effect and governed the relationship of the parties, except as specifically changed in the amendment. *See* Development Amendment, ¶¶ 7; 11. The Development Amendment did not mention the applicable cure periods for a default, let alone modify the duration of those periods. *See id.*, *generally*.

### B.      Construction Delays And The Parties' Actions Between 2010 and 2011

According to the Ground Lease, the plaintiff was to pay the defendant $525,000 at the time the Ground Lease was signed, *see* Ground Lease, Art. 2 § 2.1(a), which the plaintiff paid into an escrow account established for that purpose at Regional Title Incorporated ("RTI"), SOF ¶ 24. Consistent with the Development Amendment, the Escrow Agreement signed by the parties explained that the plaintiff was to pay the $525,000 rent payment "to [RTI] in lieu of the payment of the sum payable by [the plaintiff] to [the defendant] under Section 2.1(a) of the [Ground] Lease." Def.'s MSJ Ex. 8 ("Escrow Agreement") ¶ C, ECF No. 23-8. The Escrow Agreement also required that the plaintiff pay its next rent payment, $1,475,000, into the same account "in lieu of the payment of the sum payable from [the plaintiff] to [the defendant] under Section 2.1(b) of the [Ground] Lease" when the rent payment became due. *Id.* ¶ D. These two

payments were designated "collectively as the 'Deposit.'" *Id.* There is no dispute that the plaintiff timely made the initial $525,000 rent payment required by the Ground Lease and deposited the payment into the escrow account as required by the Development Amendment. SOF ¶ 24.

Over the next two years, the parties agreed to extend the various deadlines contained in the Ground Lease and the Development Agreement multiple times. *See, e.g.*, SOF ¶ 27; Pl.'s/TPD's Statement of Material Facts in Dispute ("Pl.'s SOF") ¶ 27, ECF No. 32 (admitting that the construction schedule was extended on February 28, 2011); SOF ¶ 30 (extending construction deadlines); Aff. of Robert M. Tarola, Senior Vice-President, Chief Financial Officer and Treasurer, Howard University (Sept. 18, 2013) ("1st Tarola Aff.") ¶¶ 25; 32, ECF No. 16-1; *see also* Pl.'s SOF Ex. B (memorandum from plaintiff to defendant discussing "modifications needed to Development Agreement and Ground Lease to reflect revise [sic] schedule" dated February 28, 2011) at 1, ECF No. 32-7. Pursuant to the Ground Lease, the plaintiff was to make its second rent payment of $1,475,000 on March 15, 2011, which it did not do. SOF ¶ 28. Rather, the parties agreed to extend the deadline for the second rent payment until December 8, 2011. SOF ¶ 31.

In August, 2011, the defendant grew concerned that the plaintiff would be unable to "complete the project called for by the Development Agreement" and sent a letter to the plaintiff demanding "adequate and substantial written assurances that the [plaintiff] was and would remain able and willing to fulfill its contractual commitments to [the defendant.]" Aff. of Robert M. Tarola, Senior Vice-President, Chief Financial Officer and Treasurer, Howard University (Sept. 30, 2013) ("2d Tarola Aff.") ¶¶ 27–28, ECF No. 23-1; Def.'s MSJ Ex. 9 (letter from defendant to plaintiff seeking assurances dated August 30, 2011) at 5, ECF No. 23-9; *see* Aff. of

Eric L. Siegel, Co-Vice Manager of Howard Town Center Developer, LLC ("Siegel Aff.") ¶ 19, ECF No. 32-1. The plaintiff did not respond to the defendant's letter by the time designated for response. 2d Tarola Aff. ¶ 30; *see* SOF ¶ 35; Pl.'s SOF ¶ 35 (noting dates of letters to defendant after deadline in letter had passed); Def.'s MSJ Ex. 9 (requiring assurances by September 8, 2011) at 6; *see also* Siegel Aff. Ex. 3 (letter from plaintiff to defendant dated September 15, 2011 accusing defendant of "attempt[ing] to paint an inaccurate picture of past events") at 1, ECF No. 32-4.

### C. The First Default Notices

In September, 2011, in the absence of what the defendant considered adequate written assurances, the defendant served the plaintiff with a Notice of Default under the Development Agreement and the Ground Lease. SOF ¶ 36; *see* Def.'s MSJ Ex. 10 (notice of default dated September 26, 2011), ECF No. 23-10; Siegel Aff. Ex. 4 (letter dated September 29, 2011from plaintiff to defendant acknowledging receipt of September 26, 2011 notice of default), ECF No. 32-5. Nonetheless, in December 2011, the plaintiff failed to make the $1,475,000 payment that was originally due in March 2011, under the Ground Lease. SOF ¶ 37. In February 2012, the defendant served the plaintiff with a second notice of default and a notice of intent to terminate the Development Agreement. *See* SOF ¶ 38; Def.'s MSJ Ex. 11 (notice of default and notice of intent to terminate dated February 3, 2012), ECF No. 23-11. In March 2012, nearly one year after the $1,475,000 payment was initially due, the defendant served a third notice of default and intent to terminate on the plaintiff, noting defaults under the Development Agreement and the failure to pay the $1,475,000 due on December 8, 2011. *See* Def.'s MSJ Ex. 12 (notice of default and notice of intent to terminate dated March 5, 2012) at 1–2, ECF No. 23-12. Notably, both the February and the March 2012 notices reference the $1,475,000 payment as being due

under the Ground Lease and the need for the default to be cured "within ten (10) days" after this notice."  Def.'s MSJ Ex. 11 at 3; *id.* Ex. 12 at 2.

### D.      The Term Sheet

The defendant eventually withdrew its 2011 and 2012 default notices "in consideration for" certain concessions from the plaintiff contained in a "term sheet" executed on April 6, 2012. SOF ¶ 41; 2d Tarola Aff. ¶ 36; Def.'s MSJ Ex. 13 (the "Term Sheet"), ECF No. 23-13; Pl.'s Opp'n Ex. E (the "Term Sheet"), ECF No. 31-5.[7] The concessions reflected in the term sheet included agreements to, *inter alia*, (1) amend the escrow agreement, (2) execute a second set of amendments to the Ground Lease and Development Agreements by April 30, 2012 (the "Second Amendments"); (3) extend certain construction deadlines; (4) enter into discussions with certain District of Columbia entities; (5) establish, using the plaintiff's funds, "an apprenticeship program at Howard University"; and (6) have the plaintiff make partial payment of $100,000 of the second rent payment "no later than ten (10) days after execution of [the] Term Sheet," i.e., April 16, 2013, with the balance to be paid within ninety days after execution of the proposed Second Amendments.  Term Sheet ¶¶ 1–10.  The proposed Second Amendments contemplated in the Term Sheet were never executed.  SOF ¶ 43; Pl.'s SOF ¶ 43.

Nevertheless, consistent with the Term Sheet, the termination of the escrow agreement, which was established under the Development Amendment, was executed in May, 2012.  *See* Def.'s MSJ Ex. 14 ("Escrow Termination"), ECF No. 23-14; Pl.'s Suppl. PI Mot. Ex. D (same), ECF No. 12-5; Pl.'s Opp'n Ex. F (same), ECF No. 31-7.  Although the plaintiff is correct that the

---

[7] The plaintiff complains that the parties had "agreed that the Term Sheet would remain confidential as a settlement document" and therefore requests that the Term Sheet be stricken.  Pl.'s SOF ¶ 41 n.2; *see also* Pl.'s Opp'n Ex. E1 (letter from defendant to plaintiff, dated December 28, 2011,discussing negotiations), ECF No. 31-6; Pl.'s Reply Def.'s Opp'n Pl.'s PI Mot. Ex. B (same), ECF No. 22-2.  The plaintiff's request to strike the Term Sheet is puzzling since both parties have submitted complete, identical copies of the full term sheet to the Court as part of their summary judgment filings.  *See* Def.'s MSJ Ex. 13; Pl.'s Opp'n Ex. E.  The plaintiff's request to strike this Term Sheet is denied.

Escrow Termination does not discuss the $1,475,000 payment that was, as of May 2012, fourteen months overdue from the date specified in the Development Agreement, the Escrow Termination specifically refers to the Development Amendment and notes that the plaintiff and defendant "have agreed to terminate the Escrow Agreement and to direct Escrow Agent to release the Remaining Deposit to [the defendant]." *Id.* ¶¶ C–D.  Consequently, the "Deposit," which was defined under the Escrow Agreement as the initial $525,000 rent payment and the $1,475,000 rent payment, had it been deposited, *see* Escrow Agreement ¶ D, was to be disbursed to the defendant "at the soonest practicable time," Escrow Termination ¶¶ 1–2.

The plaintiff contends that the Term Sheet only "anticipated the execution of amendments to the Development Agreement and Ground Lease" and, therefore, "[s]ince those amendments were never executed, the Term Sheet is immaterial."  Pl.'s Opp'n at 7.  The plaintiff relies upon two cases, *Overseas Partners, Inc. v. PROGEN Musavirlik ve Yonetim Hismetleri, Ltd Sikerti*, 15 F. Supp. 2d 47, 53 (D.D.C. 1998), and *Maloney v. E.I. Du Pont de Nemours & Co.*, 352 F.2d 936, 938 (D.C. Cir. 1965), in support of its argument that the Term Sheet is not binding on the parties.  *See* Pl.'s Opp'n at 7, n.8.  *Overseas Partners, Inc.* holds that "a record of [a] meeting between the parties" that discussed a "final agreement [that] would be drawn up later and signed" was not a binding contract.  *See Overseas Partners, Inc.*, 15 F. Supp. 2d at 53. Similarly, *Maloney* holds that, under Delaware contract law, "a contract providing for employment 'on terms to be mutually agreed on' [is] 'almost the classic example of a legally unenforceable . . . agreement to agree.'"  *Maloney*, 352 F.2d at 938 (citations omitted).

The Court need not determine whether the Term Sheet was merely an "agreement to agree" or itself a stand-alone contract, since neither party purports to hold the other to the terms of the Term Sheet in the instant action.  Indeed, to the extent the parties relied on the Term Sheet,

it appears the defendant gave the plaintiff the benefit of the deadline of May 30, 2013 for the second rent payment, as set out in the contemplated Second Amendments to the Development Agreement, despite the fact that the Second Amendments were never signed. *See* Def.'s MSJ Ex. 16 (email from plaintiff to defendant including draft of "Second Amendment to Development Agreement" in which $1,475,000 payment is required to be paid on May 30, 2013) at 12, ¶ 11(a), ECF No. 23-16.

The plaintiff appears to challenge that the $1,475,000 second rent payment was due on May 30, 2013. *See* Pl.'s SOF ¶ 48; Siegel Aff. ¶ 23. According to the plaintiff, the two parties "agreed that [the plaintiff] would not be obligated to tender the $1,475,000 Payment called for under the Amendment until May 30, 2013, subject to the execution of [the] second amendment to the Development Agreement and Ground Lease." *See* Pl.'s Opp'n at 8; Pl.'s SOF ¶¶ 43; 48–51; *see also* Def.'s MSJ Ex. 16 (email from plaintiff to defendant referencing May 30, 2013 date) at 1. The plaintiff apparently cites the execution of the Second Amendments as a condition precedent to the second rent payment being due and contends that, absent the Second Amendments, the plaintiff was somehow absolved from making that payment. *See* Pl.'s Opp'n at 9. This is specious reasoning to concede, on the one hand, that the Term Sheet is not binding, Pl.'s Opp'n at 7, and, on the other hand, that the Term Sheet worked to delay indefinitely the due date of the second rent payment, *see* Pl.'s Opp'n at 9. The plaintiff cannot have this both ways.

In any event, the May 30, 2013 deadline was sought by the plaintiff in the Second Amendments to the Development Agreement, *see* Def.'s MSJ Ex. 16 at 12, ¶ 11(a), and the deadline the parties acknowledged several times in correspondence leading up to the alleged default that gave rise to the instant action. *See, e.g.*, Def.'s MSJ Ex. 16 at 1, ECF No. 23-16 ("[T]he only monetary amount owed pursuant to Paragraph 11 of the Second Amendment is the

initial Ground Lease payment of $1,475,000 on or before May 30, 2013. . . . [W]e cannot agree that the [defendant] is entitled to collect $1,475,000 should the Development Agreement and Ground Lease be terminated on May 30 for non-payment"); *see also* Def.'s MSJ Ex. 17 (Letter from the plaintiff to the defendant dated April 15, 2013) at 2, ECF No. 23-17 ("[W]e discussed at our Friday meeting that the $1,475,000 ground lease payment to be tendered on or before May 30, 2013 is now a potential issue. . . . While we have every intent to make that ground lease payment by the date specified, we are discomforted by the notion that a material change to the development program, which has been beyond our control, will surely impact the economics of this project.").

Ironically, if the Court were to adopt the plaintiff's view that the May 30, 2013 deadline was invalid since it stemmed from the unexecuted Second Amendments, then, as the plaintiff concedes, "the parties' duties and rights regarding the Property and Project" would be controlled by the previously executed Ground Lease, Development Agreement, and Development Amendment. *See* Pl.'s Opp'n at 10. This would not improve the plaintiff's position since the plaintiff remained in default under those documents, which required payment of the $1,475,000 rent by March 15, 2011, a deadline that was subsequently extended until December 8, 2011. SOF ¶ 31. Thus, the Court will, for the purposes of the instant motion, follow the understanding of the parties as shown in their correspondence that the $1,475,000 payment was due no later than May 30, 2013, as contemplated in the plaintiff's requested Second Amendments to the Development Agreement that were generated pursuant to the Term Sheet.

### E. The Second Development Amendment Negotiations and the Historic Designation

Following the termination of the Escrow Agreement in May 2012, the relationship between the parties continued to deteriorate. On February 1, 2013, the defendant sent an email

to the plaintiff indicating that it would "take no further action in support of the current developer" until certain conditions were satisfied, including payment of the $1,475,000 rental payment due under the Ground Lease by May 30, 2013. *See* SOF ¶ 44; Def.'s MSJ Ex. 15 (email from defendant to plaintiff dated February 1, 2013) at 2, ECF No. 23-15. The parties discussed the defendant's concerns in a telephone conversation after the email was sent, and after the conversation, the defendant's Vice President and General Counsel, Kurt Schmoke, reiterated via email to the plaintiff that "it is very clear that if the financing [for the project] is not obtained [by May 30, 2013] the relationship between your company and the defendant is dissolved." Def.'s MSJ Ex. 15 at 1.

In early 2013, the District of Columbia Preservation League "filed applications to designate . . . two existing buildings on the property that is the subject matter of the Ground Lease as historic landmarks, such that they could not be demolished to make way for the new development." SOF ¶ 47. Correspondence between the parties indicates that the plaintiff believed these historic designations could severely adversely affect the development. *See* Def.'s MSJ Ex. 16 ("If we do not make payment on May 30 because we do not know whether we will even have a viable project on that date due to the historic preservation issues, [the defendant] is free to pursue any and all legal remedies for non-payment."); *id.* Ex. 17 (letter from plaintiff to defendant noting the plaintiff "cannot afford any additional historic concessions beyond the V Street-Georgia Avenue façade requirement") at 2, ECF No. 23-17. The defendant acknowledged the plaintiff's concerns by letter, dated April 16, 2013, but also noted that the defendant "view[ed the plaintiff's] upcoming payment as a commitment to continue with the redevelopment of the property and more importantly as a cure for the fact that a default condition currently exists with respect to the project." Def.'s MSJ Ex. 18 (Letter from defendant to plaintiff dated April 16,

2013) at 2, ECF No. 23-18.  The buildings in question were officially designated "as historic landmarks, subject to preservation," on May 23, 2013.  SOF ¶ 56.

The day the historic designation was approved, the plaintiff sent a letter to the defendant stating "that until these historic issues are resolved, [the plaintiff does] not intend to make any further monetary payments to [the defendant,]" specifically referencing the "ground lease payment in the amount of $1,475,000 on or before June 1, 2013."  Def.'s MSJ Ex. 19 (Letter from plaintiff to defendant dated May 23, 2013) at 1, ECF No. 23-19.  The parties agree that the plaintiff did not tender the $1,475,000 rent payment to the defendant or to an escrow account on May 30, 2013.  *See* SOF ¶ 58; Pl.'s SOF ¶ 58.  The plaintiff asserts that the Development Amendment governed that payment, requiring it be made to an escrow account, and that although the "Second Amendment documents . . . provided for payment directly to the [defendant]," those documents "were never executed."  Pl.'s SOF ¶ 58.

### F.    The Default Proceedings

In light of the plaintiff's failure to tender the $1,475,000 payment due under the Ground Lease, the defendant sent a Notice of Default and Notice of Intent to Terminate the Ground Lease to the plaintiff via "email, first-class mail, and certified e-mail, return receipt requested" on June 3, 2013.  SOF ¶ 61; *see* Def.'s MSJ Ex. 20 (notice of default and notice of intent to terminate dated June 3, 2013), ECF No. 23-20; Compl. Ex. D (same); Pl.'s Suppl. PI Mot. Ex. E (same), ECF No. 12-6; Pl.'s. Mot. Leave to File Ex. D (same), ECF No. 21-6; Pl.'s Opp'n Ex. G (same), ECF No. 31-8.  The parties agree that the plaintiff did not tender payment of any kind, either in escrow or to the defendant, within ten days of this notice.  *See* SOF ¶ 63; Pl.'s SOF ¶ 63.  The parties differ as to whether the Ground Lease, which provides for a ten day cure period, or the Development Agreement, which provides a twenty day cure period, and the Development Amendment, which requires payment into an escrow account, controls the rent payment and the

16

subsequent cure period.  *See* SOF ¶¶ 61–62 (citing the Ground Lease); Pl.'s SOF ¶¶ 60–62

(stating the Ground Lease did not control).

Pursuant to the provisions of the Ground Lease, the defendant sent a Notice of Election to

Terminate the Ground Lease on June 14, 2013, after expiration of the cure period provided for in

the Ground Lease without the plaintiff having cured.  *See* Def.'s MSJ Ex. 21 (notice of election

to terminate ground lease dated June 14, 2013), ECF No. 23-21; Compl. Ex. E (same); Pl.'s

Suppl. PI Mot. Ex. G (same), ECF No. 21-8; Pl.'s Mot. Leave to File Ex. E (same), ECF No. 21-

7; Pl.'s Opp'n Ex. I (same), ECF No. 31-10.  On June 17, 2013, pursuant to the Development

Agreement, which provides for its immediate termination if the plaintiff lost its lease on the

property, *see* Development Agreement, Art. V. § 5.4, the defendant sent a notice of termination

of the Development Agreement and Supplemental Development Agreement via first class and

certified mail.  *See* Def.'s MSJ Ex. 22 (notice of termination of development agreement and

supplemental development agreement dated June 17, 2013), ECF No. 23-22; Compl. Ex. F

(same); Pl.'s Suppl. PI Mot. Ex. H (same), ECF No. 12-9; Pl.'s Mot. for Leave to File Ex. F

(same), ECF No. 21-8; Pl.'s Opp'n Ex. J (same), ECF No. 31-11.

On June 19, 2013, after receiving the notices of termination of the Development

Agreement and Ground Lease, the plaintiff "delivered the sum of $1,475,000 to Closeline

Settlements" to be placed in escrow.  Pl.'s SOF ¶ 68; *see* Def.'s MSJ Ex. 23 (letter from

Closeline Settlements to plaintiff dated June 19, 2013), ECF No. 23-23.  The escrow agreement

unilaterally established by the plaintiff with Closeline Settlements does not provide for any

mechanism whereby the $1,475,000 payment can be released to the defendant, but it does

provide for the funds to be released to the plaintiff on the plaintiff's instruction.  *See* Siegel Aff.

Ex. 5 (letter from plaintiff to Closeline Settlements) at 2, ECF No. 32-6.

### G.     The Instant Litigation

On July 15, 2013, almost one month after the plaintiff received the defendant's notice of termination of the Development Agreement, the plaintiff filed suit in this Court seeking a Temporary Restraining Order ("TRO"), as well as declaratory and injunctive relief.  *See* Compl.; Pl.'s Mot. Temp. Restraining Order ("Pl.'s TRO Mot."), ECF No. 5.  The plaintiff alleged that it would suffer irreparable harm unless, *inter alia*, the defendant were ordered to reinstate the Ground Lease and Development Agreement, the plaintiff were allowed to schedule meetings with the District of Columbia Historic Preservation Review Board, and the defendant were barred from publicly disclosing the circumstances of the agreements' termination.  *See* Pl.'s TRO Mot. at 1–3.

After a prompt hearing on July 16, 2013, this Court denied the TRO, finding that any harm suffered by the plaintiff in the absence of such relief was merely economic and there was a "serious question" about whether the plaintiff would be able to succeed on the merits of its claims.  *See* Pl.'s Suppl. PI Mot. Ex. I (Transcript of TRO Hearing) at 35:5–22, ECF No. 12-10; Pl.'s Opp'n Ex. A (same) at 35:5–22, ECF No. 31-1; Pl.'s Reply Def.'s Opp'n Pl.'s Suppl. PI Mot. Ex. A (same), ECF No. 22-1; Order, ECF No. 7.  The parties subsequently agreed upon an extended schedule for the plaintiff's submission of a Supplemental Preliminary Injunction and related briefing.  *See* Minute Order dated July 30, 2013 (establishing schedule for supplemental filings and briefing).  The defendant timely answered the plaintiff's Complaint, counterclaimed against the plaintiff, and filed its Third Party Complaint against the TPD.  *See* Answer, ECF No. 14; Counterclaim, ECF No. 15; Third Party Complaint, ECF No. 17.

Upon review of the plaintiff's Supplemental Preliminary Injunction, the Court ordered the parties to show cause why the preliminary injunction motions "should not be consolidated with a trial on the merits," pursuant to Federal Rule of Civil Procedure 65(a)(2), "in order to

conserve judicial resources and efficiently resolve this matter."  Minute Order to Show Cause

dated September 20, 2013.  Prior to the deadline for responding to the Court's Order to Show

Cause, the defendant filed the instant Motion for Summary Judgment.  *See* Def.'s MSJ.  In the

interest of efficiency, and after considering the responses of the parties, the Court finds it

appropriate to resolve the Motion for Preliminary Injunction, Supplemental Motion for

Preliminary Injunction, Amended Motion for Leave to File, and Motion for Summary Judgment

in this Memorandum Opinion.[8]

## II.     LEGAL STANDARD

Granting a motion for summary judgment is appropriate if the movant carries the burden

of showing "that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law," based upon the pleadings, depositions, and affidavits, and other

factual materials in the record.  FED. R. CIV. P. 56(a), (c); *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C.

Cir. 2011); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  The Court is only required to

consider the materials explicitly cited by the parties, but may, on its own accord, consider "other

materials in the record."  FED. R. CIV. P. 56(c)(3).

When, at the summary judgment stage, the parties present a genuine dispute about the

facts, the Court must draw all justifiable inferences in favor of the nonmoving party and accept

the nonmoving party's evidence as true.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Scott

v. Harris*, 550 U.S. 372, 380 (2007); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);

*Evans v. Sebelius*, 716 F.3d 617, 619 (D.C. Cir. 2013).  For a factual dispute to be "genuine," the

nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence" in

support of its position, *Anderson*, 477 U.S. at 252, "must do more than simply show that there is

---

[8] In consideration of the oral argument already heard at the TRO hearing on July 16, 2013, and the thorough briefing provided by both parties, the Court exercises its discretion under Local Civil Rule 65.1(d) to "decide[] the motion on the papers" and deny the defendant's Motion for a Hearing.

some metaphysical doubt as to the material facts," *Scott*, 550 U.S. at 380, and cannot rely on "mere allegations" or conclusory statements, *see Estate of Parsons v. Palestinian Authority*, 651 F.3d 118, 123 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). Notably, "[s]elf-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007).

Rather, the nonmoving party must present specific facts "'such that a reasonable jury could return a verdict for the nonmoving party.'" *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013) (quoting *Anderson*, 477 U.S. at 248); s*ee also* FED. R. CIV. P. 56(c)(1). If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 6 (D.C. Cir. 2010). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In that situation, summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## III. DISCUSSION

As the plaintiff stated in its memorandum supporting its TRO Motion, "this case is essentially about which notice and opportunity to cure period applies, ten (10) days under the [Ground] Lease, or twenty 20 [sic] days under the [Development] Agreement." Pl.'s Mem. Supp. Pl.'s TRO Mot. at 10, n.7, ECF No. 5-2. There is no dispute that, as of June 3, 2013, the plaintiff was in default to the defendant for failure to make a $1,475,000 rent payment. *See* SOF ¶ 65 ("Due to [the plaintiff] and [TPD's] failure to cure [their] default . . ."); Pl.'s SOF ¶ 65 (noting the plaintiff "cured and accordingly, [the TPD] is not liable to [the defendant]," implicitly conceding that a default had occurred). Consequently, as the defendant points out, this is "a rather simple case of failure to pay rent and repercussions flowing therefrom." Def.'s Reply Mem. Supp. MSJ ("Def.'s Reply") at 7, ECF No. 35. Since it is clear that a default occurred, the critical issue to be decided is under which agreement the missed payment was due and, consequently, what cure period applied.

### A. The Ground Lease Governed Payments Of Rent

Under District of Columbia law,[9] "[l]eases of real property are to be construed as contracts." *Capital City Mortg. Corp. v. Habana Village Art & Folklore, Inc.*, 747 A.2d 564, 567 (D.C. 2000). In interpreting contracts, the District of Columbia follows the "objective law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and

---

[9] The Ground Lease provides that it "shall be governed by and construed in accordance with the laws of the District of Columbia, without reference to principles of conflicts of law." Ground Lease, Art. 27 § 27.6.

definite undertaking, or unless there is fraud, duress, or mutual mistake." *Abdelrhman v. Ackerman*, 76 A.3d 883, 888 (D.C. 2013) (internal quotation marks and citations omitted; brackets in the original). Thus, the Court must look to the language of the agreements at issue, namely, the Ground Lease, the Development Agreement, and the Development Amendment.

The payment at issue is the $1,475,000 rent payment due under Section 2.1(b) of the Ground Lease, which states that "[the plaintiff] shall pay to [the defendant] (b) [u]pon the Closing Date,[10] the sum of One Million Four Hundred Seventy-Five Thousand and 00/100 dollars ($1,475,000)." The plaintiff argues that "the [Development] Amendment, and not the Ground Lease, governs all obligations and rights attendant to the" second rent payment. Pl.'s Opp'n at 16–17. The plaintiff is incorrect.

The Development Amendment does, as the plaintiff points out, "mandate[] in detail the treatment of the [Rent] Payment and provides that it is to be made, not to [the defendant], but to an escrow agent." *Id.* at 16. Yet, this is the only change to the rent payment effected by the Development Amendment. Paragraph Six of the Development Amendment explains the way in which environmental remediation costs will be paid and provides that the "second payment of Rent under Section 2(a)(ii) [sic] of the [Ground] Lease (being the sum of $1,475,000.00)" shall be deposited into "the Escrow Account," which must be "reasonably acceptable to the [defendant] and [the plaintiff.]" Development Amendment ¶ 6(c)(i). The remainder of Paragraph Six details when and how the funds may be released from the escrow account to the defendant. *See id.* at ¶¶ 6(c)(ii–v).

---

[10] As noted in Part I.A.1, *supra*, the Closing Date is elsewhere identified in the Ground Lease as being "the earlier to occur of (i) the date on which [the plaintiff] shall make settlement upon a construction loan for the funding of the costs of constructing the Mandatory Project Improvements (as defined in the Development Agreement) to the extent such costs are not funded from [the plaintiff's] own resources or other equity sources or (ii) March 15, 2011." Ground Lease at 2, ¶ e.

The next paragraph in the Development Amendment, Paragraph 7, states clearly and unambiguously that "the obligations of, and requirements imposed upon, [the plaintiff] . . . under the Ground Lease and the Development Agreement . . . as contained in the Ground Lease and in the Development Agreement, are incorporated herein as though fully set forth herein" and are unchanged "except as otherwise expressly provided herein[.]" *Id.* ¶ 7. The plaintiff acknowledges this language, but makes two logical leaps too far based on it.

First, the plaintiff argues that "[t]he Payment obligation is 'expressly provided' in the [Development] Amendment, and it is an obligation of [the plaintiff] to make the Payment," implying that the Development Amendment has somehow supplanted the Ground Lease regarding this rent payment. *See* Pl.'s Opp'n at 17. The plaintiff reads too much into Paragraph Six. Paragraph Six, when read in conjunction with Paragraph Seven, merely provides direction about payment into a mutually agreed upon escrow account of the rent payment due under Section 2.1(b) of the Ground Lease. *See* Development Amendment ¶¶ 6–7. It does not otherwise change "the obligations of, and requirements imposed upon" the plaintiff under the Ground Lease. *See id.* ¶ 7. Thus, the only change "expressly provided in the Amendment" is the manner in which the rent shall be paid under the Ground Lease. Nothing is said or implied in the Development Amendment that refers to the cure period, the date on which the rent payment was due and obligated to be paid, or any other aspect of the rent payment.

The clear language in the Development Amendment limiting the change in the Ground Lease to the placement of the subject second rent payment into a mutually agreeable escrow account is important and casts doubt on the plaintiff's second logical leap. The plaintiff asserts that "the Ground Lease obligation regarding the Payment was merged into and supplanted by the [Development] Amendment. Therefore, the [Development] Amendment controls the Payment.

Since the [Development] Amendment controls the payment, it follows that the Development Agreement, which was amended by the [Development] Amendment, controls the cure period." Pl.'s Opp'n at 17. The interpretive conclusion urged by the plaintiff is belied by the plain language of the Ground Lease and the Development Amendment. Paragraph Seven does not cause the Development Amendment to "supplant" the Ground Lease. Rather, Paragraph Seven *reaffirms* the Ground Lease "except as otherwise expressly provided herein," meaning that the only change to the Ground Lease made by the Development Amendment was the establishment of the escrow agreement, not a change in the cure period or any other "obligation of, and requirement imposed upon" the plaintiff.

No reasonable reading of Paragraph Seven supports the strained construction urged by the plaintiff that the entire Ground Lease was somehow subsumed by the eight pages of the Development Amendment. Indeed, if that were the case, there could never be a default triggered by the non-payment of rent because the Development Amendment does not specifically state when the rent payment is due, nor does it provide any cure period. *See* Development Amendment, *generally*. Not even the plaintiff disputes whether a cure period is applicable, but only whether the ten day cure period under the Ground Lease or the twenty day cure period under the Development Agreement is applicable. In short, the Ground Lease governs the payment and default provisions of all rent due under the Ground Lease, with the Development Amendment merely adding the requirement to make the payment into a mutually agreed upon escrow account.[11]

---

[11] The parties dispute whether the Escrow Termination ended the obligation to deposit the rent payment at issue into escrow or pay it directly to the defendant. *See* Pl.'s Opp'n at 19–20; Def.'s Reply at 10–11. This dispute is immaterial to resolve the instant motions, however, since the plaintiff tendered no payment of rent and made no attempt to cure within the ten day period provided under the Ground Lease, which is the operative language providing the applicable cure period. *See* SOF ¶ 63; Pl.'s SOF ¶¶ 61–63. Thus, the plaintiff's further argument that a belated payment was made to an escrow agent is unavailing.

**B.    The Plaintiff Failed To Cure Its Default**

Since the Ground Lease is the operative document for the rent payment, Section 16.2 of the Ground Lease is the applicable default provision.  That section reads in relevant part: "Should [the plaintiff] at any time be in default with respect to any rental payments . . . and should such default continue for a period of ten (10) days after written notice from [the defendant] to [the plaintiff] . . . then [the defendant] may treat the occurrence of any one or more of the foregoing events as a breach of this [Ground] Lease . . . [and] it shall be, at the option of [the defendant], without further notice or demand of any kind to [the plaintiff] or any other person . . . (a) the right of the [defendant] to terminate this [Ground] Lease and to declare the [Ground] Lease term ended[.]"  Ground Lease, Art 16 § 16.2.

As discussed in Part I.D, *supra*, the deadline for the second rental payment required under Section 2.1(b) of the Ground Lease was no later than May 30, 2013, given the multiple extensions granted by the defendant.  *See* SOF ¶ 58; Pl.'s SOF ¶ 58 (disputing to whom the payment was due and the governing document, but not disputing the date on which the payment was due).  The plaintiff concedes that it failed to tender the requisite rent payment at the time the defendant issued the June 3, 2013 default notice.  *See* SOF ¶ 58; Pl.'s SOF ¶ 58.

Under the applicable default provision in the Ground Lease, the defendant was required to provide the plaintiff with "a written notice . . . specifying IN BOLD FACE CONSPICUOUS TYPE, that [the defendant] intends to terminate the [Ground] Lease if the Event of Default is not cured within ten (10) days."  Ground Lease, Art. 16 § 16.2 (emphasis in original).  The defendant provided such a notice on June 3, 2013, requiring the plaintiff to cure by June 13, 2013.  *See* Def.'s MSJ Ex. 20 at 1.  There is no dispute that the plaintiff did not tender any payment by June 13, 2013.  *See* SOF ¶ 63; Pl.'s SOF ¶ 63 (disputing that the ten day cure period applied, but not disputing that payment was not tendered within ten days).  On June 14, 2013, pursuant to the

Ground Lease, the defendant terminated the Ground Lease and sent a notice of termination to the plaintiff.  *See* Def.'s MSJ Ex. 21 at 1.

The Development Agreement, as amended by the Development Amendment, states that "[i]n the event the Ground Lease shall be terminated for any reason prior to the Project Improvements Substantial Completion Date . . . the [defendant] (unless an [sic] default shall have occurred under a Ground Lease on the part of the [defendant] which has not been cured within any applicable cure period) . . . shall have the right, at its sole option, to terminate this [Development] Agreement by written notice to the other Party."  Development Agreement, Art. V § 5.4.  Pursuant to this section, the defendant sent the plaintiff a notice of termination of the Development Agreement on June 17, 2013.  Def.'s MSJ Ex. 22 at 1.  This Notice terminated the Development Agreement immediately, since Section 5.4 of the Development Agreement does not provide for a cure period when the basis for termination is the loss of the Ground Lease.  Development Agreement, Art. V § 5.4.  Therefore, as of June 17, 2013, the contractual relationship between the parties under both the Ground Lease and the Development Agreement was over.

C.      **The Plaintiff's Arguments Regarding Notice And Cure Are Predicated On The Wrong Contractual Document**

The plaintiff argues that the defendant's termination of the agreements was improper for a variety of reasons, all of which are based on the erroneous contention that the Development Amendment, not the Ground Lease, is the governing document.  Specifically, the plaintiff alleges that "the Ground Lease does not govern [the plaintiff's] obligation to make the $1,475,000 payment.  Thus, [the defendant's] reliance on and reference to the Ground Lease at Section 2.1(b) in the Default Notice was improper" and invalidates the termination.  *See* Pl.'s Opp'n at

21. As explained in Part III.B, *supra*, the Ground Lease *did* govern the plaintiff's obligation.

Thus, the plaintiff's arguments are built on the wrong foundation and therefore fail.

First, as to the default notice under the Ground Lease sent by the defendant on June 3, 2013 and the termination of the Ground Lease sent on June 14, 2013, the plaintiff disputes its obligation to cure the default by June 13, 2013, arguing that "the Ground Lease does not govern [the plaintiff's] obligation to make the $1,475,000 Payment." Pl.'s Opp'n at 21. As discussed in Part III.B, *supra*, this contention is incorrect. The plaintiff does not dispute that the default notice under the Ground Lease was governed by the default provisions set forth in Section 16.2 of the Ground Lease, and was issued following the procedures in Article 22 of the Ground Lease. *See* Ground Lease Art. 16 § 16.2; Art. 22. [12] Under those provisions, the defendant's default notice and termination of the Ground Lease, both of which were sent via certified mail, were proper. *See id.*[13]

As to the termination of the Development Agreement sent on June 17, 2013, the plaintiff's argument involves two interrelated provisions of the Development Agreement, Section 5.1(g) and Section 5.2(b). *See* Pl.'s Opp'n at 22. Section 5.1(g) states that if the plaintiff "fails to pay when due to the [defendant] any amount payable by [the plaintiff] hereunder within twenty (20) days after receipt of written notice of such failure[,]" the non-payment constitutes a "Developer Event of Default." Development Agreement, Art. V § 5.1(g). Section 5.2(b) further

---

[12] The plaintiff, in a two sentence paragraph citing to no authority, also argues that because the Development Amendment mandated a payment to an escrow account and the default notice under the Ground Lease demanded payment to the defendant, the notice of termination of the Ground Lease was "independently improper." Pl.'s Opp'n at 21. The Ground Lease does not specify any language to be contained in the default notice, however. Instead, it merely states that the defendant was to specify that it intended to terminate the Ground Lease within ten days if the default was not cured. *See* Ground Lease, Art. 16 § 16.2. Thus, the plaintiff's effort to find a technical deficiency in the default notice under the Ground Lease is baseless.

[13] All of the cases the plaintiff relies upon in support of its contention that the default notice was invalid are based upon the use of an "incorrect cure date and the proper period to cure [having] not expired prior to termination of a lease." Pl.'s Opp'n 23 (citing *Grimes v. Newsome*, 780 A.2d 1119 (D.C. 2001); *Cromier v. McRae*, 609 A.2d 676 (D.C. 1992); *ATM One, LLC v. Landaverde*, 736 N.Y.S.2d 833 (2001); and *Lewis v. Clothes Shack Inc.*, 322 N.Y.S.2d 738, 739–40 (1971)). Since the proper cure period had expired at the time of the termination of the Ground Lease in this case, all of these cases are inapposite.

explains that, if a Developer Event of Default occurs, except in circumstances not at issue here, the defendant was entitled to "terminate this [Development] Agreement and to terminate the Ground Lease." *Id.*, Art. V. § 5.2(b). In order to effect that termination, the defendant had to provide a second written notice, in addition to that provided under Section 5.1, "specifying, **IN BOLD FACE CONSPICUOUS TYPE**, that this [Development] Agreement will terminate automatically and without necessity of any further action by any Party if the Developer Event of Default is not cured within twenty (20) days." *Id.* (emphasis in original). The plaintiff argues that the Development Agreement cure period laid out in Section 5.2(b) applied to the June 17, 2013 termination of the Development Agreement and operated to give the plaintiff an additional 20 day cure period. *See* Pl.'s Opp'n at 22. This contention is incorrect.

Section 5.2(b) only applied in the event of a default under the Development Agreement specified in Section 5.1. *See* Development Agreement, Art. V. § 5.2(b). The plaintiff appears to be arguing that its failure to make the second rent payment was a Developer Event of Default under section 5.1(g), which governed "fail[ure] to pay when due to the [defendant] any amount payable by [the plaintiff] hereunder[.]" *Id.*, Art V. § 5.1(g). The second rent payment was not an "amount payable . . . []under" the Development Agreement; rather, this rent payment was due under the Ground Lease. *See* Part III.A, *supra*. Consequently, neither Section 5.1(g) nor Section 5.2(b) applies because the default that led to the termination of the Development Agreement was the loss of the Ground Lease, which is controlled by Section 5.4 of the Development Agreement and provides no cure period. *See* Development Agreement, Art. V. § 5.4.

The plaintiff further contends that the notice of termination of the Development Agreement sent on June 17, 2013 was improper because it was not sent in accordance with the notice provision of the Development Agreement. Specifically, the plaintiff points to Section 7.6,

which requires that the notice be "sent by a reputable, national overnight delivery service, charges prepaid." *See* Pl.'s Opp'n at 22. The plaintiff argues that the termination of the Development Agreement was sent by certified mail and was therefore invalid.[14] *See id.* At the outset, there is no dispute that the plaintiff received the Development Agreement termination notice. *See* Pl.'s Opp'n at 22; Compl. Ex. F (notice of termination of Development Agreement); Pl.'s Suppl. PI Mot. Ex. H (same); Pl.'s Mot. for Leave to File Ex. F (same); Pl.'s Opp'n Ex. J (same); *see also* SOF ¶ 61 (noting the defendant sent notice to the plaintiff "by email, first class mail and certified e-mail, return receipt requested."). As established *supra*, the Ground Lease was properly terminated under the applicable provisions.[15] Thus, once the Ground Lease was terminated, "all of the rights of [the plaintiff] in or to the Premises" were also terminated. Ground Lease, Art. 16 § 16.2. Thus, even if the plaintiff were correct about a technical error in the service of the June 17, 2013 Development Agreement termination notice, any such error is ultimately irrelevant to the resolution of the instant motion. Any rights the plaintiff had under the Development Agreement that were independent of the Ground Lease would appear to be moot, since the plaintiff had, on June 14, 2013, lost all rights "in or to the Premises" on which the Development Agreement was to be executed, and could not perform under the Development Agreement. *See id.*

Finally, the plaintiff argues any default was cured by the plaintiff depositing the $1,475,000 second rent payment in an escrow account unilaterally established by the plaintiff without the involvement of the defendant within the twenty day cure period provided for under

---

[14] The document appears, on its face, to have been sent by first-class, certified mail. *See* Def.'s MSJ Ex. 22 at 1.

[15] The plaintiff's contends, however, that it did not receive the Ground Lease default notice, dated June 3, 2013, via mail until June 13, 2013, *see* Pl.'s Opp'n at 22; Pl.'s Suppl. PI Mot. Ex. F (plaintiff's mail registry), ECF No. 12-7; Pl.'s Opp'n Ex. H (same), ECF No. 31-9. The Ground Lease provided that such service was "deemed complete on the day of actual delivery . . . or at the expiration of the second day after the date of mailing, whichever is earlier in time." Ground Lease, Art. 22. Therefore, the notice was deemed to have been delivered no later than the evening of June 4, 2013, per the parties' agreement.

the Development Agreement.  Pl.'s Opp'n at 24–26.  This argument fails for two reasons.  First, the proper cure period was ten days under the governing document, the Ground Lease, and that cure period had expired before the plaintiff even attempted to cure.  *See* Part III.B, *supra*. Second, even if the twenty day cure period were proper, the plaintiff did not make the rent payment to an escrow account that complied with the terms of the Development Amendment and was "reasonably acceptable to the" defendant, *see* Development Amendment ¶ 6(c)(i), since the escrow account into which the plaintiff deposited the money did not include the defendant as a party and provided no mechanism by which the defendant could receive funds deposited in the account.  *See* Siegel Aff. Ex. 5, *generally*.

Moreover, the escrow account that the two parties had established to receive the rent payments under the Development Amendment was terminated by mutual consent in 2012.  *See* Escrow Termination, *generally*.  This termination renders suspect the plaintiff's argument that it was still required to deposit the $1,475,000 rent payment into escrow, since the parties had specifically contemplated that, prior to the termination of the escrow account, the $1,475,000 payment would be made into the RTI escrow account.  *See* Escrow Agreement ¶¶ C–D.  If the plaintiff had intended to cure the default by reviving and complying with the terminated Escrow Agreement, the plaintiff failed to do so by retaining a new escrow company with no connections to the defendant and no mechanism in the escrow agreement to disburse the funds to the defendant.  In any event, there is no dispute that this attempted "cure" did not occur within the requisite cure period and was, therefore, untimely under the Ground Lease.

### D.  Forfeiture Is An Appropriate Remedy

The plaintiff devotes a substantial portion of its briefing in support of its preliminary injunction application and in opposition to the defendant's motion for summary judgment to the argument that forfeiture of rights in a lease for violation of that lease is "disfavored" and should

not be enforced.  *See* Pl.'s Opp'n at 27–36; Pl.'s Mem. Supp. Mot. TRO/PI ("Pl.'s PI Mem.") at

22–26, ECF No . 6-1; Pl.'s Mem. Supp. Pl.'s Suppl. PI Mot. ("Pl.'s Suppl. PI Mem.") at 39–43,

ECF No. 12-1.  In short, the plaintiff argues that it should not lose its rights under the Ground

Lease merely because it failed to make a single rent payment.  The cases relied upon by the

plaintiff as support for this argument, however, are either distinguishable or favor forfeiture in

this case.

In its preliminary injunction briefing and again in its opposition, the plaintiff relies

heavily on the "seminal decision" of *Entrepreneur, Ltd. v. Yasuna*, 498 A.2d 1151, 1155 (D.C.

1985).  Pl.'s PI Mem. at 23; Pl.'s Suppl. PI Mem. at 39; Pl.'s Opp'n at 29.  In *Yasuna*, a private

homeowner sought to enforce the forfeiture provision of a lease against a small business to

which the homeowner was renting a townhouse.  *Yasuna*, 498 A.2d at 1155–57.  In that case,

during the lease term, the landlord ran into financial difficulties and wanted to obtain more rent

from the tenant.  *Id.* at 1156.  When the tenant refused to renegotiate the amount of the rental

payment due under the lease, the landlord sold the townhouse, in violation of a covenant in the

lease providing the tenant with a right of first refusal to purchase the building, and the

subsequent owner sought to use a long-known non-conforming use of the property by the tenant

as grounds for holding the tenant in default under the lease.  *See id.* at 1156–57.  The D.C. Court

of Appeals overturned the jury verdict for the new landlord, noting that its opinion was limited to

"the circumstances of this case."  *Id.* at 1155.

The *Yasuna* court held that a "lease continues to be valid as against a lessee in breach of a

lease covenant until such time as the landlord manifests some intent to take action based on the

lease violation."  *Id.* at 1160.  The court further required that a lease may be forfeited only when

"the right of forfeiture . . . [is] clearly defined" in the lease, "the party entitled to do so must

exercise[s] his right promptly[,] and the result of enforcing the forfeiture [is] not be unconscionable." *Id.* Of particular relevance to the *Yasuna* decision was the fact that the second landlord in that case was aware of the non-conforming use on which he tried to base the termination of the lease for several years before providing the first notice to the tenant about the violation of a lease covenant. *See id.* at 1161 ("When the lessee demonstrates, however, that the landlord long had knowledge of the breach yet provided no notice of it to the tenant, the landlord is considered to have 'encouraged the default,' and therefore 'should not be allowed to take advantage of it.'" (quoting *Cleveland v. Salwen*, 141 A. 155, 156 (Pa. 1928)).

The instant matter is readily distinguishable from *Yasuna*. Here, the defendant notified the plaintiff on multiple occasions of the breach: it issued three prior default notices, SOF ¶¶ 36–39; it notified the plaintiff on February 1, 2013, that failure to obtain financing by May 30, 2013 would result in the parties "part[ing] company," Def.'s MSJ Ex. 15 at 1; it reminded the plaintiff, on April 9 and 16, 2013, that it considered the failure to make the second rental payment a default, Def.'s MSJ Ex. 18 at 2 ("As I stated in my email to [the plaintiff] on April 9, the [defendant] views your upcoming payment as a commitment to continue with the redevelopment of the property and more importantly as a cure for the fact that a default condition currently exists with respect to the project."); and it provided the notice contemplated by the parties in the Ground Lease immediately after the plaintiff missed the final extended deadline for the payment, some twenty-six months after the payment was originally due, *see* Def.'s MSJ Exs. 20–22. In addition, the plaintiff was plainly aware of the possible consequences of failing to tender the rent payment, as reflected by the plaintiff's statement to the defendant in an email, dated April 1, 2013, that "[i]f we do not make payment on May 30 because we do not know whether we will

even have a viable project on that date due to the historic preservation issues, [the defendant] is free to pursue any and all legal remedies for non-payment." Def.'s MSJ Ex. 16 at 1.

The parties in the instant matter, unlike the parties in *Yasuna*, were sophisticated business concerns that discussed the default for more than a year before the final default notices were issued. Even if the plaintiff could somehow claim the defendant did not provide adequate notice of the default condition prior to June 3, 2013, under *Yasuna*, the defendant did all that was required to invoke the forfeiture provision of the lease. The *Yasuna* court held that "[o]nce the landlord has, by his conduct, in effect acquiesced in the breach of the lease covenant, he may stand on his legal right to enforce the covenant only if he gives notice of his intent to the tenant and an opportunity to cure the default prior to declaring a forfeiture." *Yasuna*, 498 A.2d at 1162. This course of action was precisely followed in this case when the defendant provided the June 3, 2013 notice of default and intent to terminate and waited the requisite ten days before terminating the lease.

The plaintiff argues that the defendant's actions in enforcing the default provisions of the Ground Lease for failure to pay rent were "pretext" under *Yasuna* and therefore "forfeiture [should] not be enforced." Pl.'s Opp'n at 29 (citing *Yasuna*, 498 A.2d at 1160 for the proposition that when "the real purpose of the lessor in maintaining that his tenant had breached a lease covenant was to oust the tenant in order to get a better price for the property," equity may not favor the landlord). This argument is unsupported by the record. The plaintiff's failure to make the $1,475,000 second rent payment had been a sticking point between the parties for many months, as shown by the repeated extensions of the deadline for payment, *see* SOF ¶¶ 28; 31; 41; 44, the repeated statements that the defendant considered the plaintiff in breach as a result of its failure to pay rent, and the defendant's demand for payment by a date certain, *see*

Def.'s MSJ Ex. 15 at 2; *id.* Ex. 18 at 2. The plaintiff's effort to draw a corollary between the instant case, where the defendant repeatedly expressed dissatisfaction with the plaintiff's delay in making the second rent payment at issue, and the facts in *Yasuna*, where the landlord cited a long-sanctioned non-conforming use to terminate a lease abruptly, strains logic beyond the breaking point.

The plaintiff further relies on the principle articulated in *Yasuna* that it is "inequitable for [a] landlord to enforce a forfeiture" in the face of an acquiescence to the breach of a lease covenant, to argue that the defendant's behavior here was inequitable. *See, e.g.*, Reply to Def.'s Opp'n to Pl.'s Supl. PI Mot. at 19, ECF No. 22 (arguing defendant's conduct in not signing the Second Amendment to the Development Agreement rendered the defendant ineligible for equitable relief); Pl.'s Opp'n at 29–30 (implying defendant's termination based on non-payment of rent was pretext to allow defendant to obtain a better price from another developer). This attempt fails. Each party has accused the other of inequitable conduct regarding the plaintiff's failure to pay rent. *See id.*; Def.'s Mem. at 25 ("The [plaintiff] seeks an equitable remedy – relief from forfeiture, but is not entitled to equity having deliberately failed to pay its rent in an effort to extort more concessions from the [defendant]."). Even if the mention in *Yasuna* of equitable considerations weighing against forfeiture when a "landlord has long tolerated his tenant's conduct without protest" would require this Court to engage in an equitable balancing analysis, the *Yasuna* court noted that equity is preserved where the landlord gives the tenant "reasonable warning . . . to conform to the terms of the lease." *Yasuna*, 498 A.2d at 1162. In light of the defendant's repeated demands for payment, the fact that the defendant also granted repeated extensions of the deadline for the second rent payment does not excuse the plaintiff's consistent

failure to pay rent due. In short, the Court finds that any equitable balance necessary to resolve this matter tips in favor of the defendant.

In *Shapiro v. Tauber*, 575 A.2d 297, 300 (D.C. 1990), another case on which the plaintiff relies, the D.C. Court of Appeals discussed *Yasuna* and reiterated that forfeitures "will not be enforced unless there are circumstances which make them reasonably proper for the protection of rights which would be otherwise impaired." *Shapiro*, 575 A.2d at 300 (internal quotation marks omitted). Among the circumstances to be considered are whether "the event triggering the right to forfeiture was 'clearly defined' in the agreement, whether the tenant acted in good faith despite the breach, whether there existed alternative and less drastic means to make the landlord whole, and ultimately whether enforcing the forfeiture would be unconscionable." *Id.* (internal citations and quotation marks omitted). In the instant matter, the circumstances favor forfeiture: the default provision was "clearly defined" in the agreement, *see* Ground Lease Art. 16 § 16.2; the plaintiff indicated that it would not pay rent undisputedly owed and invited the defendant to "pursue any and all legal remedies for non-payment," Def.'s MSJ Ex. 16 at 1; there is no alternative to timely tendering the rent owed, as the payment was due as early as March 15, 2011;[16] and the Court finds nothing unconscionable in holding two commercially sophisticated parties to the meaning of their agreement.

Nor does *Trans-Lux Radio City Corporation v. Service Parking Corporation*, 54 A.2d 144, 146 (D.C. 1947), on which the plaintiff also relies, counsel any differently. In that case, the D.C. Court of Appeals found that "a court of law or equity may relieve a tenant from forfeiture of his lease for nonpayment of rent by permitting him before or after judgment, so long as he is

---

[16] In *Shapiro*, the alleged breach of the lease was the cementing over of windows by the tenant in violation of a covenant in the lease. *See Shapiro*, 575 A.2d at 298. The court found that the tenants could be required to restore the premises to their original condition to bring it back into compliance with the lease as an alternative remedy to forfeiture, a situation that is plainly inapplicable here. *See id.* at 300.

in possession, i.e., before 'execution is executed,' to pay the rent due, with interest and costs. . . .

[but] relief from forfeiture ought not and will not be given a tenant whose default in payment of

rent is willful, calculated, and persistent." *Id.* The plaintiff's reliance on this case is misplaced.

In *Trans-Lux* the tenant in default stated "it was ready and willing to pay such rent as was

ultimately determined by the court to be proper." *Id.* The dispute in *Trans-Lux* was the amount

of rent due, not what cure period applied after the tenant willfully declined to pay rent

undisputedly due. *Id.* In the instant case, all parties acknowledge that the $1,475,000 payment

was due no later than May 30, 2013, and the plaintiff, while aware of this due date, willfully

declined to tender payment on that date, consistent with its previous non-performance of

payment on March 15, 2011 and December 8, 2011.[17] *See* SOF ¶¶ 28, 31.

The plaintiff's failure to pay rent in the instant action was "willful, calculated, and

persistent" in that the plaintiff did not pay rent owed on repeated occasions and it was only after

receiving notices of default and termination that the plaintiff made any attempt to cure the

default, and even then, the effort made was not performed in a manner contemplated by the

governing documents. *See* Part I.F., *supra.* It is well settled in this jurisdiction that where a

contract "is clear and unambiguous, its plain language is relied upon in determining the parties'

intention." *GLM P'ship v. Hartford Cas. Ins. Co.*, 753 A.2d 995, 998 (D.C. 2000). Here, the

parties plainly contracted for a ten day cure period for any default on payment of rent, where

failure to cure could result in the unilateral termination of the Ground Lease and trigger

termination of the Development Agreement as well. *See* Part III.A–B, *supra.* Thus, there is

---

[17] The plaintiff's reliance on *Burrows Motor Company, Inc. v. Davis*, 76 A.2d 163, 165 (D.C. 1950), is similarly misplaced. In that case, the primary issue between the parties and considered by the court was whether the parties had agreed to an assignment. *Id.* at 164. The late payment of one month's rent, which is pointed to by the plaintiff here, was merely an ancillary issue to which the court devoted three sentences of analysis. *See id.* at 165. In any event, the late payment in that case was not willful, as is the case here. *See id.*

nothing inequitable about holding these two sophisticated parties to their bargain and enforcing the terms of their agreement.[18]  The plaintiff's arguments to the contrary are unavailing.

### E.    The Defendant's Counterclaim and Third Party Complaint

In its Counterclaim and Third Party Complaint, the defendant seeks the $1,475,000 rent payment due under the Ground Lease prior to its termination, in addition to attorneys' fees and costs, from the plaintiff and TPD.  *See* Counterclaim at 9–10; Third Party Complaint at 8–10. The defendant's claim is predicated on Section 16.4 of the Ground Lease, which states in relevant part that "[s]hould [the defendant] elect to terminate this [Ground] Lease . . . [the defendant] may recover from [the plaintiff] as damages: (a) the worth at the time of award of any unpaid rent . . . that had been earned and is outstanding at the time of such termination; plus . . . (c) the reasonable amount of any costs or expenses incurred by [the defendant] in enforcing its rights under this [Ground] Lease after such default."  Ground Lease, Art. 16 § 16.4.

The sole argument the plaintiff and TPD raise against the defendant's claim is that "the terminations of the Ground Lease and Development Agreement were baseless, improper, premature and invalid[,]" and that the $1,475,000 rent payment was not "rent due in accordance with the Ground Lease."  Pl.'s Opp'n at 37.  Contrary to the factual predicate for this argument,

---

[18] The plaintiff argues unpersuasively that it should be entitled to some sort of relief as a result of the defendant's alleged breach of a confidentiality provision in the Development Agreement.  *See* Compl. ¶¶ 43–44 and Compl. Ex. G (news articles discussing termination of project); Pl.'s Mot. Leave to File Ex. G (same), ECF No. 21-9.  The plaintiff contends that the defendant's confirmation to news reporters that the parties' agreements had been terminated ten days earlier was a violation of the Development Agreement's requirement that "each Party shall maintain as confidential and shall not publicly disclose the terms of this Agreement without the advance written consent of the other Party" and "[a]ny press release or other public statement that either party proposes to issue shall be subject to the prior review and approval by each Party, such approval not to be unreasonably withheld."  Development Agreement, Art. VII § 7.15.  None of the newspaper articles and blog postings submitted by the plaintiff pre-date the termination of the Development Agreement, *see* Compl. Ex. G; Pl.'s Mot. Leave to File Ex. G. Article Seven of the Development Agreement does not contain a survival clause, thus rendering the confidentiality terms of Section 7.15 inapplicable when the statements were allegedly made.  *See* Development Agreement, Art. VII.  Moreover, the defendant's mere statement, repeated in each article, that the defendant "took this action because [the plaintiff] failed to meet certain benchmarks under the ground lease and development agreements," *e.g.*, Compl. Ex. G at 47, cannot be reasonably construed as "publicly disclos[ing] the terms of this [Development] Agreement," *see* Development Agreement, Art. VII § 7.15.  Finally, the plaintiff has offered no reason why the defendant's post-termination statements entitles the plaintiff to any relief since the Development Agreement does not provide any remedy to either party for violating Section 7.15.

the terminations were proper and valid, *see* Parts III.A–C, *supra*, and the $1,475,000 rent payment was due under the Ground Lease, *see* Part III.A, *supra*. Thus, the plaintiff's argument is not persuasive. Accordingly the Court enters summary judgment for the defendant.[19]

## IV. CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment on the plaintiff's Complaint, the defendant's Counterclaim, and the Third Party Complaint, ECF No. 23, is granted. The plaintiff's Motion and Supplemental Motion for Preliminary Injunction, ECF Nos. 6 and 12, are denied as moot. The plaintiff's Motion for Leave to File an Amended Complaint, ECF No. 21, is denied as futile and the defendant's Motion for Hearing, ECF No. 36, is denied. The defendant is granted leave "to submit additional papers evidencing the damages, including reasonable attorneys' fees," Def.'s Mem. at 27, to which it is entitled under Sections 16.4 and 27.10 of the Ground Lease, and the parties are directed to submit jointly a proposed schedule to address those damages by January 2, 2014.

An appropriate Order accompanies this Memorandum Opinion.

Date: December 19, 2013

_____
BERYL A. HOWELL
United States District Judge

---

[19] The plaintiff's Amended Motion for Leave to File an Amended Complaint is futile since the additions in the proposed Amended Complaint "stem from the transaction which is the subject of the original complaint, and are proposed to clarify the relief requested." Pl.'s Mot. Leave to File ¶ 4, ECF No. 21. As the Court finds that the termination of the Ground Lease and Development Agreement was proper and the relief requested in the proposed amended complaint is based on these terminations, *see* Prop. Am. Compl., ECF No. 21-2, *generally*, the plaintiff's Amended Motion for Leave to File an Amended Complaint is denied.