**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOWARD TOWN CENTER DEVELOPER, LLC, | |
| Plaintiff-Counter Defendant, | Civil Action No. 13-1075 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| HOWARD UNIVERSITY, | |
| Defendant-Counter Plaintiff-Third Party Plaintiff | |
| v. | |
| CASTLEROCK PARTNERS, LLC, | |
| Third Party Defendant. | |

## MEMORANDUM OPINION

This case returns to the Court for reconsideration of the appropriateness of summary judgment in favor of either the defendant/counter-plaintiff Howard University ("the University"), which owns property that it seeks to develop, or the plaintiff/counter-defendant Howard Town Center, LLC, ("the Developer") and the third-party defendant Castlerock Partners, LLC, another developer. The D.C. Circuit concluded that a "term sheet" (the "Term Sheet") —which the Developer previously urged this Court to disregard but, in an about-face, characterized on appeal as controlling the outcome of the present dispute—might affect the parties' respective claims in this case and, for this reason, vacated the entry of summary judgment in favor of the University and remanded the case for consideration of the significance of the Term Sheet. The parties have now filed cross-motions for summary judgment. *See* Mot. Def. Howard Univ. Summ. J. Am. Compl., Counterclaim, & Third-Party Compl. ("Def.'s Mot."), ECF No. 86; Plaintiff & Third-

Party Def.'s Mot. Summ. J. ("Pl.'s Mot."), ECF No. 87.  In those motions, the University seeks a rental payment originally due in 2011 from the Developer, which for the past eight years has been unsuccessful in developing the property, while the Developer seeks yet more time to fulfill its contractual obligations with respect to the property.  For the reasons set forth below, the motions are denied.

## I.    BACKGROUND

The factual and procedural history underlying the present dispute is fully set out in this Court's prior Memorandum Opinion granting summary judgment in favor of the University, *see Howard Town Ctr. Developer, LLC v. Howard Univ.*, 7 F. Supp. 3d 64, 66–76 (D.D.C. 2013), as well as in the D.C. Circuit's decision vacating that judgment and remanding the case, *see Howard Town Ctr. Developer, LLC v. Howard Univ.*, 788 F.3d 321, 323–25 (D.C. Cir. 2015), and, consequently, will be summarized only briefly.

The parties' now contentious relationship began over eight years ago, in December 2008, when the University executed a development agreement with the third-party defendant to develop for mixed use a parcel of land in Washington, D.C. that the University agreed to lease for this purpose.  Def.'s Statement Undisputed Material Facts Supp. Mot. Summ. J. ("Def.'s SMF") ¶¶ 1–2, ECF No. 86.[1]  In January 2010, the University and the third-party defendant executed a ground lease for the parcel, along with a second development agreement, both of which agreements the third-party defendant assigned on the same day to the Developer, a newly created entity in which the third-party defendant and its principal hold interests.  *Id.* ¶¶ 4, 7, 9, 11.[2]  The ground lease provided for payments to the University on the following schedule:

---

[1]     Unless otherwise stated, all facts taken from the SMFs submitted by the parties are undisputed.
[2]     The third-party defendant's "responsibilities as an assignor are identical to [the Developer's]," Pl.'s Mem. P. & A. Supp. Pl. & Third-Party Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 18 n.2 ECF No. 87, and the third-party

$525,000 on January 22, 2010; $1,475,000 no later than March 15, 2011; and monthly installments of rent thereafter.  *Id.* ¶ 8.  The development agreement provided that construction would begin on the parcel no later than March 15, 2011, with substantial completion by March 15, 2013.  *Id.* ¶ 10.[3]  The agreements also provided for their termination upon the occurrence of certain events to be considered defaults, with provisions requiring notice and an opportunity to cure be given to the defaulting party.

In accordance with these agreements, the Developer made the first rental payment of $525,000 into an escrow account.  *Id.* ¶ 23.  Yet, March 15, 2011, the key date for payment of the second rental payment, came and went with the Developer neither paying the University the $1,475,000 required under the lease agreement, nor beginning construction on the project as provided in the development agreement.  *Id.* ¶ 29.  According to the Developer, this failure is attributable to a myriad of factors relevant to an analysis of its contractual obligations under the agreements existing at that time, including "the financial crisis," that made securing financing difficult.  Pl. & Third-Party Def.'s Statement Material Facts Not Gen. Disp. ("Pl.'s SMF") ¶ 52, ECF. No. 87.  As it became clear that construction would not commence as agreed in the lease and development agreements, the parties began to discuss alternative timelines and alterations to the building project, which discussions continued after March 15, 2011, and included the University's proposal of December 8, 2011, as an amended deadline for commencement of construction and payment of the second installment of rent.  Def.'s SMF ¶ 32.  The Developer

---

defendant has not been released from its obligations to the University, Def.'s SMF ¶ 13.  For this reason, the third-party defendant will not be referenced separately when discussing the actions of the parties in this matter.

[3]          On the same day of execution of the ground lease and development agreements, the parties executed amendments to both agreements that, in pertinent part, addressed "the allocation of the cost [of] certain environmental remediation of the property on which the development was to be built," Def.'s SMF ¶ 16, and required the Developer to deposit into an escrow account the first and second rent payments of $525,000 and $1,475,000, respectively, due under the ground lease agreement, *id.* ¶ 17, thereby, in the University's view, confirming "the obligation to pay rent under the Ground Lease [and] the timing of the rent payments under the Ground Lease (which remained in full force and effect)," *id.* ¶ 18.

never formally accepted in writing the University's offer of an amended schedule, failed to comply with this offered extended schedule, and did not respond to the University's August 30, 2011, demand for assurances of the Developer's ability and willingness "to fulfill its contractual commitments to the University." *Id.* ¶¶ 34–37.  Consequently, on September 26, 2011, the University sent the Developer a notice of default under the lease and development agreements, citing eight distinct defaults, including the Developer's failure to make progress on improvements to the property, as well as its failure to give the University requested assurances as to its ability to make a rental payment on December 8, 2011.  Def.'s SMF ¶ 39; Pl.'s SMF ¶ 65.

Following the notice of default, the Developer failed to cure any of the cited defaults or to make the second rental payment of $1,475,000, which was originally due by March 15, 2011, by the University's proposed extended date of December 8, 2011, or to commence construction on the project.  Def.'s SMF ¶ 40.  Four months after issuance of the first default notice, the University sent the Developer, on February 3, 2012 a second notice of default and notice of intent to terminate both the lease and development agreements, citing the Developer's failure to make the requisite payment by December 8, 2011.  *Id.* ¶ 45.

By the time of the second default notice, the parties had begun to discuss a way to resolve the Developer's enumerated defaults.  These discussions resulted in execution, on February 14, 2012, *id.* ¶ 48, of a "Pre-Negotiation Agreement" to govern "discussions relating to the obligations the Developer owes to the University pursuant to the Ground Lease and Development Agreement dated January 22, 2010," Def.'s Mot., Ex. 24 ("Pre-Negotiation Agreement") at 1, ECF No. 86-24. The Pre-Negotiation Agreement provided, *inter alia*, that the content of the discussions would remain private; any additional binding agreements must be reduced to writing; and the negotiations could be terminated at any time.  Pre-Negotiation

Agreement at 1–2.  Notwithstanding the agreement to negotiate, on March 5, 2012, the University sent the Developer a third notice of default and notice of intent to terminate both the lease and development agreements due to the Developer's continuing failure to make the second rental payment of $1,475,000, which was now almost one year overdue.  Def.'s SMF ¶ 50.

In the course of the parties' negotiations under the Pre-Negotiation Agreement, on April 6, 2012, the parties executed the Term Sheet, drafted and forwarded to the University by the Developer.  Id. ¶ 51–52.[4]  The Term Sheet provides that the notices of default sent in February and March 2012 "are hereby withdrawn" but "[t]he timetable for cure of the monetary default is defined herein."  Def.'s Mot., Ex. 26 ("Term Sheet") at 1, ECF No. 86-26.  Specifically, the "timetable" provided in the Term Sheet for "RENT, SCHEDULE, AND OTHER ITEMS," required (1) execution of the Term Sheet itself by April 6, 2012; (2) execution of an amendment to the escrow agreement such that the $525,000 in escrow would be released to the University upon execution of the Term Sheet; (3) execution of amendments to the lease and development agreements by April 30, 2012; (4) commencement of construction by April 15, 2013, with certain phasing of the project permitted; (5) automatic termination of the lease if the "Developer fails to break ground by September 15, 2013," at which point "both parties agree that all actions, by either party, prior to the execution of the Ground Lease Amendment shall not be grounds for litigation"; and (6) "[p]ayment of past due ground rent in the amount of $1,475,000," with

---

[4]   While the University vehemently argues that the Term Sheet and all discussions subject to the Pre-Negotiation Agreement must remain confidential under the Pre-Negotiation Agreement and Rule 408 of the Federal Rules of Evidence, see Def.'s Mem. Opp'n Mot. Pl. & Third-Party Def. Summ. J. ("Def.'s Opp'n"). at 1–4, ECF No. 89, the University itself relies on such evidence in support of its counterclaim, see e.g., Def.'s Mot., Ex. 48, ECF No. 86-48 (reflecting email exchange, marked "CONFIDENTIAL," related to negotiation of amendments to the lease and development agreements).  The University's own use of this evidence amounts to a waiver of any protection from the Pre-Negotiation Agreement and, in any event, Rule 408 does not prohibit the use of "compromise evidence [when] offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim," i.e., to prove a party's bad faith or intent with respect to the agreement.  FED. R. EVID. 408 committee's notes to 2006 amendment.

$100,000 to be paid "no later than ten (10) days after execution of th[e] Term Sheet" and "the balance of $1,375,000" to be paid "no later than ninety (90) days after the execution" of the amendments to the lease and development agreements. *Id.*

Only the first two requirements of the Term Sheet—execution of the Term Sheet itself and dissolution of the escrow agreement releasing the $525,000 to the University—occurred. Specifically, following the execution of the Term Sheet, the parties executed an amendment terminating the separate escrow agreement between the parties, thereby releasing the funds in that account to the University. Pl.'s SMF ¶ 101; Def.'s SMF ¶ 64. Notwithstanding the Developer's payment requirements in the Term Sheet, the Developer made no further payments to the University, including no payment of the $100,000 due within ten days of execution of the Term Sheet. Def.'s SMF ¶ 64.

Moreover, despite the Term Sheet's requirement that amendments to the lease and development agreements be concluded on a short time-table, by April 30, 2012, *i.e.*, within the same month as execution of the Term Sheet, *see* Term Sheet at 2, negotiations regarding these amendments continued over the next nine months. The parties circulated numerous draft documents, emails, and other communications, yet executed no amendments to either the lease or development agreements. *See* Def.'s SMF ¶¶ 60–76; Pl.'s SMF ¶¶ 97–125. Finally, on February 1, 2013, the University sent the Developer an email stating that "Howard University will take no further action in support of the current developer . . . [unless, *inter alia*,] [t]he developer has obtained sufficient financing from a reliable source [and] [a] rental payment of $1.4 million has been made to Howard University by May 30, 2013," Def.'s Mot., Ex. 41 at 2, ECF No. 86-41, which is the date the Developer had promised would be "the outside date to 'true up' on the

initial ground lease payment of $1.425 [sic] million," Def.'s SMF ¶ 72 (quoting Ex. 38, Jan. 1, 2013, email from Eric Siegel, Developer's representative).

On February 7, 2013, the D.C. Preservation League notified the University of pending applications to designate as historic two buildings on the property, with the result that they could not be razed, and the University, in turn, immediately notified the Developer.  *See* Pl.'s Mot, Ex. 71 at 2, ECF No. 87-74.  After a further round of communications regarding the amendments to the lease and development agreements, on April 15, 2013, the Developer sent a letter to the University explaining that "the $1,475,000 ground lease payment to be tendered on or before May 30, 2013 is now a potential issue because we do not know what we are building as a result of [the pending historic applications]."  Def.'s Mot., Ex. 53, ECF No. 86-53.  Then, on May 23, 2013, the Developer sent the University a letter stating that "until the[] historic issues are resolved, we do not intend to make any further monetary payments to Howard University."  *Id.*, Ex. 55 at 1, ECF No. 86-65.  By this point, the only monetary payment made to the University by the Developer or the third-party defendant over the prior five years since the execution of the initial development agreement was the first rent payment of $525,000 released from the escrow account in May 2012.  *See* Pl. & Third-Party Def.'s Resp. Def.'s SMF ("Pl.'s Resp. Def.'s SMF") ¶ 120, ECF No. 90 (stating the Developer "has paid [the University] the only ground rent payment due to date, which was $525,000").

Consistent with its unilateral notice of intent not to make the second rental payment, the Developer failed to make a rental payment on May 30, 2013, prompting the University to send the Developer a fourth notice of default and notice of intent to terminate on June 3, 2013.  *See* Def.'s SMF ¶¶ 101–02.  On June 14, 2013, the University sent the Developer a notice of election to terminate the ground lease and, three days later, the University terminated the development

agreement.  *See id.* ¶¶ 108–09.  Even after the University's transmittal of the fourth default

notice, intent to terminate, and notice of termination of the lease and development agreements,

the Developer sent the University, on June 22, 2013, a further round of draft amendments to the

lease and development agreements, as well as an email assuring the University that the

Developer had ready the $1,475,000 necessary to make the rental payment and attaching, as

proof, a receipt from the Developer's agent, Closeline Settlements, indicating Closeline's receipt

of the Developer's check for $1,475,000 and the deposit of those funds into an interest bearing

account in the Developer's name.  *See* Pl.'s Mot., Exs. 88–90, ECF Nos. 87-91–93.[5]

On July 15, 2013, the Developer instituted the instant lawsuit along with a motion for a

preliminary injunction, contending that the University improperly terminated the lease and

development agreements and requesting reinstatement of those agreements.  *See* Pl.'s Mem.

Supp. Mot. TRO and/or Prelim. Inj., ECF No. 6-1.  In support of its motion, the Developer

argued that the University's "terminations of the [l]ease and [a]greements were improper"

because the Developer "cured any alleged default within the applicable cure period," citing the

Developer's check held by Closeline for $1,475,000.  *Id.* at 18.  With the consent of the

University, the Developer requested an extended briefing schedule on its motion, which this

Court granted.  *See* Min. Order, dated July 30, 2013.  The University then filed a counterclaim

seeking $1,475,000 for the second rental payment, originally due under the lease agreement by

March 15, 2011, and moved for summary judgment on October 15, 2013, which motion this

Court granted on December 19, 2013, while denying the Developer's motion for injunctive

relief.  *See* Order, ECF No. 38.

---

[5]     While the Developer has referred to Closeline as its "escrow agent," Pl.'s Resp. Def.'s SMF ¶ 110, ECF No.
90, an agent for Closeline has noted that "[n]ormally an escrow agreement has three parties," including the person
for whom the funds are held in escrow, and expressed skepticism that the account in question, which lacked the
University as a party, was a "true escrow," Def.'s Mot., Ex. 63, ECF No. 86-63.

After the Developer filed an appeal to the D.C. Circuit, the University filed an application, on January 3, 2014, for a writ of attachment for the $1,475,000 held by Closeline, ECF Nos. 46; Def.'s SMF ¶ 115, which writ was issued by the Clerk of this Court on January 6, 2014, ECF No. 48. Before the writ was served on Closeline on January 8, 2014, *see* Aff. of Service of Writ, ECF No. 50, however, at the Developer's direction, Closeline returned the $1,475,000 to the Developer on January 6, 2014, the same date the writ had issued, Def.'s SMF ¶¶ 116–17.[6]

On appeal, the D.C. Circuit vacated the grant of summary judgment to the University and remanded for the Court to determine "whether the Term Sheet is a legally enforceable contract under D.C. law and, if so, how the Term Sheet affects both" the Developer's claim and the University's counterclaim. *Howard Town Ctr. Developer*, 788 F.3d at 329. As noted, the Developer and the University then filed cross-motions for summary judgment, which are now ripe for review.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex*

---

[6]    The University has described its unsuccessful efforts to attach the Developer's funds to pay the judgment award, indicating that, in response to the writ of attachment, Closeline produced a copy of the check, payable to the Developer, that "had been deposited into the Developer's account with Industrial Bank," which bank, in turn, explained, when served with a writ of attachment, that the Developer had transferred those funds to Property Management Account Services, LLC ("PMAS"), "an affiliate of the Developer." Def.'s Mot. Suppl. Rec. App. at 4, ECF No. 64; *see* Pl.'s Resp. Def.'s Mot. Suppl. Rec. App. at 9, ECF No. 65 (acknowledging that check for $1,475,000 to Closeline was "clearly made out by 'Property Mgmt Acct Svcs LLC,' i.e., PMAS, not [Developer]"). PMAS's deponent—also an officer of the Developer—testified that "the funds on deposit with Closeline Settlements were the property of PMAS (not the Developer) and PMAS had never relinquished its ownership of those funds." Def.'s Mot. Suppl. Rec. App. at 4.

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 256 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party" (internal quotation marks omitted)); *see also* Fed. R. Civ. P. 56(c), (e)(2)–(3).  When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, "for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc*., 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed. 2016)); *see also Fox v. Transam Leasing, Inc*., 839 F.3d 1209, 1213 (10th Cir. 2016) ("Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." (internal quotation marks omitted)); *Pac. Indem. Co. v. Deming*, 828 F.3d 19, 23 (1st Cir. 2016) (same).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth*., 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)).  Courts must avoid making "credibility determinations

or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150–51 (2000) (internal quotation

marks omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295–96 (D.C. Cir.

2015).  In addition, for a factual dispute to be "genuine," the nonmoving party must establish

more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty

Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see

Equal Rights Ctr. v. Post Props, Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v.

England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir.

1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e).  If

"opposing parties tell two different stories, one of which is blatantly contradicted by the record,

so that no reasonable jury could believe it, a court should not adopt that version of the facts for

purposes of ruling on a motion for summary judgment."  *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir.

2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is only required to

consider the materials explicitly cited by the parties, but may on its own accord consider "other

materials in the record." FED. R. CIV. P. 56(c)(3).

## III.   DISCUSSION

In their respective motions for summary judgment, the parties dispute the following

issues: (1) the effect of the Term Sheet on the parties' obligations and whether the parties acted

in good faith to fulfill those obligations; (2) whether performance of the $1,475,000 rental

payment was impossible;[7] and (3) whether the University gave the Developer proper notice of

---

[7]      In yet another shifting position, the Developer's primary argument to this Court in its motion for a preliminary injunction was that it cured any breach, which was echoed in its argument to the D.C. Circuit that it made "an effort to cure the alleged breach."  *Howard Town Ctr. Developer*, 788 F.3d at 325; *see* Pl.'s Mem. Supp. Mot. TRO and/or Prelim. Inj. at 18 (asserting the University "terminated [the Developer] prior to the expiration of

any default.  Specifically, the University argues that the Term Sheet was not a binding amendment to the lease and development agreements and, in any event, the University acted in good faith and that the Developer defaulted by not making the $1,475,000 rental payment due under the lease agreement by March 15, 2011.  The Developer, on the other hand, argues that the Term Sheet is a binding amendment to the lease and development agreement and established a deadline for the $1,475,000 rental payment that has not yet occurred, that the University failed to negotiate the amendments to the lease and development agreements in good faith, that performance of the $1,475,000 rental payment was impossible, and, in any event, that the University's termination of the lease was improper.  Based on their respective requested conclusions, the University seeks in this case finality in the termination of its agreements with the Developer and the third-party defendant, along with payment of the second rental installment of $1,475,000, which it originally expected to be paid six years ago on March 15, 2011, while the Developer seeks specific performance by the University of the ground lease and development agreements, which began almost a decade ago, as well as unspecified monetary damages for the period it was denied use of the parcel.  The parties' contrary assertions for which they each seek summary judgment are addressed below.

### A. Whether the Term Sheet is a Legally Enforceable Contract and Its Effect, If Any, on the Parties' Claims

The Developer previously argued to this Court that the Term Sheet is "immaterial," an "agreement to agree and not enforceable," Pl.'s & Third-Party Def.'s Mem. P. & A. Opp'n Def.'s Mot. Summ. J. ("1st Pl.'s Mem.") at 7–8 & n.8, ECF No. 31, but now contends, as it did on appeal, that the Term Sheet is "an enforceable agreement under the law (D.C.)," Pl.'s Mem.

---

the proper cure period and that [the Developer] cured any alleged default").  The Developer has dropped this argument here, contending instead that its failure to cure the default is excused by the doctrine of impossibility.

P. & A. Supp. Pl. & Third-Party Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 22, ECF No. 87.

Specifically, the Developer avers that the Term Sheet "constitutes a modification of the [l]ease"

and "committed the parties to executing Second Amendment documents at future dates and

engaging in review and negotiations of other issues." *Id.* at 22–23. The University, on the other

hand, has consistently argued that the Term Sheet "was merely a framework for continued

negotiations," Def.'s Mem. Supp. Mot. Summ. J. Compl., Counterclaim, & Third-Party Compl.

("Def.'s Mem.") at 15, ECF No. 86, asserting that "it is clear that the Term Sheet was not a

binding amendment" to the prior agreements, *id.* at 14. While the University is correct that the

Term Sheet was not itself a binding *amendment* to the substantive provisions of the existing

agreement, the Developer is correct that, under D.C. law, the Term Sheet is a legally enforceable

contract that bound the parties to engage in good faith negotiations toward such an amendment.

In support of its argument that the Term Sheet is merely a "framework for negotiations,"

the University emphasizes that it "leaves most material terms unresolved," Def.'s Mem. at 13,

but does not contest that the Term Sheet reflects "an intention on the part of parties to be bound,"

*see id.* Nor could the University dispute that intention, given the formal hallmarks of this intent

reflected by the Term Sheet, which accords with the Pre-Negotiation Agreement's requirement

that an agreement reached during negotiations will have effect only if it "is reduced to writing,

signed and delivered by all parties' authorized representatives." Pre-Negotiation Agreement at 2.

Consequently, the relevant question is not whether the Term Sheet is binding, but the nature of

the obligations to which it bound the parties in this matter.

The D.C. Court of Appeals addressed the attributes of such binding preliminary

agreements in *Stanford Hotels Corp. v. Potomac Creek Associates, LLP*, 18 A.3d 725, 736 (D.C.

2011). In that case, the Court of Appeals made clear that at least two types of preliminary

agreements are recognized under District of Columbia law as having binding force: "Type I" agreements, in which all material terms have been agreed upon, and "Type II" agreements, in which some material terms remain to be negotiated, and the parties agree to do so in good faith. *Id*. at 735 (quoting *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)).  The court explained the differences between these two forms of preliminary agreements, noting that Type I agreements are "preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement.  The second stage is not necessary; it is merely considered desirable," while binding "both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities."  *Id.* (quoting *Tribune*, 670 F. Supp. at 498).  By contrast, a Type II preliminary agreement "expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated" and "accept[ing] a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement."  *Id*. (quoting *Tribune*, 670 F. Supp. at 498).[8]

Given the difference in the nature of the binding promises made between these two types of agreements, the consequences that may flow from each are similarly different.  Thus, under a Type I preliminary agreement, "a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the 'preliminary' agreement," while under a Type II agreement, "he may not."  *Id*. (quoting *Tribune*, 670 F. Supp. at 498).  For

---

[8]       Given that Type II preliminary agreements lack all of the material terms and do not guarantee a final contract, such legally binding agreements may be difficult to distinguish from a simple failure to reach a contract at all, with the risk of ending up "trapping parties in surprise contractual obligations that they never intended." *Tribune*, 670 F. Supp. at 497.

the latter type of agreement, a party is limited to demanding "that his counter-party negotiate the open terms in good faith toward a final contract incorporating the agreed terms," and may not "renounc[e] the deal, abandon[] the negotiations, or insist[] on conditions that do not conform to the preliminary agreement," but these obligations do not guarantee the conclusion of any final contract since "good faith differences in the negotiation of the open issues may prevent a reaching of final contract" or the parties may "lose interest as circumstances change and . . . mutually abandon the negotiation." *Id.* at 735–36 (quoting *Tribune*, 670 F. Supp. at 498). Nevertheless, specific performance of the ultimate objective of a Type II agreement may be appropriate where a final agreement "would have been signed . . . but for [a party's] bad faith refusal to do so." *Id.* at 736.

While both the University and the Developer cite *Stanford Hotels*, neither party discusses its distinction between Type I and Type II preliminary agreements. In discussing the nature of the parties' obligations under the Term Sheet, the Developer contends in the same breath that the Term Sheet "committed the parties to executing [amendment] documents at future dates," suggesting a Type I agreement, and "engaging in review and negotiations," suggesting a Type II agreement. Pl.'s Mem. at 23. The Developer's coyness notwithstanding, the relevant case law offers clear instruction on this question. In *Stanford Hotels*, the D.C. Court of Appeals affirmed the trial court's conclusion that a "Preliminary Agreement" providing for the execution of a "Definitive Agreement" within ten days was a Type II agreement obligating the parties to negotiate in good faith. *Stanford Hotels*, 18 A.3d at 729. The D.C. Court of Appeals then remanded the case for the trial court to determine whether specific performance of the Definitive Agreement was an appropriate remedy in view of one party's bad faith, while also making plain

that the parties would not have been bound to execute the Definitive Agreement "if they could [not] come to agreement on its terms" through good faith negotiation.  *See id.* at 736–37.

Similarly, in *United House of Prayer for All People v. Therrien Waddell, Inc.*, the D.C. Court of Appeals found an enforceable Type II agreement where an agreement specified that one of the parties "was to draft a written contract and accompany schedules" and that a certain individual "was to be the project manager," but included a "reservation of the right to negotiate additional unspecified terms."  112 A.3d 330, 341–42 (D.C. 2015).  Finally, in *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015), applying District of Columbia law, the D.C. Circuit identified the "Term Sheet" at issue as "on its face manifestly a Type II agreement" where the document specifically stated it had "binding effect" while also expressing as its primary aim the parties' desire "to negotiate a Definitive Agreement."  *Id.* at 1131.

In this case, examination of the Term Sheet's requirements vis-à-vis the contemplated amendments to the lease and development agreements reveals that it, too, is properly understood as a Type II agreement.  While not clearly stating that the Term Sheet was binding on the parties, this document does indicate that the parties "AGREED AND ACCEPTED" the "terms and conditions" contained therein, Term Sheet at 1 (capitalization in original), and further that its "terms and conditions" are "[s]ubject to the provisions of the Letter Agreement dated February 14, 2012," *i.e.*, the Pre-Negotiation Agreement executed by the parties, *id*.  The Pre-Negotiation Agreement, in turn, expressly states that "this Agreement shall inure to the benefit of, and be binding upon, the parties thereto . . . ."  Pre-Negotiation Agreement at 2.  The Term Sheet outlines a "timetable for cure of [the Developer's] monetary default," including that the parties shall "[e]xecute Ground Lease Amendment and Development Agreement Amendment by Monday, April 30, 2012," Term Sheet at 2, and provides for "review[] and negotiat[ion]" of "[a]

revised rent schedule . . . during discussions relative to the [contemplated amendments]."  Term Sheet at 1–2.  At the same time, neither the Term Sheet nor any other proffered document supplies all the material terms of the contemplated amendments, *see, e.g., id.* at 2 (providing one example of "[a]n acceptable phasing plan" for the project, rather than stipulating such a plan's precise terms).

Indeed, the Developer appears to acknowledge that the Term Sheet has attributes of a Type II, rather than a Type I, preliminary agreement, asserting that "by agreeing to execute documents on a future date, the parties took on a specific, enforceable obligation to engage in good-faith negotiation about any open issues" relating to those documents.  Pl.'s Mem. at 24. Consequently, unlike in the case of a Type I preliminary agreement, which reflects complete agreement between the parties on all material terms, the parties here were not bound to the "ultimate contractual objective" of executing the amendments *per se*, but rather to negotiate in good faith toward that objective.  If negotiating in good faith led to agreement on all material terms, the parties were required to enter into the contemplated contract.  *See Stanford Hotels*, 18 A.3d at 736–37 (concluding specific performance of the contemplated contract was an appropriate remedy where "the parties did, in fact, come to agreement on all . . . terms . . . and [the agreement] would have been signed [absent] bad faith").  Accordingly, the Term Sheet bound the parties to negotiate amendments to the lease and development agreements in good faith, as well as to abide by the substantive provisions of the Term Sheet.

Yet, the conclusion that the Term Sheet bound the parties to negotiate in good faith toward amendments of the lease and development agreements does not enable this Court to enter summary judgment in favor of either party on their requested relief.  With respect to the University's requested relief finding the Developer in default on the $1,475,000 rental payment,

the Developer contends that the Term Sheet set a contingent yet enforceable deadline on the parties that has not occurred, noting that "the Term Sheet was the latest writing signed by both parties to address the payment date, and it provided that payment of the $1,475,000 was to be made 'ninety (90) days after' an event[, *i.e.*, the execution of the amendments to the lease and development agreements,] that had not yet transpired." Pl.'s Mem. at 25. The Developer is incorrect.

Although, as the Developer acknowledges, the event upon which the ninety-day deadline was contingent never came to pass, that is the wrong focus. In essence, the Developer asks the Court to refrain from asking *why* that event never came to pass and instead conclude that its non-occurrence is sufficient to establish as a matter of law that no rental payment has become due as a consequence of the operation of the Term Sheet. Contrary to the Developer's position, the critical question now, in view of the Developer's new arguments as to the Term Sheet it previously urged the Court to ignore, *see* 1st Pl.'s Mem. at 7–8 & n.8, is whether the parties negotiated the open material terms of the amendments contemplated by the Term Sheet in good faith.

The necessity of assessing whether bad faith caused a Type II preliminary agreement to fail is the reason the D.C. Circuit reviewed the conduct found to breach Type II agreements in *Tribune*, *Stanford Hotels*, and *United House of Prayer* before scrutinizing the evidence of bad faith underlying the finding of a breach in in *Banneker Ventures*. For example, the *Banneker Ventures* Court noted that, in *Tribune*, "the court found a breach" after a bench trial of a Type II agreement to negotiate "[w]hen the borrower 'broke off negotiations, declining to negotiate further unless the lender agreed' to a new term not anticipated by the commitment letter." *Banneker Ventures*, 798 F.3d at 1132 (quoting *Tribune*, 670 F. Supp. at 491, 506). Similarly, the

18

Court observed that in *Stanford Hotels,* a breach of Type II agreement was found, after a trial, "[w]hen the purchaser showed itself 'willing to concede' on all of the open issues 'if necessary to close on the sale,' [but] the seller . . . responded by holding out for a more advantageous alternative, stringing the purchaser along, and ultimately abandoning the negotiations." *Id.* (quoting *Stanford Hotels*, 18 A.3d at 731–33 & n.5).  As a final example, the *Banneker Ventures* Court noted that "[i]n *United House of Prayer*, a party violated an enforceable Type II agreement when it 'terminated discussions . . . without offering any explanation of what terms its lawyer purportedly found unacceptable and by declining to negotiate . . . or even to discuss the matter,' even though the counterparty communicated its willingness to discuss any remaining issues or concerns," *id.* (quoting *United House of Prayer,* 112 A.3d at 344), all findings predicated on evidence presented at trial.

Accordingly, the parties' good faith in negotiating must be assessed before a determination whether the Term Sheet was breached and, if a breach occurred, the proper remedy for that breach.  The University may be able to prove that the Developer failed to engage in good faith negotiations of the contemplated amendments to the lease and development agreements by, for example, proposing terms that diverged from those reflected in the Term Sheet and stringing out the negotiations for those amendments long past the contemplated April 30, 2012, deadline for completion, *see* Def.'s Mot, Ex. 29, ECF No. 86-29 (email from the University to the Developer stating the Developer's proposed documents "depart considerably from the Term Sheet"), the consequence of which would be that the Court would then proceed to the appropriate remedy for this bad faith breach by the Developer. [9]  In that case, the University

---

[9]     The Developer's blatant failure to comply with the most simple of the Term Sheet's conditions—payment of $100,000 of the "past due ground rent . . . no later than ten (10) days after the execution of this Term Sheet," Term Sheet at 2—even if not a technical default, also may be used by the University as evidence of bad faith from the outset of the negotiations, a consideration that may have contributed to the Developer's strategy prior to appeal

may be entitled to specific performance of the amendments contemplated by the Term Sheet, *see Stanford Hotels*, 18 A.3d at 736, or, alternatively, recoupment of its investment of "time, money, and effort in negotiating" with the Developer on the amendments, *see id.* at 740, as well as its requested remedy of termination of the lease and development agreements and the $1,475,000 rental payment, due to the Developer's breach of the original agreements, which breach the breached Term Sheet was expressly intended to remedy, *see* Def.'s Mem. at 27–28.  On the other hand, the Developer may be able to prove that the University failed to negotiate the contemplated amendments in good faith, in which case the Developer may be entitled to the specific performance it requests and monetary damages "for the period it was denied use of the [l]and." Pl.'s Mem. at 31.

Finally, neither party may be able to prove bad faith on the part of the other in their course of dealing under the Term Sheet, in which case the Term Sheet's obligation to negotiate in good faith would not have been breached.  *See Stanford Hotels*, 18 A.3d at 736 ("[G]ood faith differences in the negotiation of open issues may prevent a reaching of final contract . . . ." (quoting *Tribune*, 670 F. Supp. at 498)).  In that circumstance, the Term Sheet would remain binding and the focus of the dispute would turn to the effect of its provision terminating the lease agreement and removing "all actions, by either party . . . [as] grounds for litigation," if no construction is begun by September 15, 2013, on the parties' respective requests for relief.[10] This analysis may turn on whether the University's notice of default in June 2013, is effective

---

of eschewing any reliance on the Term Sheet.  In addition, the Developer's explanation that PMAS, and not the Developer, was the owner of the $1,475,000 received by Closeline on June 21, 2013, *see supra* note 6, may be used as evidence that, as the University feared, the Developer lacked sufficient funds itself to comply with its obligation to make the second rental payment and was unable to obtain the requisite financing for the contracted-for improvements to the property.

[10]     Notably, the parties are silent on this Term Sheet provision, which by its terms voids claims between the parties if construction has not commenced by a date now long past, presenting yet another reason the Developer may have previously urged before appeal that this document be disregarded.

and operates to nullify that provision of the Term Sheet, since the notice was issued prior to

September 15, 2013, and, if so, whether the Developer's failure to make the $1,475,000 rental

payment originally due on March 15, 2011, entitles the University to termination of the lease and

development agreements, plus recovery of said rental payment and "the reasonable amount of

any costs or expenses incurred by [the University] in enforcing its rights under this Lease after

such default."  Def.'s Mot., Ex. 4 at 51, ECF No. 86-4.

As the necessity for trials in *Tribune*, *Stanford Hotels*, and *United House of Prayer*

reflects, and as the D.C. Court of Appeals has aptly noted, "[o]rdinarily, a 'claim of bad faith

bargaining presents an issue of mental state somewhat akin to disputes in which intent is at

issue'; and, given the often subjective nature of determining one's mental state, 'summary

judgment should be granted sparingly' on that ground." *William J. Davis, Inc. v. Tuxedo LLC*,

124 A.3d 612, 624–25 (D.C. 2015).  This case presents no exception.  The present record

contains voluminous evidence of the parties' assertions, behavior, and communications

surrounding the negotiations of the amendments contemplated by the Term Sheet.  Assessing

whether this evidence reflects good or bad faith and resolving inconsistent evidence requires

credibility determinations and weighing of the evidence inappropriate at summary judgment.

*See Reeves*, 530 U.S. at 150–51 (explaining that credibility determinations and weighing

evidence "are for the jury, not the court").  Accordingly, a genuine dispute of material fact exists

as to whether one or both parties breached the obligation pursuant to the Term Sheet to negotiate

in good faith.  On this basis alone, the parties' cross-motions for summary judgment must be

denied.  Nevertheless, to focus and simplify the case for trial, the remaining issues disputed by

the parties are addressed.

**B.    Whether Impossibility Excuses the Developer's Failure to Make the $1,475,000 Payment**

The Developer raises as an excuse for its non-payment of the $1,475,000 the defense that "any such payment was . . . impossible to make under the governing documents without further cooperation from [the University]." Pl.'s Mem. at 25–26. According to the Developer, the agreements in effect at the time required the rental payment to be made into an escrow account, but the Term Sheet dissolved the parties' escrow account, and this dissolution, the Developer contends, made it impossible for it to make the requisite payment. *Id.* at 26. The Developer is incorrect.

"The doctrine of impossibility relieves non-performance only in extreme circumstances." *E. Capitol View Cmty. Dev. Corp. v. Robinson*, 941 A.2d 1036, 1040–41 (D.C. 2008). "To maintain [the impossibility] defense, the defaulting party must show that an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of the parties." 102 AM. JUR. PROOF OF FACTS 3d § 6 (2016). In this case, the non-existence of an escrow account was hardly "unanticipated." To the contrary, the parties not only anticipated but brought about the termination of the escrow account. As required by the Term Sheet, the Developer and the University executed a "Termination of Escrow Agreement," effective May, 10, 2012. Def.'s Mot., Ex. 31, ECF No. 86-31.

Nor did the lack of an escrow account make payment of the $1,475,000 directly to the University as landlord "vitally different" from what the parties should reasonably have expected. While the Developer asserts that payment into an escrow account was required under the governing agreements, the Termination of Escrow Agreement specifically references the escrow requirement before announcing that "Landlord and Tenant have agreed to terminate the Escrow

22

Agreement and to direct Escrow Agent to release the Remaining Deposit to Landlord." *Id.* In this way, the Termination of Escrow Agreement effectively amended the existing agreements to remove the requirement that rental payments be made into an escrow account. Moreover, as the Developer itself acknowledges, the parties expressly discussed that all rental payments going forward would be made directly to the University, rather than into an escrow account. *See* Pl.'s SMF ¶ 141. Consequently, the Developer could have made the rental payment directly to the University without rendering performance "vitally different" from what the parties reasonably should have expected. Indeed, such a payment would have reflected the parties' understanding of the payment obligation at the time.[11] Accordingly, the Developer's impossibility defense fails as a matter of law.

### C.     Whether the University Gave Proper Notice of Termination

As a third ground upon which summary judgment should be granted in its favor, the Developer asserts that "for reasons knowable only by [the University] and its counsel," the University "failed to comply with the notice provision applicable to the termination of the [lease]: the [lease] requires two notices, each with an opportunity to cure, before [the University] can terminate the [l]ease" but the University "only sent one notice in this case," on June 3, 2013. Pl.'s Mem. at 29–30. In support of this assertion, the Developer contends that the D.C. Circuit already decided in the Developer's favor the question whether the University failed to give proper notice of the termination of the lease in its notice of default and notice of intent to terminate sent on June 3, 2013. *See id.* Specifically, the Developer notes the D.C. Circuit's statement that the University "did not follow" a "two-step process" required under the applicable

---

[11]     The Term Sheet's provision for termination of the escrow account, reflecting a clear indication that future payments should be made to the University directly, may be yet another consideration that informed the Developer's strategy prior to appeal of eschewing any reliance on the Term Sheet in order to bolster its then-position that placing the second rental payment with Closeline cured its default.

agreements "when it purported to terminate the [lease] in June 2013." *Id.* at 30 (quoting *Howard Town Ctr. Developer*, 788 F.3d at 328–29).

The University, for its part, argues that the D.C. Circuit's conclusions about the notice requirements under the applicable agreements are "not consistent with the overwhelming proof that the Developer not only recognized the existence of the default, but also that the University substantially complied with the notice requirements" and thus should not be the "law of the case." Def.'s Mem. Opp'n Mot. Pl. & Third-Party Def. Summ. J. ("Def.'s Opp'n") at 9, ECF No. 89. In any event, the University contends that "[t]he law requires only that the University's notice be sufficient to inform the interested parties of its intent to terminate," which the University's notice did with respect to the $1,475,000 rental payment. *Id.* While the University's invitation to reject the D.C. Circuit's interpretation of the applicable notice requirement is declined, the Developer's position is untenable.

In its opinion in this matter, the D.C. Circuit decided only that the University did not properly terminate the lease if the basis for that termination were a breach of the Developer's obligation under the Term Sheet *to pay $100,000* within ten days of that document's execution. In the portion of the opinion relied upon by the Developer, the D.C. Circuit was evaluating the University's argument that its summary judgment could be affirmed on the alternative ground of the Developer's failure to pay $100,000 within ten days of the execution of the Term Sheet, as required by the Term Sheet. *See Howard Town Ctr. Developer*, 788 F.3d at 328–29. Rejecting the University's argument, the Circuit noted that "[t]he notice issued by the University on June 3, 2013 . . . does not mention the obligation to pay $100,000 within ten days after the parties executed the Term Sheet" and, in any event, "even if [the June 3, 2013, notice] is construed as a notice that the Developer was in default of the lease as a result of its failure to pay $100,000"

pursuant to the Term Sheet, "the University did not properly terminate the [lease]" on that ground. *Id.* at 328.  The D.C. Circuit simply had no occasion to address the very different question whether the University provided adequate notice of the Developer's default of not making the $1,475,000 rental payment, originally due on March 15, 2011, for which the University provided the Developer multiple notices of default, and which default the Term Sheet was intended to "cure."  Term Sheet at 1.

Under District of Columbia law, "courts have shown some willingness to excuse purely technical deficiencies in notice." *Sun Secured Financing LLC v. ARCS Commercial Mortg. Co.*, 730 F. Supp. 2d 132, 138 (D.D.C. 2010) (citing *Mason v. Curro*, 41 A.2d 164, 165 (D.C. 1945)). Moreover, a contract's notice requirements may "merely impose[] a duty," as opposed to a "condition precedent" to termination, such that an "alleged failure to comply at most entitles the plaintiffs to recover damages." *Id.* at 139.  "[T]he question of whether a provision in a contract constitutes a condition precedent is one of construction dependent on the intent of the parties as revealed by the contract itself and, if necessary, by extrinsic evidence." *Id.* (quoting *Wash. Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 550 (D.C. 2000)).  The evidence proffered thus far in this case reflects that the Developer received multiple notices of default over the course of the parties' business relationship, and, moreover, expressed awareness to the University that it was in default warranting termination after the receipt of the June 3, 2013 notice.  *See* Def.'s SMF ¶ 106 ("I do not think that being in capital 'D' default is a position where we can stay . . . ." (quoting Ex. 58,  June 7, 2013, email from Tim Kissler, a principal of the Developer, to Eric Siegel)).  Should a jury determine that the University was under no continuing obligation to negotiate pursuant to the Term Sheet as of June 3, 2013, on the evidence presented, it could also determine that, with respect to the $1,475,000 rental payment, the notice provided was sufficient.

Consequently, a genuine dispute of material fact exists as to the whether the University provided proper notice to the Developer prior to terminating the lease in June 2013.

## IV.     CONCLUSION

For the foregoing reasons, the parties' motions for summary judgment are denied. Genuine disputes of material fact exist as to the parties' good faith in engaging in negotiations pursuant to the Term Sheet and the sufficiency of the notice of termination provided by the University to the Developer.  The parties shall jointly submit by February 14, 2017, three proposed dates for trial in this case in May or June 2017, along with their estimate of the length of the trial.

An appropriate Order accompanies this Memorandum Opinion.

Date:  January 31, 2017

_____
BERYL A. HOWELL
Chief Judge