# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HOWARD TOWN CENTER
DEVELOPER, LLC,

        Plaintiff-Counter Defendant,

        v.

HOWARD UNIVERSITY,

        Defendant-Counter Plaintiff-
        Third Party Plaintiff

        v.

CASTLEROCK PARTNERS, LLC,

        Third Party Defendant.

Civil Action No. 13-1075 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION SETTING FORTH
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The plaintiff Howard Town Center Developer, LLC, (the "Developer") instituted this lawsuit against the defendant, Howard University (the "University"), over four years ago, on July 15, 2013. The parties' dispute, over which this Court possesses diversity jurisdiction, centers on a parcel of land (the "Property") located in the Shaw neighborhood of Washington, D.C., that was leased by the University to the Developer in January 2010, based on the Developer's contractual obligation to construct improvements at a cost of over $140,000,000. Instead, the Property has remained dormant for nearly eight years. Pending before the Court are the Developer's claim that the University breached its contract with the Developer and the University's claims that the Developer and the third-party defendant, CastleRock Partners, LLC, are in breach of contract. *See* Pl.'s Amended Complaint, ECF No. 72; Def.'s Counterclaim and

Third-Party Complaint, ECF No. 15.[1]  During an eight-day-long bench trial, the Court heard evidence on the parties' claims and counterclaims.  For the reasons set forth below, the Court concludes that the University has sustained its burden of proof on its breach of contract claims, that judgment must be entered for the University, and that forfeiture is an appropriate remedy.

## I.    PROCEDURAL BACKGROUND

The parties' allegations, as well as significant issues raised and either resolved or deferred in pre-trial motions, are summarized below.

### A.    THE PARTIES' CLAIMS

The Developer's operative complaint in this action, Pl.'s Amended Complaint, asserts two counts, amounting to a single claim for relief.  Count I claims breach of contract because the Developer "has performed its duties and responsibilities under the agreements," while the University "has breached the terms of the Ground Lease and the Development Agreement by issuing an improper notice of termination and purporting to terminate the Ground Lease" and "has breached the terms of the Term Sheet by refusing to negotiate in good faith over the Second Amendments to the Ground Lease and Development Agreement."  Pl.'s Amended Complaint ¶¶ 88–91.  In Count II, the Developer seeks declaratory relief, declaring that the Developer "was not and is not in default under the Ground Lease and the Development Agreement," "that no Event of Default occurred," "that [the University's] purported termination . . . of June 17, 2013, is null and void," "that delays that result from the historic designation process constitutes an Unavoidable Delay under the Lease," and "that the construction deadlines contemplated by the parties will be shifted by at least the amount of time these proceedings are pending."  *Id.* ¶¶ 95–

---

[1]    The third-party defendant, CastleRock Partners, LLC, assigned its rights and obligations under the operative agreements to the Developer, as explained below, but has not been released from its obligations to the University.  *See* Def.'s Counterclaim and Third-Party Complaint ¶¶ 16–17.  Consequently, the third-party defendant generally will not be referenced separately when discussing the actions of the parties in this matter.

100. The Developer seeks relief in the form of specific performance of the Term Sheet and "damages, including the lost value of the Lease during the period during which [the University's] actions interfered with [the Developer's] rights," or, alternatively, "damages for the period of the 99-year Ground Lease remaining at the time of breach"; declaratory relief; payment of "all of [the Developer's] costs and expenses, including attorney's fees"; and pre- and post-judgment interest. *Id.* at 100.

The University's operative counterclaim and third-party complaint in this action alleges one claim of breach of contract each against Howard Town Center Developer, LLC, and the third-party defendant, CastleRock Partners, LLC. As support, the University asserts that the Developer "breached the Ground Lease by failing to pay rent as and when due" and requests judgment in its favor "in the amount of $1,475,000, together with additional interest, attorneys' fees and costs recoverable under the applicable contracts." Def.'s Counterclaim and Third-Party Complaint ¶¶ 44, 47, 51, 54.

## B.     LITIGATION HISTORY

This case's extensive litigation history includes two memorandum opinions by this Court, as well as a decision of the D.C. Circuit. Upon instituting this action on July 15, 2013, the Developer filed a motion for a temporary restraining order, which motion was denied. *See* Pl.'s Mot. Temp. Restraining Order, ECF No. 5; Order, dated July 16, 2013, ECF No. 7. The Developer also requested a preliminary injunction. *See* Pl.'s Mem. Supp. Mot. TRO and/or Prelim. Inj., ECF No. 6-1. With the consent of the University, the Developer requested an extended briefing schedule on its injunction motion, which request this Court granted. *See* Min. Order, dated July 30, 2013. The University then filed a counterclaim seeking $1,475,000 for the second rental payment, originally due under the lease agreement by March 15, 2011, and moved

for summary judgment on October 15, 2013, which motion this Court granted on December 19, 2013, while denying the Developer's motion for injunctive relief. *See* Order, ECF No. 38. Relevant here, the Court's decision was based in part on (1) the parties' representations that a Term Sheet executed by the parties was "immaterial," an "agreement to agree and not enforceable," Pl.'s & Third-Party Def.'s Mem. P. & A. Opp'n Def.'s Mot. Summ. J. at 7–8 & n.8, ECF No. 31; *see Howard Town Ctr. Developer, LLC v. Howard Univ. (HTC I)*, 7 F. Supp. 3d 64, 72–73 (D.D.C. 2013); (2) the conclusion that the parties had agreed that the overdue rental payment was to be made by May 30, 2013, or the parties' relationship would terminate, *see HTC I*, 7 F. Supp. 3d at 73–74; and (3) a determination that the University properly terminated the parties' agreements and the Developer's deposit of $1,475,000 on June 19, 2013, in an account held by its third-party agent, Closeline Settlements, did not cure its default, *see id.* at 80–83. The Court also concluded that in addition to the $1,475,000 payment due to the University, forfeiture of the Developer's rights in the lease was an appropriate remedy. *See id.* at 83–87.

On appeal, the D.C. Circuit vacated the grant of summary judgment to the University, concluding "[t]here is a genuine dispute whether the Developer was required to pay the University $1,475,000 by May 30, 2013, and, therefore, whether the University was entitled to terminate the Ground Lease and to collect $1,475,000 in damages," and remanded for the Court to determine "whether the Term Sheet is a legally enforceable contract under D.C. law and, if so, how the Term Sheet affects both the Developer's claim . . . and the University's counterclaim." *Howard Town Ctr. Developer, LLC v. Howard Univ. (HTC II)*, 788 F.3d 321, 329–30 (D.C. Cir. 2015). The Circuit declined to address three other arguments raised by the Developer: (1) whether "it was impossible to make the $1,475,000 rental payment in accordance with the terms of the Ground Lease because the parties had terminated the escrow account designated to receive

the payment"; (2) whether "the Developer cured the alleged breach by depositing $1,475,000 into an escrow account on June 19, 2013"; and (3) whether "the district court erred by allowing the University to terminate the lease in addition to requiring the Developer to pay rent." *Id.*

On remand, the parties filed cross-motions for summary judgment, which motions were denied. *See* Order, dated Jan. 31, 2017, ECF No. 93. Concluding the Term Sheet was a binding preliminary agreement, requiring the parties to fulfill the terms contained in the Term Sheet and negotiate toward the amendments to the Ground Lease and Development Agreement in good faith, the motions nevertheless were denied because the parties' good faith in negotiating presented questions of fact as to which there was a genuine dispute. *See Howard Town Ctr. Developer, LLC v. Howard Univ. (HTC III)*, No. 13-1075 (BAH), 2017 WL 421909, at *8–9 (D.D.C. Jan. 31, 2017). The Developer's argument that payment of the $1,475,000 was impossible was also addressed and rejected as a matter of law. *See id.* at *9–10. Finally, while dropping its contention that the deposit of funds with its own third-party agent cured any default, the Developer argued on remand that the University's notices to the defendant were insufficient, relying upon the D.C. Circuit's observation that "the Ground Lease provides the University must send two notices to the Developer before it may terminate the lease." *HTC II*, 788 F.3d at 328. Noting that "the Developer received multiple notices of default over the course of the parties' business relationship," the merits of the Developer's arguments regarding notice were left to be resolved following trial. *HTC III*, 2017 WL 421909, at *11.

## C. BENCH TRIAL

Over the course of the eight-day bench trial, the Developer presented the testimony of eight witnesses: Ronald Cohen, Manager of Howard Town Center Developer, LLC; Dr. Sidney Ribeau, Ph.D., former President of Howard University; Steven Callcott, Deputy Historic

Preservation Office for the District of Columbia; Robert Tarola, former Chief Financial Officer of Howard University; Eric Siegel, Vice Manager of Howard Town Center Developer, LLC; Kurt Schmoke, former General Counsel and Vice President of Governmental Affairs for Howard University; Fabrice Vasques, Managing Director of Phillips Realty Capital; and Dennis Duffy, Certified General Real Estate Appraiser, testifying as an expert on damages. The University also called eight witnesses, including five of the Developer's witnesses: Ronald Cohen, Sidney Ribeau, Eric Siegel, Kurt Schmoke, and Fabrice Vasques. In addition, the University called Norman Jenkins, Trustee of Howard University; Bryan Dickson, Vice President at Citi Community Capital; and Alan Brangman, former Associate Vice President of Facilities and Real Estate and University Architect of Howard University.[2] During the bench trial, the Court received the following 272 exhibits into evidence: Joint Exhibits 1–72; Plaintiff's Exhibits 6, 8, 10, 12–14, 16, 21–22, 27, 33–35, 37, 40, 46–48, 50, 52–56, 58–59, 62, 64, 66, 68–69, 71–73, 75, 78, 80–81, 85–90, 93–94, 96–97, 101–06, 108–09, 111–12, 114, 117, 119, 121–26, 128, 134–35, 137–38, 143, 145–46, 148–51, 153–54, 160–66, 168, 170, 173, 175, 177, 184, 191, 197–98, 202–03, 209, 212, 215–18, 220, 223, 225, 228–30, 232, 234, 236, 256–59, 261, 276–77, and 296–97; and Defendant's Exhibits 1–2, 9–11, 14–15, 17–19, 21, 23, 25–26, 29, 31–32, 34, 36, 42, 44, 49–63, 67–68, 70–71, 74, 80, 87, 93–95, 100, 104, 109–14, 116–18, 124–25, 129–33, 135–36, 140, 142–45, 149–54, and 156.

Following the bench trial, both parties submitted proposed findings of fact and conclusions of law. *See* Pl.'s Prop. Findings Fact Concls. Law, ECF No. 108; Def.'s Prop.

---

[2] The transcript of the bench trial appears on the docket as follows: Day 1 AM, ECF No. 112; Day 1 PM, ECF No. 120; Day 2 AM, ECF No. 113; Day 2 PM, ECF No. 121; Day 3 AM, ECF No. 114; Day 3 PM, ECF No. 122; Day 4 AM, ECF No. 115; Day 4 PM, ECF No. 123; Day 5 AM, ECF No. 116; Day 5 PM, ECF No. 124; Day 6 AM, ECF No. 117; Day 6 PM, ECF No. 125; Day 7 AM, ECF No. 118; Day 8 AM, ECF No. 119. Citations to the transcript indicate, if not otherwise apparent from the context, the name of the witness testifying to the information referenced.

Findings Fact Concls. Law, ECF No. 111. The parties' respective claims became ripe for

consideration on June 30, 2017.[3] The parties' post-trial submissions, along with the testimony

and exhibits at trial, have been duly considered.

## II.    FINDINGS OF FACT

Based upon the testimony presented and exhibits admitted at the trial, the Court makes

the findings of fact set forth below and further states its conclusions of law.  *See* FED. R. CIV. P.

52(a)(1) ("In an action tried on the facts without a jury . . . the court must find the facts specially

and state its conclusions of law separately.  The findings and conclusions may be stated on the

record after the close of the evidence or may appear in an opinion or a memorandum of decision

filed by the court.").

The findings of fact are based on the ample record in this case, which includes nearly

three hundred exhibits and thousands of pages of trial testimony.  "Factfinding is the basic

---

[3]    After postponing a total of three scheduled trial days at the request of the Developer and the Developer's counsel so that they could attend the graduations of family members, one of which days was objected to by the University's counsel on the ground that the long-scheduled trial could proceed without the Developer's representative present, *see* Pl.'s Mot. One-Day Continuance May 22, 2017 Trial Date, ECF No. 100, and postponing the parties' deadlines for submission of their Findings of Fact and Conclusions of Law by four days, also at the Developer's request, the Developer and its counsel objected to the University's counsel's two requests for extensions for filing post-trial briefing as a result of emergency eye surgery that precluded counsel from working during the period of his recovery.  Def.'s Mot. Extension Time, ECF No. 106; Pl.'s Resp. Position Statement, ECF No. 107; Def.'s Mot. Extension Time, ECF No. 109; Pl.'s Resp., ECF No. 110.  The University first requested an extension of one week for the Developer, to June 21, 2017, and two weeks for the University, to July 5, 2017, to accommodate the University's counsel's emergency eye surgery and anticipated recovery period.  Def.'s Mot. Extension Time at 4, ECF No. 106.  The Developer objected to that proposal, arguing that the University should have only until June 28, 2017, on the ground that the Developer and the University should have the same amount of time for their filings, and that the Developer "d[id] not understand the . . . extension to July 5, 2017 to be based on the health issues of counsel."  *See* Pl.'s Resp. Position Statement at 2.  The Developer's proposal, granting it an extension to June 21, 2017, and the University an extension only until June 28, 2017, was adopted.  *See* Min. Order, dated June 12, 2017.  Then, on June 23, 2017, the University requested a further extension of two days because counsel's "recovery has proven to be more extended than initially expected."  Def.'s Mot. Extension Time at 3, ECF No. 109.  The Developer this time objected to any extension whatsoever, again on the ground that the Developer was entitled to the same extensions granted the University—ignoring the medical necessity for the University's requested extension and lack of any such necessity on the part of the Developer—and noting that the Developer had already submitted its post-trial briefing and thus could not reap the benefit of the extension to which it believed it would be entitled in the event the University received an extension.  *See* Pl.'s Resp. at 2.  The University's requested two-day extension for a medical necessity was granted over the Developer's objection.  *See* Min. Order, dated June 23, 2017.  This sampling of the motion practice in this litigation consumed judicial attention and falls short of the civility generally expected of members of the bar of this Court.  *See* LCvR 83.8(b)(6)(v).

responsibility of district courts, rather than appellate courts . . . ." *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982) (quoting *DeMarco v. United States*, 415 U.S. 449, 450 (1974)). "The ultimate test as to the adequacy of findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision, and whether they are supported by the evidence." *Schilling v. Schwitzer-Cummins Co.*, 142 F.2d 82, 84 (D.C. Cir. 1944) (footnotes omitted). The findings must be "sufficient to allow [the appellate] court to conduct a meaningful review, which is the main point of the rule." *Caffey v. West*, 1998 U.S. App. LEXIS 4689, *6–7 (D.C. Cir. Feb. 9, 1998); *see also Lyles v. United States*, 759 F.2d 941, 943–45 (D.C. Cir. 1985) (noting that "an appellate court requires some reasonable measure of detail and exactness in the trial court's findings as a predicate for intelligent review"(internal quotation marks omitted)); *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1058 (2d Cir. 1992) ("All that is required by Rule 52(a) is that the trial court provide findings that are adequate to allow a clear understanding of its ruling."). Accordingly, the court need not "address every factual contention and argumentative detail raised by the parties," *Mayaguez v. Corporacion Para El Desarrollo Del Oeste*, 824 F. Supp. 2d 289, 295 (D.P.R. 2011), or "discuss all evidence presented at trial," *Wachovia Bank N.A., Nat'l Ass'n v. Tien*, 598 F. App'x 613, 617–18 (11th Cir. 2014). *See also Schilling*, 142 F.2d at 84 ("While counsel may be disappointed that findings do not discuss propositions sincerely contended for, that, alone, does not make them inadequate or suggest that such propositions were not understood by the court."). Instead, as the Advisory Committee Notes on Rule 52 explain, a "judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." FED. R. CIV. P. 52(a) advisory committee's note to 1946 amendment.

While "a district court's opinion should not simply state conclusions where circumstances require more detail," courts have "wide leeway . . . in determining what facts to include." *Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158, 1160–61 (1st Cir. 1992) (Breyer, C.J.) (internal quotation marks omitted). In particular, the trial court is tasked with the "opportunity to judge the witnesses' credibility," FED R. CIV. P. 52(a)(6), and should make that assessment where probative of the legal conclusions. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401–02 (1990) ("Issues involving credibility are normally considered factual matters." (citing FED. R. CIV. P. 52)); *Noble v. Sombrotto*, 525 F.3d 1230, 1237 (D.C. Cir. 2008) (remanding where district court failed to discuss evidence of "bad faith" and advising court to "closely scrutinize self-serving" evidence).

In this case, the evidence shows the parties on a collision course toward litigation at least as early as October 2010, when the Developer lost the opportunity to finance the project with a particular lender with which the Developer had been in discussions since before entering into the agreements with the University. After October 2010, the Developer abandoned any intention it may have had previously to take seriously the agreed-upon deadlines for fulfillment of its monetary and construction-related obligations to the University. While no provision of any agreement ever executed by the parties made the Developer's performance of those obligations contingent on the Developer securing financing—indeed, the University entered into the agreement for the express purpose of delegating to an experienced real estate development professional the risks and rewards of developing the Property—the Developer simply refused to perform fully absent financing. At the same time, the Developer repeatedly persuaded the University to forbear from terminating the parties' agreements with tactics that varied from agreeing to new deadlines to threatening litigation.

The Developer's principals appear to have deeply internalized the view that the Developer was entitled to hold fast to the Property while failing to fulfill its performance obligations, operating in an alternate reality in which the flagrant breaching of binding contracts is "reasonable" if doing so is favorable, from a business perspective, to the Developer. At one point, one principal of the Developer, Ronald Cohen, even expressed his view that for the Developer to honor its contractual commitment to make a long overdue $1,475,000 rental payment to the University, when financing had not yet been secured, would be "STUPID and that we are not," Def.'s Ex. 118, Email from Ron Cohen to Eric Siegel and Alan Cohen, dated May 29, 2013, at 1, despite the University's certain termination of the agreements. As the following evidence illustrates, the Developer was dead wrong, at least with respect to its own conduct.

## A.    THE PARTIES

1.  The plaintiff, Howard Town Center Developer, LLC, is a limited liability corporation ("LLC") created for the purpose of developing the Property. Cohen testified that, as an LLC, Howard Town Center Developer, LLC, is a "standalone entity," capitalized only for the purpose of the Howard Town Center project through funding provided by Cohen, his son, Alan Cohen, and his son-in-law, Eric Siegel. Trial Tr. Day 1 AM at 64:14–15, 65:11. The three individuals use the "trade name" Cohen Companies. *See id.* at 99:3–8. Cohen further testified that the LLC form is used to "limit[] certain exposures you have" as a result of the risks associated with real estate development. *Id.* at 63:25–64:1. Siegel testified that Howard Town Center Developer, LLC, "has no money in its bank account as of today" and, consequently, in the "narrow" sense that the LLC is unable to pay any judgment rendered

against it, the instant litigation is "risk free" for the Developer. Trial Tr. Day 5 PM at 26:14–22, 27:1–16.

2. The defendant, Howard University, is a private university located in the District of Columbia, "authorized by a charter of the thirty-ninth Congress of the United States in 1867." Def.'s Counterclaim and Third-Party Complaint ¶ 1.

3. The third-party defendant, CastleRock Partners, LLC, is also an LLC in the business of developing real estate, and is headed by Timothy Kissler. *See id.* ¶ 3; Trial Tr. Day 1 AM at 61:4–17 (Cohen).

### B.   2008 – 2009: THE 2008 DEVELOPMENT AGREEMENT AND THE DEVELOPER'S INITIAL EFFORTS

4. *The Property.* In December 2008, CastleRock and the University agreed that the University would lease to CastleRock a parcel of land, located at 2112 and 2146 Georgia Avenue NW, which CastleRock would develop for mixed residential and commercial use. *See generally* Def.'s Ex. 1, 2008 Development Agreement. The University had acquired the parcel of land from the District of Columbia in an agreement dated February 19, 2008. *See id.* at 5. Two buildings were already located on the site: the WRECO ("Washington Railway and Electric Company") garage, which was "the first purpose built bus garage for the city's transit system," constructed in 1930, and the Bond Bread building, a large industrial bakery building, constructed in 1929. Trial Tr. Day 2 PM at 4:7–17 (Callcott).

5. *Pertinent Terms of the Declaration of Covenants with the District.* Pursuant to the University's land conveyance agreement with the District of Columbia, the parcel was subject to a "Declaration of Covenants . . . recorded in the land records of the District of Columbia" in 2008. 2008 Development Agreement at 3; *see generally* Def.'s Ex. 2,

Declaration of Covenants. The Declaration of Covenants required that the parcel be developed, specifying four salient terms for its development, described below.

a)      The design of the development was to be consistent with the Development Framework for a Cultural Destination District within Washington, D.C.'s Greater Shaw/U Street adopted by the D.C. Council in 2005. Declaration of Covenants at 2; *see* Pl.'s Ex. 261, Draft Development Framework for a Cultural Destination District within Washington, DC's Greater Shaw/U Street (the "DUKE Plan").[4] Notably, the DUKE Plan contemplated the Howard Town Center development project and specified that the project "[p]reserve . . . all or some façade elements" of the WRECO garage. DUKE Plan at 30; *see* Trial Tr. Day 2 PM at 5:15–7:22 (Callcott).

b)      The development was required to include a grocery store of no less than 35,000 square feet, unless the District approved a grocery store comprising fewer square feet. *See* Declaration of Covenants at 3.

c)      Construction was to commence within twenty-four months of the execution of the Declaration of Covenants and be completed within thirty-six months of said execution. *See id.* at 4. In other words, the development was to be completed in 2011.

d)      The Developer was to enter into a "CBE Agreement" with the District of Columbia Department of Small and Local Business Development "requiring that 20% of the equity and development participation of the Developer be comprised

---

[4] The DUKE Plan is named after Edward Kennedy "Duke" Ellington, a Washington, D.C., native. *See* DUKE Plan.

of CBEs," which are "local, small, or disadvantaged business enterprise[s]" certified as such under D.C. law. *Id.* at 5.

6. While never made clear why CastleRock involved the Developer in the development of the Property, shortly after the 2008 Development Agreement was signed, the Developer took steps, at its own expense, toward developing the parcel in anticipation of the transfer of CastleRock's rights and obligations under the 2008 Development Agreement to the Developer. *See* Trial Tr. Day 3 AM at 106:22–113:7. These steps included:

   a) retaining Fabrice Vasques of Phillips Realty Capital to prepare a "pro forma document," which "sets forth all of the construction costs associated with the project; all of the sources where these funds will be coming from to pay for those construction costs and the uses for those funds." *Id.* at 107:6–14. The "initial plan" for financing the project was to obtain funding from the U.S. Department of Housing and Urban Development ("HUD"), through HUD's "conduit," Wells Fargo. *Id.* at 113:8–18. Siegel testified that "starting 2009 through 2010 the economy was in bad shape and conventional financing was very difficult to have, particularly given the size of this project," so "HUD financing was really one of our only options we could pursue." *Id.* at 114:4–14; *see* Trial Tr. Day 6 PM at 9:23–10:17, 13:15–18 (Vasques) (testifying that in 2009 and 2010, financing sources were "[v]ery limited, the finance world was frozen, . . . [s]o, [the Developer] applied to HUD");

   b) retaining an environmental consultant, which determined that the site needed extensive remediation. *See* Trial Tr. Day 3 AM at 107:16–24; Pl.'s Ex. 231,

Phase II Environmental Site Assessment, 2112 and 2146 Georgia Avenue, NW, Washington, DC;

c)  retaining two retail brokers, beginning in "approximately April or May of 2009," "to seek retail tenants for the project," in accordance with the requirements of the Declaration of Covenants. Trial Tr. Day 3 AM at 110:20–111:21; and

d)  retaining GTM Architects to do "concept drawings and feasibility studies of the entire site." *Id*. at 112:16–113:2.

## C.  JANUARY 22, 2010: GROUND LEASE AND DEVELOPMENT AGREEMENT AND FIRST AMENDMENTS

7.  On January 22, 2010, the University and CastleRock executed a Ground Lease Agreement and a second Development Agreement. *See* Joint Ex. 1, Ground Lease; Joint Ex. 2, Development Agreement. Effective that same day, the University, CastleRock, and the Developer executed an agreement assigning CastleRock's rights and obligations under the Ground Lease and Development Agreement to the Developer. *See* Joint Ex. 5, Assignment and Assumption of Ground Lease and Development Agreement.[5] Siegel testified that CastleRock, not the Developer, was the signatory to the Ground Lease and Development Agreement because CastleRock "was the awardee of the request [for] proposals from Howard University" and, consequently, given the public nature of the request for proposal process, "the parties believed it best, from the optic standpoint, to have Castle[R]ock sign the original document and then assign it to the master developer." Trial Tr. Day 3 AM at 115:20–24.

---

[5]  While the Developer now identifies CastleRock only as a "minority partner" in the project, Pl.'s Prop. Findings Fact Concls. Law ¶ 30, the Developer has previously acknowledged that CastleRock's "responsibilities as an assignor are identical to [the Developer's]," Pl.'s Mem. P. & A. Supp. Pl. & Third-Party Def.'s Mot. Summ. J. at 18 n.2, ECF No. 87.

**8.** *Pertinent Terms of the Ground Lease.* The Ground Lease provided for a lease term of ninety-nine years, *see* Ground Lease at 5, as well as a right of first offer to purchase the Property in the event of its sale, *see id.* at 68, in exchange for which rent was to be paid to the University according to a specified schedule.

    a)    The rent payment schedule required the Developer to pay:

        i.    $525,000 on January 22, 2010, "which amount shall be deemed earned and is non-refundable notwithstanding any future termination of this Lease for any reason whatsoever," *id.* at 5;

        ii.    $1,475,000 upon "the earlier to occur of (i) the date on which [the Developer] shall make settlement upon a construction loan for the funding of the costs of constructing the Mandatory Project Improvements (as defined in the Development Agreement) to the extent such costs are not funded from [the Developer's] own resources or other equity sources, or (ii) March 15, 2011," *id.* at 2, 5; and

        iii.    monthly installments of rent thereafter, beginning no later than December 31, 2014, the latest possible "Rent Commencement Date," at a monthly rate of $95,016.25, subject to (1) a percentage reduction during any period prior to the Rent Commencement Date in which, pursuant to the Ground Lease, rent is due, if less than 100% of the improvements are occupied by tenants and (2) increases after the fifth year following the Rent Commencement Date based on the Consumer Price Index, *id.* at 6.

In sum, at the outset of the parties' relationship, the Developer agreed to pay rent to the University of $525,000 on January 22, 2010; $1,475,000 by March 15,

2011; and monthly installments of about $95,016.25 no later than December 31, 2014. Over the last seven years, the Developer made only the first payment.

b)     The Ground Lease provided that, in the event that the Developer should "at any time be in default with respect to any rental payments or other charges . . . and should such default continue for a period of ten (10) days after written notice from [the University] to [the Developer]; or should [the Developer] be in default in the prompt and full performance of any other of its promises, covenants or agreements" in the Ground Lease or the Development Agreement, subject to defined cure period and notice requirements, including "written notice, . . . specifying in BOLD FACE CONSPICUOUS TYPE, that [the University] intends to terminate" the Ground Lease if the default is not cured, the University shall have the option to terminate the agreements or reenter the Property. *Id.* at 49–50.

c)     The Ground Lease further provided that the University could recover from the Developer in damages, *inter alia*, "the worth at the time of award of any unpaid rent . . . that had been earned and is outstanding at the time of such termination" and "the reasonable amount of any costs or expenses incurred by [the University] in enforcing its rights under this [Ground] Lease after such default." *Id.* at 51.

**9.** *Pertinent Terms of the Development Agreement.* The 2010 Development Agreement "set forth [the parties'] agreements and understandings concerning the planning, development and construction of the Project Improvements." Development Agreement at 1.

a)     In particular, the Development Agreement imposed a number of requirements, in addition to those contained in the Declaration of Covenants, on the Developer, including that:

i.     the improvements on the parcel would be constructed at the Developer's "sole expense," *id.* at 1;

ii.     because the parcel "is an integral part of the University's campus, . . . the University requires that the Project Improvements be approved by the University" and "[n]o Work on any of the Project Improvements shall be commenced that is not approved in accordance with [this Agreement]," *id.* at 11;

iii.     the Developer "shall develop with Contractor, and deliver to the University, a comprehensive, integrated project schedule . . . addressing and setting forth specific dates for the timeline and sequencing of each distinct portion, aspect or phase of the activities and tasks to be accomplished by the Developer with respect to the construction and completion" of the development, *id.* at 15.

b)     The 2010 Development Agreement further dictated the timetable for the development of the Property, specifying as follows:

i.     the Developer shall commence construction as provided in the Declaration of Covenants, *i.e.*, by December 17, 2010, and achieve completion by December 17, 2011, or, failing either, shall "pay to the University, upon demand, all penalties, damages and demands that the University may become obligated to pay to the District of Columbia," except that the University authorizes the Developer to communicate with the District regarding extension of those two dates, as long as the Developer "keep[s] the University fully informed" of its discussions with the District, the

University "ha[s] the right to participate directly" in those discussions, and the Developer has no "right to commit the University as to any matter," and the University "shall not object" to any extension "consistent with the schedule for performance of Developer's obligations," *id*. at 17–18;

ii.  if construction is not commenced by March 15, 2011, the University may "give written notice specifying IN BOLD FACE CONSPICUOUS TYPE" that the Development Agreement and Ground Lease will be terminated if construction does not begin within thirty days of receipt of notice, *id*. at 17; and

iii.  "the Developer shall achieve Substantial Completion of all of the Mandatory Project Improvements no later than March 15, 2013 . . . , subject to extensions for additional periods of time equal to time actually lost on account of Unavoidable Delays," *id*. at 18, which category includes delays due to, *inter alia*, "unanticipated, unusual and extreme weather" and "other unanticipated events or circumstances beyond the affected Party's control," *id*. at 7. Significantly for the parties' future relationship, the Unavoidable Delays provisions expressly excluded delays due to "changes in market conditions" affecting costs, "governmental delays" unless not attributable to the Developer's actions, or "unavailability to Developer of any debt or equity financing to provide construction or permanent funding for the Project." *Id*. In other words, if the Developer was unable to obtain financing or to do so on the timetable the University expected, as set out in the Development Agreement, the University had the

clear contractual right to terminate the agreements and find a developer up to the job.

10. *First Amendments.* The same day as the execution of the Ground Lease and Development Agreement, the parties executed amendments to both agreements, effective January 22, 2010, addressing various matters, including environmental remediation of the site. *See generally* Joint Ex. 3, Ground Lease Amendment; Joint Ex. 4, Development Agreement Amendment. The Developer's consultant had "determined in 2009 [the remediation cost] to be approximately $4 million," and the University agreed through the Development Agreement Amendment to shift a substantial portion of those costs from the Developer to itself. Trial. Tr. Day 3 AM at 116:7–15 (Siegel). Specifically, the amendments provided that:

a)  the University would, at its own cost, hire a consultant to prepare a remediation report and plan, in coordination with the Developer, and "endeavor to cause the Consultant to complete a draft [remediation plan] by approximately mid-March, 2010," Development Amendment Agreement at 2;

b)  the Developer would be responsible for implementation of the remediation plan, *see id.* at 2–3;

c)  the Developer would be responsible for remediation costs up to $750,000, and the University would cover the costs in excess of that amount, *see id.* at 4–6; and

d)  as a means of facilitating the Developer's reimbursement by the University for the environmental remediation expenses in excess of $750,000, "the University and the Developer shall establish an escrow account . . . with an escrow agent . . . reasonably acceptable to the University and Developer," into which the Developer would deposit the first two rental payments "when due and payable under the

Lease." *Id.* at 4. The account was to bear interest, which interest would "be added to" and "included as a part of" the funds in the account. *Id.* at 5. The funds in the escrow account would be disbursed by the escrow agent, upon receipt of specified documentation, to cover incurred remediation costs. *Id.* The parties entered into an escrow agreement, effective January 25, 2010, to form the required escrow account. *See* Joint Ex. 6, Escrow Agreement.

### D. SPRING 2010 – FEBRUARY 2011: THE DEVELOPER SEEKS MODIFICATION OF THE AGREEMENTS

11. Following the signing of the agreements and amendments thereto, the Developer continued to pursue financing for the project. Siegel testified that "[a]round March or April of 2010, HUD representatives had a site tour" and, after a subsequent meeting, the Developer was given a "green light to file an application" to obtain HUD financing for the project. Trial Tr. Day 3 AM at 114:17–21.

12. At the same time, the Developer sought to extend the deadlines for commencement and completion of construction contained in the Declaration of Covenants. Siegel testified that in his view those deadlines were "unrealistic" and "candidly ridiculous" at the time they were entered into two years earlier, in 2008, by the University and the District. *Id.* at 105:9–19. Based on this view, "beginning in the spring of 2010, Ron Cohen and [Siegel] met with various council members" seeking revision of the schedule, and those council members "seemed very supportive of the approach" outlined by the Developer. *Id.* at 130:9–19 (Siegel). Siegel further testified that he would learn later, in October 2010, almost ten months after executing the Ground Lease and Development Agreement with the University, that changing the schedule "required an administrative change from [the deputy mayor's] office, not from the council members." *Id.* at 131:5–11.

**13.** Meanwhile, the parties undertook to fulfill their obligations under the Development Agreement Amendment and applicable law regarding the environmental remediation of the Property site. Those efforts culminated in the filing with the District, of a remediation plan, known as the "Corrective Action Plan," dated November 17, 2010, which was approved by the District's Department of the Environment ("DDoE") on December 4, 2010. Pl.'s Ex. 234, Corrective Action Plan. Siegel testified that no construction could be done on the site prior to the District's approval of a Corrective Action Plan. *See* Trial Tr. Day 3 AM at 121:24–122:3.

**14.** *The Developer First Accuses the University of Delay.* Just prior to the District's approval of the Corrective Action Plan, in a letter dated December 2, 2010, the Developer expressed to the University its belief that the University had delayed the environmental remediation process. *See* Pl.'s Ex. 72, Letter from Ronald Cohen to Diane Branch, Assoc. Vice President of Real Estate Development and Asset Mgmt., Howard Univ., dated Dec. 2, 2010, at 2. First, citing a provision of yet another agreement between the parties "that the *Developer is not to release* the environmental reports to any governmental agency without the prior approval of Howard," the Developer objected to the University's forwarding of an environmental report to the DDoE. *Id.* (emphasis added). The Developer's letter ignored the plain language of the cited agreement, which imposes the nondisclosure obligation only on the Developer, not the University. In any event, according to the Developer, the University's action resulted in the DDoE issuing directives requiring remediation of the site before any excavation permits could be granted, a result characterized by the Developer as "unnecessary bureaucratic delay[]," without acknowledging any other potential reasons for this requirement, such as the safety of the community or environment. *Id.* Second, the Developer expressed its view that

the University had failed to comply with the Development Agreement Amendment's provisions regarding the timing of the production of the remediation report and plan, asserting that the report was produced "a full six (6) months after it was required" under that amendment. *Id.* In fact, the University was merely required to "endeavor to cause the Consultant to complete a draft [remediation plan] by approximately mid-March, 2010," Development Agreement Amendment at 2, and, according to the Developer, produced the report in August of that year, *see* Pl.'s Ex. 72, Letter from Ronald Cohen to Diane Branch, dated Dec. 2, 2010, at 2.

15. In the same letter, the Developer represented that "[u]ntil the [remediation plan] is approved, the Developer is unable to complete its excavation permit application because DDoE comments, qualifications and conditions to the [plan] will determine certain basic questions as to whether excavation beyond the garage levels will be necessary." *Id.* at 3. According to the Developer, in light of the status of the remediation plan, "the March 15, 2011 deadline to commence construction is not realistic, and has not been for some time, beyond the control of the Developer." *Id.* At the same time the Developer was shifting fault for delay on the University, the Developer had been unsuccessful in obtaining any financing for the project.

16. The University responded to the Developer, stating the University's view that the University "has proceeded appropriately and with diligence" with the work required for environmental remediation, and that "[a]lthough that process has not proceeded strictly in accordance with the schedule outlined in the Amendment, the deviations from that schedule were caused by a number of factors beyond Howard's control." Pl.'s Ex. 46, Letter from Troy Stovall to Ronald Cohen, dated Dec. 9, 2010, at 1. Contrary to the Developer's proffer of the remediation plan as a justification for delay, the University further stated it did "not believe

that any delays in the implementation of the process outlined in the Amendment have materially impaired the Developer's ability to proceed with any of the numerous other steps necessary to commence and complete the Project as and when contemplated in the Development Agreement." *Id.* at 1. Countering the Developer's contention that disclosure of an environmental report to the DDoE was improper, the University expressed its belief that disclosure was permissible and, moreover, was "required under applicable law." *Id.* at 2.[6]

17. *The December 15, 2010 Meeting.* On December 15, 2010, the Developer submitted to the University plans the Developer describes as "reflect[ing] conceptual design, building specifications and schematic design for the project." Pl.'s Ex. 109, Letter from Developer to Diane Branch, dated Dec. 15, 2010; *see also* Pl.'s Ex. 236, Howard Town Center Feasibility Study by GTM Architects, dated Dec. 15, 2010. That same day, representatives for the Developer and the University met to discuss the project. *See* Trial Tr. Day 3 AM at 127:18–128:4 (Siegel). At that meeting, the Developer presented those plans to the University and also informed the University that the Developer had "lost the opportunity to finance the project with HUD" in October 2010. *Id.* at 128:11–14, 115:3–4. The Developer raised the "difficulty in getting conventional financing for an entire city block project and the need to potentially phase the project if [the Developer] could not secure financing for an entire city block." *Id.* at 128:14–17.[7] Stovall responded by "suggest[ing] that the University might be

---

[6]      While the Developer presses the view that the University "mishandl[ed] [the] environmental issues" affecting the Property, Pl.'s Prop. Findings Fact Concls. Law at 1, the evidence hardly supports that characterization. The University did not comply strictly with the generally framed deadline in the amendment to the Development Agreement, but took appropriate actions to comply fully with applicable environmental and safety laws. Moreover, while the Developer is also critical of the fact that the University "submitted a report to the District without the Developer's approval," that criticism also seems misplaced given the lack of any evidence indicating the Developer's approval was in fact required. *Id.* ¶ 86.

[7]      The record is thin as to the reasons why the Developer lost the HUD financing. Siegel testified that "we received a letter from them, a formal letter, that upon communications with the District they felt that there were

open to the idea of master-leasing one of the [two planned] residential towers as a way to finance the entire project at once." *Id*. at 129:1–3. In such an arrangement, the University would have rented an entire tower from the Developer and handled the unit-by-unit rental agreements itself. *See id*. at 129:4–15.

18. Under the Development Agreement, the Developer was required to submit a conceptual design for the University's approval before submitting building specifications or a schematic design, presumably to give the University ample time to review these designs separately and avoid the inefficiencies of moving forward on a conceptual design not approved by the University, but the Developer failed to follow this procedure. *See* Development Agreement at 12–13. The University did not respond to the Developer's proposed plans within twenty days, the amount of time specified in the Development Agreement. *See* Trial Tr. Day 3 AM at 129:19–130:3; Development Agreement at 12.[8]

19. In a letter dated January 20, 2011, Stovall wrote to the Developer indicating that the University was "continuing to review [the submitted] documents in greater detail" but was "writing this preliminary response to identify certain discrepancies between" the Developer's documents and "the program for development contemplated in the Ground Lease and Development Agreement." Joint Ex. 7, Letter from Troy Stovall to Ronald J. Cohen, dated Jan. 20, 2011, at 1. Specifically, Stovall noted that "it appears from [the documents] that the

---

other priorities they wanted to have HUD pursue" with available funding. Trial Tr. Day 3 AM at 115:3–9. Despite Siegel's seeming placement of the blame for the loss of the HUD financing on the District, other evidence suggests that the Developer's negotiation tactics may have played a role. A letter from Cohen to a Wells Fargo representative regarding the HUD financing, dated September 16, 2010, reveals that Cohen found certain terms of one of Wells Fargo's proposed agreements to be "a deal breaker" and expressed the view that at Wells Fargo, "the right hand does not know what the left hand is doing," further asserting that "Wells Fargo must convince [Cohen] that it has its act together, or [he is] going to sever [their] relationship." Def.'s Ex. 11, Letter from Ronald Cohen to Catherine Pharis, Wells Fargo Multifamily Capital, dated Sept. 16, 2010, at 1–2.

[8]     In discussing a later instance in which the Developer sent the University documents in mid-December that invited a response, counsel for the Developer "recognize[d]" that the period during which the University did not respond was "the holidays." Trial Tr. Day 1 AM at 19:7–9.

commencement of construction will occur approximately at the end of January, 2012, rather than by March 15, 2011, as required under the Development Agreement" and that "the area of the proposed grocery store . . . is significantly less than the minimum required by both the Development Agreement and the Covenant." *Id.* at 1–2. Stovall reminded the Developer that the District's approval was needed for modifications to the schedule and grocery store requirements and, with respect to the former, the University's approval as well. *See id.* The letter further included a "reminder that the Ground Lease requires that the Developer tender $1,475,000 to the University, by March 15, 2010 [sic], in payment," *id.* at 2, which rental payment due date was only two months away. Finally, Stovall requested that the Developer "contact [him] at [the Developer's] earliest opportunity to schedule a time for a detailed discussion of the concerns identified in this letter." *Id.*[9]

20. The Developer responded to the University, expressing the view that the concerns outlined in the University's letter reflected "a direct departure from the results of [their] meeting on December 15, 2010," where a "detailed discussion of the revised project schedule" had occurred. Joint Ex. 8, Letter from Developer to Troy Stovall, dated Feb. 1, 2011, at 1. Notwithstanding the Developer's execution of the Development Agreement along with a first amendment to that agreement that incorporated construction deadlines, the Developer now complained "that neither the District nor the University set forth realistic deadlines three years earlier." *Id.* With respect to the items for which the Developer needed District approval, the Developer represented that it had been "informed in December by . . . staff [at the deputy mayor's office] that a representative of Howard University intervened in [the

---

[9] While the Developer describes the University's letter as "not[ing] only unspecified 'discrepancies,'" Pl.'s Prop. Findings Fact Concls. Law ¶ 90, the above-cited evidence demonstrates that, to the contrary, the University provided details as to the identified discrepancies.

Developer's] process and insisted that [the deputy mayor's office] not communicate with the Developer on this matter at this time and that it should be taken up with the administration of Howard University," and, thus, the Developer had "been stymied in [its] efforts to meet with the District to address" the issues requiring District approval. *Id*. at 2. The Developer made this accusation without acknowledging that the Developer was required by the Development Agreement to "keep the University fully informed" of all communications with the District regarding the deadlines. Development Agreement at 18.[10] The Developer again for a second time raised the issue of building the project in two phases and the University "potentially master leasing a residential tower for student housing," conveying that this potentiality "has a real impact on the progress of the designs." Joint Ex. 8, Letter from Developer to Troy Stovall, dated Feb. 1, 2011, at 3.

21. Toward the letter's conclusion, the Developer alluded for the first time to litigation with the University, stating it "can only assume through reading between the lines . . . that the University is setting up the Developer to assert termination of the Ground Lease and that this venture is heading toward litigation" but that the Developer was "prepared to vigorously defend [its] actions and efforts to date." *Id*. The Developer also noted that it "feels that the Closing Date . . . needs to be renegotiated." *Id*. The Developer understood that the "Closing Date" was the date upon which the $1,475,000 payment was to be made. *See* Trial Tr. Day 3 AM at 140:12–15 (Siegel). Despite the aggressive tone of this letter, the Developer still had not secured financing for the project, and, according to the Developer, would not have been prepared to make the rental payment or move forward without that financing in place. *See,*

---

[10] The Developer now acknowledges this, but apparently begrudgingly, since it notes that the phrase "keep the University fully informed" should be understood to mean "the Developer was not required to include the University on all its communications." Pl.'s Prop. Findings Fact Concls. Law ¶ 199 n.5.

*e.g.,* Trial Tr. Day 1 PM at 100:5–12 (Cohen) (explaining "because we . . . did not secure our financing, . . . we just weren't in a position to break ground" by December 17, 2010, as required by the agreements).

22. *The Historic Factories Blog Post.* Later that month, on February 22, 2011, Branch, the Associate Vice President of Real Estate Development and Asset Management at the University, forwarded Cohen an email containing the text of a blog post entitled "Bread for the City: Shaw's Historic Bakeries" discussing the historic nature of the Bond Bread building on the Property. Def.'s Ex. 14, Emails Between Ronald Cohen, Diane Branch, Maybelle Bennett, and Scott Roberts, dated Feb. 22, 2011. She asked Cohen, "Are we concerned that there will be an application to deem this property historic? What are your recommendations?" *Id.* at 1. Cohen forwarded the email to Siegel and wrote, "??? FYI- we need to monitor this . . . ." *Id.* Siegel testified that upon receiving this email, he "went back to the Duke Plan" and verified its requirement that "some portion of the corner of V and Georgia Avenue," *i.e.*, the WRECO garage, but not the Bond Bread building, be preserved. Trial Tr. Day 3 PM at 93:15–94:4.

23. Siegel testified that between February 1, 2011, and the end of the month, Stovall "was essentially requesting information from [the Developer] so that he could evaluate th[e] master lease concept" and two-phase plan newly proposed by the Developer but conceded that the University did not agree to either alternative plan. Trial Tr. Day 3 AM at 143:7– 144:10. With the March 15, 2011, deadline for payment of the $1,475,000 rent installment looming, on February 28, 2011, the Developer submitted to the University a memorandum setting out a schedule for the development, based on a two-phase project, and moving the Closing Date to "the earlier of settlement on a construction loan or February 15, 2012," with

"excavation to begin December 8, 2011." *See* Def.'s Ex. 15, Memorandum from Ronald J. Cohen to Troy Stovall, dated Feb. 28, 2011, at 1–3.

### E. MARCH – AUGUST 2011: THE UNIVERSITY AGREES TO CERTAIN OF THE DEVELOPER'S PROPOSED MODIFICATIONS, BUT THE DEVELOPER SEEKS FURTHER MODIFICATION

24. A month later, on March 31, 2011, Stovall represented that the University had undertaken "a considered review of the entire history of the Developer's interaction with the University since the Project's inception" and was "prepared to approve the revised schedule for the Project" provided by the Developer on February 28, 2011, which included a scheduled construction commencement date of December 8, 2011. Joint Ex. 9, Letter from Troy Stovall to Developer dated Mar. 31, 2011, at 1.

25. At the same time, however, after consideration of the Developer's proposals to change the development plan to, *inter alia*, "divide its development into two phases," the University did "not believe [the Developer's explanations for the proposals] warrant changes" to the development plan set out in the agreements. *Id*. at 2.

26. Notably, Stovall also highlighted the fact that the Developer "failed to pay the $1,475,000 rental payment that became due under the Ground Lease on March 15, 2011," and explained that the University did "not concur" with the Developer's position that the failure was justified. *Id*. at 2 (emphasis in original). Nevertheless, having agreed to push back the date for commencement of construction, the University also agreed to "postpone the due date for that payment until December 8, 2011," as requested by the Developer. *Id*. (emphasis in original). Having rejected a two-phase project, however, the University did not grant the Developer's request that "only half of the next ground lease payment" be paid at that time.

Def.'s Ex. 15, Memorandum from Ronald J. Cohen to Troy Stovall, dated Feb. 28, 2011, at 2.

27. Siegel testified that at the end of April 2011, the Developer met with the deputy mayor to brief him on the project. *See* Trial Tr. Day 3 PM at 9:7–13 (Siegel). According to Siegel, the Developer did not request revision of the covenant deadlines in that meeting, however, because, notwithstanding the University's clear rejection of the Developer's proposed change to the development plan to permit two phases, it "couldn't ask for deadlines . . . unless [the Developer] knew whether [it] w[as] building all at one time or in two phases." *Id.* at 9:14–20. Notably, the Developer still had not secured financing at this point.

28. Siegel further testified that during the months of May, June, and July, the Developer and the University discussed how they would proceed with the project, with the University explaining that master-leasing could be considered if the rental rate reflected a twenty percent discount off the market rate, which the Developer believed "wasn't economically feasible." *Id.* at 3:24–25.

29. By the summer of 2011, the Developer had still been unable to secure financing after the possibility of the HUD funding had evaporated. In good news on the financing front, however, in a "letter of intent" dated July 7, 2011, J.P. Morgan Investment Management, Inc., "set forth the general terms and conditions under which [it] would be prepared to enter into a [redacted] joint venture agreement" with the Developer regarding the development, "based upon the information [the Developer has] supplied . . . to date." Pl.'s Ex. 212, Letter of Intent from J.P. Morgan Investment Management, Inc., to Ron Cohen, dated July 7, 2011, at 1. The letter of intent was "non-binding" and required the Developer to sign and return a

copy of the letter to J.P. Morgan "no later than July 15th, 2011" if the developer agree[d] to the terms and conditions described." *Id*. at 4.

30. Siegel testified that he provided the letter of intent from J.P. Morgan to the University and continued discussions regarding the plan for the project, sending a further proposal for terms of the project to the University on July 28, 2011. *See* Trial Tr. Day 3 PM at 5:4–11, 7:6–14. In that proposal, the Developer "approach[ed] the [two-phase] idea from the expense side," suggesting the University agree to "defer[]" the Developer's rental payment obligations for the improvements made to the Property, *i.e.*, accept late payments with interest, in exchange for the Developer building the project in a single phase, as provided in the Development Agreement, and as the University had consistently required. Trial Tr. Day 6 AM at 70:18–71:11.

31. *The District Expresses Concerns to the University*. In a letter dated August 19, 2011, Stovall provided to the Developer a copy of a letter dated August 15, 2011, from the District regarding the Declaration of Covenants and requested that the Developer respond by August 26, 2011, so that the University could, in turn, respond to the District. *See* Def.'s Ex. 19, Letter from Troy Stovall to Ronald J. Cohen, dated Aug. 19, 2011, at 1. The letter from the District stated that the University "was required to cause its selected developer to achieve Commencement of Construction . . . by December 17, 2010" and noted that "Howard ha[d] yet to achieve" that milestone. *Id*. at 3. The District represented that it was "willing to consider extending the deadline for Commencement of Construction to October 1, 2012 if Howard" delivered, by September 16, 2011, (1) an updated schedule of performance; (2) additional security in the amount of $100,000; and (3) the "CBE Agreement executed by the Developer, as required under the Covenants." *Id*.

**32.** The Developer responded in a letter, dated August 22, 2011, repeating many of its previous assertions regarding the project, including that "neither the District nor the University set forth realistic deadlines three years earlier when the Declaration of Covenants was executed," even though these were the terms to which the Developer had agreed in the Ground Lease and Development Agreement, and that "a representative of Howard University intervened in [the Developer's] process" with the District, causing delays, even though the University was merely enforcing the term of the Development Agreement requiring that it be informed of the Developer's communications and negotiations with the District. Joint Ex. 10, Letter from Developer to Troy Stovall, dated Aug. 22, 2011, at 1, 2. The Developer also informed the University of its position with respect to the three items requested by the District, asserting that the Developer would (1) not agree to a revised schedule with the District until "Howard and the Developer agree on terms to pursue the entire project or, alternatively, to develop it in phases"; (2) "not provide any additional money until Howard and [the Developer] reach an agreement on how to proceed; and (3) not sign the CBE Agreement until the University and the Developer "have an amended Ground Lease (and corresponding amended Development Agreement) in place." *Id*. at 2. With respect to the requested $100,000, in particular, Siegel testified that "the position we had in response was we're not interested in posting security." Trial Tr. Day 3 PM at 10:3–6. Again, the Developer was not open to investing additional money in the project when it had not obtained a funding commitment and did not know if the project was going to move forward.

**33.** Also on August 22, 2011, Stovall responded to the Developer's July 28, 2011, proposal, which reflected an expense-side version of the two-phase approach previously rejected by the

University, stating that the "proposal is not acceptable to Howard University." Pl.'s Ex. 90, Emails Between Eric Siegel and Troy Stovall, dated Aug. 20, 21, 22, 2011, at 1.

F. **AUGUST – SEPTEMBER 2011: WITH THE DISTRICT POSING QUESTIONS, THE UNIVERSITY DEMANDS ASSURANCE OF PERFORMANCE FROM THE DEVELOPER, WHICH INSTEAD OF PROVIDING SUCH ASSURANCE, ALLUDES TO LITIGATION**

34. In a letter dated August 30, 2011, Stovall responded to the Developer's August 22, 2011, letter "to make clear" that "[t]he Developer's proposed modifications to the Project are not acceptable; and the terms the Developer has proposed to us for the alteration of its obligations are likewise unacceptable." Joint Ex. 11, Letter from Troy Stovall to Developer, dated Aug. 30, 2011, at 1. Referring to prior discussions and correspondence between the parties, Stovall noted that he had "made it abundantly clear . . . that (i) although the University was willing to listen to and consider [the Developer's] proposed changes, and although the parties may engage in further discussions about them, [the Developer] should not assume that they are or will be approved; and (ii) our continuing discussions should not be construed to delay . . . efforts to carry out the Project as previously agreed." *Id.* at 1–2.

35. Stovall also informed the Developer of the University's position that under the governing agreements, the Developer alone is responsible for securing financing and that any delay in doing so does not warrant delay in execution of obligations under those agreements; and that the Developer's "accusations concerning the University's purported interference with [the Developer's] communications with District representatives" were "responded to . . . many months ago" and "any misunderstanding on the part of the District as to [the Developer's] authority to deal directly with the District was dispelled late last year." *Id.* After enumerating the Developer's lapsed obligations under the agreements, Stovall expressed concern that the Developer had stated repeatedly that it was "unable or unwilling to proceed

with the construction and completion of the Project according to the single-phase program" specified in the agreements, unless "the University agree[d] to significant financial concessions." *Id.* at 3–4.

36. Finally, Stovall's letter demanded that the Developer provide assurances to the University by September 8, 2011, including, *inter alia*, (1) "unqualified ratification of [the Developer's] obligations under the existing Project Documents and an unqualified statement that the Developer is ready, willing and able to timely comply with and perform" those obligations; (2) "[r]easonable evidence" of the Developer's ability to obtain tenants, financing, and permits consistent with its obligations; and (3) "written affirmation of [the Developer's] intent and ability . . . to timely pay to the University the rent payment in the amount of $1,475,000.00 due on December 8, 2011" and comply with the other milestone dates set out in the Developer's February 28, 2011, memorandum and approved by the University on March 31, 2011. *Id.* at 5–6.

37. Having received no assurances from the Developer by September 8, 2011, in a letter dated September 9, 2011, the University wrote to the District, copying the Developer, among others, "to update [the District] on the status" of the Project, informing the District that while the University "requested substantiated assurances from the Developer of its ability and intent to fulfill its contractual obligations to the University and the District[,] . . . [u]nfortunately, as of this date [the University] ha[s] not received those assurances." Def.'s Ex. 23, Letter from Troy Stovall to Senthil Sankaran, Director of Development, Office of the Deputy Mayor for Planning and Economic Development, dated Sept. 9, 2011, at 1.

38. As noted, despite the District's demand to the University setting a strict deadline, the Developer did not timely respond on September 8, 2011. Siegel explained that the Developer

did not timely respond because Siegel "was busy working on a chronology of events to make sure that the recitation of facts was precise and accurate." Trial Tr. Day 3 PM at 13:9–16. The Developer responded to the University's letters of August 30 and September 9, 2011, in a letter dated September 15, 2011, setting out the Developer's perspective on the chronology of events, followed by a warning to the University: "Conduct yourselves accordingly." *See* Joint Ex. 12, Letter from Developer to Troy Stovall, dated Sept. 15, 2011, at 1–7. Yet, rather than "conduct" itself in accordance with extant agreements or provide any of the assurances requested by the University and the District, the Developer continued to press its desired modifications to the agreements, expressing its "hope that we can put these issues behind us and continue" negotiating terms that "can realistically form the basis for a modified ground lease." *Id.* at 7. Reading between the lines, as the Developer was wont to do, *see* Joint Ex. 8, Letter from Developer to Troy Stovall, dated Feb. 1, 2011, at 3, the Developer appears to have been seizing an opportunity, leveraging the pressure exerted on the University by the District's demand for assurances to, in turn, pressure the University to concede to terms more favorable to the Developer, which terms the University had resisted. Indeed, acknowledging the harm to the University of continued delay in the project, the Developer noted that "the University has foregone approximately $1,000,000 in potential lease revenue upon delivery of this project by failing in a timely manner to come to terms with the economic realities of the environment we currently operate in and by modifying [sic] ground lease terms accordingly so that we can break ground expeditiously." Joint Ex. 12, Letter from Developer to Troy Stovall, dated Sept. 15, 2011, at 7. As the Developer put it, in a prescient, and not-so-oblique, threat of litigation, "[o]therwise, we will find ourselves mired in dispute, and the project will remain dormant for the foreseeable future." *Id.* At this point, the Developer still

had no funding secured and, as Cohen and Siegel made very clear in their testimony, moving forward with the project and any further investment of the Developer's funds—even as relatively small an amount as the $100,000 demanded by the District—was not going to happen.

### G.   SEPTEMBER 2011: THE UNIVERSITY SENDS THE FIRST NOTICE OF DEFAULT TO THE DEVELOPER

39. On September 26, 2011, the University sent the Developer a notice that the Developer "is in default under the Project Documents" for its failure to comply with the requirements of those documents in the time provided. Joint Ex. 13, Notice of Default, dated Sept. 26, 2011, at 1. The University also stated that "the Developer is in anticipatory breach of the Project Documents," noting that "the Developer has evidenced repeatedly its inability and/or unwillingness to proceed with the construction and completion of the Project according to the program" set out in the governing agreements, most recently by failing to provide the assurances requested in the letter dated August 30, 2011. *Id*. at 3–4. In other words, the University did not buckle to the pressure applied by the Developer to accede to further concessions, under the threat of litigation; the Developer's bullying tactics did not work.

40. Cohen feigned surprise at the University's reaction to the Developer's utter failure to provide assurances but only to threaten litigation, testifying that upon receiving this letter, he said to Siegel, "Let's get to the bottom of this. . . . Where is this coming from? Something we messed up on? Something they're posturing?" Trial Tr. Day 2 AM at 78:4–79:7. With the Developer's bluff called, the Developer owned up to its inability to secure financing. In a letter dated September 29, 2011, the Developer responded to the September 26, 2011, Notice of Default, explaining its "great difficulty in securing conventional financing for the entire project" after losing the HUD financing and noting the "shortfall" of $1,500,000 "in

financing this $145,000,000 project." Joint Ex. 14, Letter from Developer to Troy Stovall, dated Sept. 29, 2011, at 1. The Developer responded "to each of [the University's] alleged defaults in turn so that [the University] can receive the positive assurances [it] seek[s] that, with the exception of this $1,500,000 shortfall, [the Developer] ha[s] not stopped [its] efforts." *Id.* at 2. The Developer's responses focused on the "financing hurdle[s]" involved in the project and its continuing efforts to obtain financing; the Developer's reasons for failing to comply with certain requirements, such as the requirement that it erect and maintain signage for the project so the community would be aware of the development planned for the site, characterizing its failures as "reasonable" or "prudent"; and the Developer's progress in obtaining tenants, including a grocery store exceeding the square footage requirements of the Declaration of Covenants. *Id.* at 1–5. In this September 2011 exchange, the University simply refused to be bullied or threatened and the Developer finally responded substantively to the University and District's request from a month earlier, in August 2011. The parties then tried to reset the working relationship.

### H. OCTOBER – DECEMBER 2011: THE UNIVERSITY CONTINUES ITS RELATIONSHIP WITH THE DEVELOPER NOTWITHSTANDING THE DEVELOPER'S DEFAULTS

41. *The Proposed Memorandum of Understanding.* While Stovall was primarily responsible for the project and had the authority to issue the Notice of Default and engage in other communications with the Developer, *see* Trial Tr. Day 1 PM at 16:12–16 (Ribeau), some within the University did not agree with Stovall's approach. Dr. Hassan Minor, a Senior Vice President of the University in charge of governmental relations, had been responsible for the Howard Town Center development project at its inception, before the project was transferred to Stovall. *See id.* at 3:18–4:15, 35:7–14 (Ribeau). Dr. Ribeau testified that the

Howard Town Center project was "Dr. Minor's baby" and reassigning it to Stovall had been "tough." Trial Tr. Day 1 AM at 35:10–36:11. On October 21, 2011, Dr. Minor emailed Dr. Ribeau expressing his view that Stovall had employed a "'default to litigation' approach" to the project and his understanding that he (Dr. Minor) had been tasked with "see[ing] if it was possible to change the final destination of the [Howard Town Center development] train from injunctions, damages and years of litigation to building permits, construction, ribbon-cuttings and occupancy." Pl.'s Ex. 6, Emails Between Dr. Hassan Minor and Dr. Sidney Ribeau, dated Oct. 21, 2011, and Nov. 2, 2011, at 2. Dr. Minor "enclosed a draft of a new [Memorandum of Understanding ("MOU")] that ha[d] been developed in the last 3 days with the [Developer]." *Id.*

42. Along with Dr. Minor, Norman Jenkins helped develop the MOU on the University's behalf. *See* Joint Ex. 15, Email and Memorandum from Eric Siegel to Norman Jenkins, cc: Ron Cohen, dated Oct. 17, 2011. Jenkins is an alumnus of Howard University and has volunteered for the University for many years, now serving as a trustee. *See* Trial Tr. Day 7 AM at 4:2–7, 4:24–5:10 (Jenkins). Jenkins "run[s] a company [that] develop[s] and acquire[s] all classes of real estate" and testified that Dr. Ribeau asked him to become involved in the Howard Town Center project because he "wanted someone with a development background to come in and also have a sympathetic ear and a different lens than the University might have, to see if we can get the project moving." *Id.* at 4:14–17, 5:11–17. Both Cohen and Siegel used the same words to express their view that Jenkins was "a breath of fresh air." Trial Tr. Day 1 AM at 92:12–19 (Cohen); Trial Tr. Day 3 PM at 26:14–15 (Siegel).

**43.** The proposed MOU between the Developer and the University was reviewed by a consultant retained by the real estate committee of the Howard University Board of Trustees. *See* Pl.'s Ex. 50, Memorandum from Sumner Partners & S. Klebanoff to Josh Rales, Trustee of Howard University, cc: Sidney Ribeau, Troy Stovall, dated Nov. 14, 2011. In an eight-page memorandum relaying its assessment to a trustee of the University, the consultant noted its "previous and standing recommendations to terminate the transaction and re-market the property based on the default and actions of the [Developer]" and stated that the "'take away' from [its] review of the [MOU] is that there is nothing new in [the Developer's] proposal—in fact, it just continues the 'free look' that [the Developer] has been provided for calendar year 2011." *Id.* at 1. Indeed, for the two years that the Developer had exclusive rights to the Property's leasehold, the Developer had paid only the initial rental payment on the execution of the agreements in January 2010 and failed to make any other rental payment.[11]

**44.** Certain persons within the University appear to have been persuaded by the consultant's standing recommendation. Robert Tarola, who at the time was the University's Chief Financial Officer, took over responsibility for the project from Stovall at some point "late in 2011." Trial Tr. Day 2 PM at 44:24–45:2. Tarola testified that at the time he took over, "[t]here were a few people that had a view that [the Developer] would not be able to perform. And as a result a better deal could be obtained." *Id.* at 58:24–59:5.

**45.** Others within the University continued to desire preservation of the University's relationship with the Developer, if the University and the Developer could formulate "a deal equal to the

---

[11] The Developer cherry picks from a document containing notes from a November 8, 2011, meeting with Dr. Ribeau to suggest that the motivating factor behind the consultant's recommendation that the Developer be terminated and the Property remarketed was that the "[d]eal was done below current market," Pl.'s Prop. Findings Fact Concls. Law ¶ 121 (quoting Pl.'s Ex. 53, Notes from Meeting with President Ribeau, dated Nov. 8, 2011, at 2), but viewed in its totality, that document, along with the consultant's report and the entire record in this case, demonstrate that the Developer's failure to perform was the precipitating factor for the consultant's consideration of the consequences to the University of continuing with or terminating that relationship.

original." Pl.'s Ex. 52, Emails Between Dr. Hassan Minor, Dr. Sidney Ribeau, and Robert Tarola, dated Dec. 11–12, 2011. As noted, Dr. Ribeau had asked Dr. Minor to develop the MOU and had brought in Jenkins for that purpose. *See supra* Part II.H.41–42. Tarola testified that after Stovall's departure from the University for personal reasons, *see* Trial Tr. Day 1 PM at 60:24–61:4 (Ribeau), Dr. Ribeau "asked [Tarola] to pick up the project and see if [he] c[ould] get it moving to a positive result." Trial Tr. Day 2 PM at 59:6–12.

## I.    DECEMBER 2011 – MARCH 2012: DURING NEGOTIATIONS, THE DEVELOPER FURTHER DEFAULTS, AND THE UNIVERSITY SENDS TWO ADDITIONAL NOTICES OF DEFAULT

**46**. The Developer failed to make the $1,475,000 second rental payment on December 8, 2011. Cohen testified that while the Developer "had the money to do whatever was necessary to get this project off the ground, including funding whatever equities was required, and any other obligations financially that it took to get this project up and running," after "collective decision input from the attorney, from [his] son, from [his] son-in-law, Eric Siegel, and [him]self," he decided not to make payment as required by the extended deadline proposed by the Developer and accepted by the University in March 2011. Trial Tr. Day 2 AM at 103:2–104:14; *see also supra* Part II.E.24.

**47**. On December 28, 2011, Tarola transmitted to Cohen, via email, a "letter agreement that Howard University propose[d] [the parties] jointly execute to move the Town Center project forward." Joint Ex. 16, Email from Robert Tarola to Ron Cohen, cc: Timothy Kissler and Dr. Hassan Minor, dated Dec. 28, 2011, at 1. The email further stated, "We are prepared to negotiate in good faith toward an immediate resolution of issues that have caused project delays." *Id*. The referenced letter agreement states that the parties "desire to engage in discussions . . . aris[ing] out of a pending dispute between the University and Developer

concerning Developer's obligations." *Id.* at 2. Under the heading "Negotiations," the letter agreement provides that "the parties . . . acknowledge that they are about to commence negotiations . . . concerning the obligations owed to the University by Developer . . . with a view to a settlement by the parties of their dispute" and further provides, *inter alia*, that "[n]o [w]aiver" of any rights under the existing agreements would occur as a result of the letter agreements and "while there may be many matters which the parties hope to discuss, no agreement reached with respect to any matter . . . shall have any effect whatsoever unless such agreement is reduced to writing." *Id.* at 2–3. The Developer executed this agreement, "with some minor changes," on January 4, 2012. *See* Def.'s Ex. 34, Email from Eric Siegel to Robert Tarola, dated Jan. 4, 2012, at 1, 4.

**48**. On January 12, 2012, Dr. Ribeau sent an email to Tarola, Dr. Minor, and Klebanoff designating them as the University's "negotiating team for the current phase of project deliberations." Pl.'s Ex. 55, Emails from Dr. Ribeau and Dr. Minor, dated Jan. 12, 2012, at 2. In response to a question from Dr. Minor about Jenkins's relationship to the negotiating team, Dr. Ribeau stated that Dr. Minor would "replace Norm on the team" but "[h]e should still be on call." *Id.* at 1.

**49.** *The Second Notice of Default.* Notwithstanding the University's commitment to negotiate toward a modified agreement with the Developer regarding the Howard Town Center project, on February 3, 2012, the University sent the Developer, for the second time, a notice of the Developer's defaults, and in the same document gave the first notice of the University's intent to terminate the agreements with the Developer. *See* Joint Ex. 17, Notice of Default and Notice of Intent to Terminate, dated Feb. 3, 2012. The notice states that "[t]he Developer has failed to perform a number of its important obligations and responsibilities

under the Project Documents, including those listed in the University's letter to the Developer dated September 26, 2011, and subsequent correspondence" and that "[a]s a result of those prior notices to the Developer and the failure of the Developer to completely cure the defaults itemized in those notices within the applicable cure periods," the Developer now has only one "further opportunity to cure" before "it may be terminated by the University." *Id.* at 1, 3. The notice further cites the Developer's failure to pay $1,475,000 by December 8, 2011, as agreed by the parties in the letters between Stovall and the Developer, and warns that "if that failure is not cured . . . within ten (10) days after this notice, then such failure shall also constitute an event of default" for which, pursuant to the Ground Lease, the Developer would have one "further cure period [of] ten (10) days" before becoming subject to termination for that default. *Id.* at 3 (emphasis and capitalization omitted). The letter advises that "the University is not waiving any of the rights and remedies available to the University at law and in equity on account of the Developer's failure to timely cure the Developer's defaults" and, "specifically," that "[n]o failure to exercise and no delay in exercising, on the part of the University, any right, remedy, power or privilege, shall operate as a waiver thereof." *Id.* at 4.

50. This second notice was signed by Tarola. *Id.* He testified that the decision to send the notice at this juncture was made not by him but the lawyers advising the University as to the project. Specifically, Tarola testified that with respect to this notice, he "was deferring to legal counsel to make sure that the legalities were as they wished." Trial Tr. Day 2 PM at 60:23–61:7; *see also id.* at 61:15–62:4 (plaintiff's counsel reading Tarola's deposition testimony stating the February 3, 2012 Notice of Default and Notice of Intent to Terminate "seemed to be counterproductive").

51. Cohen testified that after receiving this notice, he consulted with Siegel and Michael Hollander, the Cohen Companies' General Counsel, and considered the past interactions and present positon of the parties, including "what [Cohen] considered at some point some[] posturing on Howard's part," and notwithstanding the reference in the default notice to the Developer's failure to make the second rental payment, "the decision was just not to make the payment." Trial Tr. Day 2 AM at 112:6–22. Siegel testified that "it's always been a surprise to [him] that the University had been pushing so hard for a rental payment that they could never use because it was always going to . . . make a clean site," *i.e.*, to cover environmental remediation costs in excess of $750,000, pursuant to the Development Agreement Amendment, and, thus, "the money would never be used by the University for their own purposes." Trial Tr. Day 4 AM at 27:5–12.

52. Rather than cure the default even in part by making the second rental payment, the Developer's response to the February 3, 2012, Notice of Default and Notice of Intent to Terminate was a blunt threat of litigation. On February 7, 2012, the Developer emailed a letter to Tarola, which stated its purpose was "to ensure that the University is on notice that it should take all necessary steps to preserve the written and electronic records associated with the Howard University Town Center project." Def.'s Ex. 36, Email from Eric Siegel to Robert Tarola, cc: Dr. Hassan Minor, Michael Hollander, Timothy Kissler, and mvahey@dccouncil.us, attaching Letter from Developer to Robert Tarola, dated Feb. 7, 2012, at 2. The letter further stated, "Failure to preserve such documents shall subject the University to a claim for spoliation of evidence in the District of Columbia, in addition to legal pursuit of any other rights and remedies the Developer may have against the University. Conduct yourselves accordingly." *Id.* at 3. Siegel testified that he included that warning

because he "was concerned based upon . . . prior dealings with the University that while [the Developer] had [its] records, . . . records might be lost." Trial Tr. Day 3 PM at 29:19–30:3. He further testified that while the letter anticipated litigation, he denied that he "perceive[d] it as a threat" but was "indicating . . . we may have a dispute here that's going to rise to the level of litigation." Trial Tr. Day 4 PM at 43:2–44:2.

53. On February 15, 2012, following the February 3, 2012, Notice of Default and Notice of Intent to Terminate and the Developer's response, the parties executed a letter agreement, substantially similar to the one sent via email to the Developer by Tarola almost two months earlier, on December 28, 2011, but including Kissler, principal of CastleRock, as a signatory and party to the negotiations and noting the February 3, 2012, Notice of Default as a basis for the contemplated discussions. *See* Joint Ex. 18, Re: Howard Town Center, dated Feb. 14, 2012, at 1–2.

54. *The Third Notice of Default.* On March 5, 2012, the University sent the third notice of default, and the second notice of intent to terminate, to the Developer. *See* Joint Ex. 20, Notice of Default and Notice of Intent to Terminate, dated Mar. 5, 2012. This notice reiterated the University's intent to terminate, announced in the February 3, 2012, Notice of Default and Notice of Intent to Terminate, based on the defaults first noticed in the September 2011 Notice of Default. *Id.* at 1. This notice further provided that the Developer's failure to pay $1,475,000 "ha[d] not been cured within the required cure period . . . and now constitutes an Event of Default," *id.* at 2, and consequently that "the University intends to terminate the Ground Lease, the Development Agreement and the other project documents if this event of default is not cured within ten (10) days." *Id.* at 1–2 (emphasis and capitalization omitted). Tarola testified that he believed this notice to be "[n]o more

productive" than the notice sent on February 3, 2012. Trial Tr. Day 2 PM at 63:10–12. Yet, in his testimony, Siegel conceded that in sending these notices, the University was "certainly well within [its] right to do so." Trial Tr. Day 4 PM at 47:5–48:21.

**55.** The evidence reflects that the Developer was unwilling to enter into the "settlement" resolving "the obligations owed to the University by Developer" contemplated by the February 14, 2012, letter agreement, *see* Joint Ex. 18, Re: Howard Town Center, dated Feb. 14, 2012, at 1, until a financing commitment had been secured. For example, on April 3, 2012, Kissler wrote an email to Tarola stating that "Ron is very close to agreeing to our deal. He would like to hear from JP Morgan, but they have not responded as of yet" and expressing his view that "a brief conversation between Norm and Ron would tip the scales in our favor." Pl.'s Ex. 12, Emails Between Timothy Kissler, Robert Tarola, Norman Jenkins, Dr. Sidney Ribeau, dated Apr. 3, 4, 2012. Tarola forwarded this email to Jenkins and Ribeau, addressing Jenkins specifically in stating that "Kissler believes that Ron Cohen would commit to my proposal if he had some assurance from you that the new Howard team will be supportive of the project," and providing a summary of the details of the proposal offered by Tarola. *Id*. at 1. Tarola inexplicably stepped over the part of Kissler's comments indicating that a financing commitment was really the hold up to the Developer moving forward, even though every document for the deal expressly excluded financing or the lack thereof as a reason for delay or non-performance. Jenkins recognized the Developer's maneuvering, stating in response that he would prefer commencement of construction sooner but "suspect[ed] [the specified date] is driven by financing?" and concluding by opining that "if we can get this deal, we should take it." *Id*. In his response, Ribeau offered, "If we can get the right deal, it's a home run for us." *Id*.

## J.    APRIL 2012: THE PARTIES SIGN A TERM SHEET

56. On April 10, 2012, after nearly six months of negotiations and two letter agreements aimed at resolving their dispute, the parties executed a three-page "Term Sheet" designated as "For Settlement purposes." Joint Ex. 21, Term Sheet, dated Apr. 6, 2012, at 1; *see* Trial Tr. Day 2 AM at 135:24–136:8 (counsel for both parties stipulating that the Term Sheet was fully executed by April 10, 2012). This is the same Term Sheet that the Developer previously advised the Court was "immaterial," *see* Pl.'s & Third-Party Def.'s Mem. P. & A. Opp'n Def.'s Mot. Summ. J. at 7–8, and, indeed, the Developer's original complaint in this matter is conspicuously devoid of any reference whatsoever to the Term Sheet, *see generally* Pl.'s Compl., ECF No. 3. In an about-face on appeal, however, the Developer pushed this Term Sheet front and center as a reason for vacatur and remand of the grant of summary judgment against it. *See supra* Part I.B (discussing this case's litigation history).

57. *Provisions of the Term Sheet.* In twelve simple paragraphs, the Term Sheet withdrew the University's second and third notices of default, sent in February and March 2012, conditioned on "[t]he timetable for cure of the monetary default . . . defined herein." Term Sheet at 1. Under this "timetable" for "RENT, SCHEDULE, AND OTHER ITEMS," the following steps were expressly required:

   a)    execution of the Term Sheet itself;

   b)    execution of an amendment to the escrow agreement such that the $525,000 paid by the Developer thus far to the parties' escrow account would be released to the University upon execution of the Term Sheet;

   c)    execution of amendments to the Ground Lease and the Development Agreement by April 30, 2012;

d)      commencement of construction by April 15, 2013, with phasing of the project permitted;

e)      automatic termination of the lease if the "Developer fails to break ground by September 15, 2013," at which point "both parties agree that all actions, by either party, prior to the execution of the Ground Lease Amendment shall not be grounds for litigation," *i.e.*, a walk away provision; and

f)      "[p]ayment of past due ground rent in the amount of $1,475,000," with $100,000 to be paid "no later than ten (10) days after execution of th[e] Term Sheet" and "the balance of $1,375,000" to be paid "no later than ninety (90) days after the execution" of the amendments to the Ground Lease and the Development Agreement, *id.* at 2.[12]

58. With respect to the University's withdrawal of the Developer's defaults, Jenkins testified that "[t]he way [he] understood the term sheet to work is: Provided that all of the terms within the term sheet were agreed upon and complied with, then there would be a waiver." Trial Tr. Day 7 AM at 27:17–22.[13]

59. Consistent with the original Ground Lease and Development Agreements, and first amendments thereto, no term of the Term Sheet made either party's performance contingent on the securing of financing for the project. *See generally id.* Tarola testified that even without financing having been secured by the Developer, he "understood that the Developer

---

[12]      The $100,000 initial installment requirement may have been driven in part by the District's prior request for security in the amount of $100,000 to demonstrate the parties' commitment to the Howard Town Center project. *See* Def.'s Ex. 19, Letter from Troy Stovall to Ronald J. Cohen, dated Aug. 19, 2011, at 3.

[13]      While the Developer summarizes Jenkins's testimony as demonstrating "he understood the Term Sheet to 'waive' the defaults," Pl.'s Prop. Findings Fact Concls. Law ¶ 143, and Siegel testified to his view that the Developer could walk away scot free from the deal following the signing of the Term Sheet, *see* Trial Tr. Day 3 PM at 34:4–8 (testifying that the default language was so the Developer "could have a playing field going forward" and "wouldn't be held in a default posture, that it would be over"), the portion of Jenkins' testimony cited in the text belies the Developer's characterization of the Term Sheet's intended effect.

had some substantial assets and should be able to pay what was due to the University; so [he] expected it to be paid and, indeed, . . . was looking for cash as a way of showing good faith to continue the project." Trial Tr. Day 5 AM at 17:19–18:4. Tarola "felt that the Developer needed to show commitment to the project in the form of cash contributed toward moving that along . . . . [T]he cash was not important to Howard University, being a billion-dollar company, but it was important to make sure that we had the commitment to move forward with the project." *Id.* at 18:11–19.

60. Siegel understood that pursuant to the Term Sheet, the money owed by the Developer would "be paid in two different installments, subject to the first one being within ten days and the second one would be subject to the second amendment documents being signed." Trial Tr. Day 6 AM at 66:5–11.

### K.   APRIL – MAY 2012: THE INITIAL PROPOSALS FOR SECOND AMENDMENTS

61. Siegel testified that "between the 10th and approximately the 19th of April," *i.e.*, "[a]fter the signing of the term sheet[,] we learned from J.P. Morgan that they were no longer interested in moving forward with the project." Trial Tr. Day 4 PM at 86:14–87:3. Apparently, the Developer had no other possible financing options by then to move the project forward, more than two years after execution of the first amendments to the Ground Lease and Development Agreement.

62. On April 19, 2012, Tarola briefed the Real Estate Committee of the Howard University Board of Trustees "on developments subsequent to the approval to commence 'default proceedings' at the January 26, 2012 meeting." Pl.'s Ex. 8, Report of the Real Estate Committee, Howard University Board of Trustees, dated Apr. 19, 2012, at 4. The Committee Report summarizes the Term Sheet as providing for, on the Developer's part, the release of

the $525,000, payment to the University of "past due ground rents," and "release of litigation risk for past acts. In return, the Developer would receive a default waiver from Howard and a new construction start date and ground rent payment schedule." *Id.* Jenkins, at that time a trustee of the University and serving as Chair of the Real Estate Committee, relayed to the Committee that, according to the Developer, "facts have changed subsequent to the execution of the term sheet" in that "the financial backing [it] had from JP Morgan may no longer be viable" but that "the Developer appears motivated and willing to proceed with this project." *Id.*

63. The Developer did not make the $100,000 payment as required by the Term Sheet. Cohen testified that, at some point, after "assessing where [the Developer] w[as] financially in this project, [he] immediately called [Jenkins]" and told him he was "just not in a position to pay this money" because the Developer was "almost $2 million out-of-pocket." Trial Tr. Day 1 AM at 103:4–9. Jenkins "was upset," and Cohen "fully underst[oo]d" given that he "went back on a promise" to the University. *Id.* at 103:9–10. The Developer continued to conduct itself as if the contract documents conditioned its responsibilities and obligations to the development project on securing financing, when the documents expressly provided the opposite.

64. *The University's April 23, 2012, Drafts.* On April 23, 2012, the University sent a first draft of the contemplated amendments to the Developer. *See* Def.'s Ex. 42, Email from Robert Tarola to Timothy Kissler, Ronald Cohen, and Eric Siegel, cc: Norman Jenkins, Bridget Sarikas, Odessa Jackson, and David Gifford, attaching three documents: (1) Termination of Escrow Agreement; (2) Second Amendment to Ground Lease; and (3) Second Amendment to Development Agreement, dated Apr. 23, 2012. The University's proposed second

amendments were fully consistent with the Term Sheet's outline of the parties' intent, including the University's concession to a two-phase project, a concept that the University had not originally agreed to and resisted for over two years. The salient terms of these documents are summarized below.

a)   The proposed Termination of Escrow Account provided for the termination of the existing escrow account between the parties and release of the amounts currently in the account to the University.  *See id.* at 2–3.

b)   The proposed Second Amendment to Ground Lease provided for payment of the $1,475,000 in two installments, one of $100,000 and one of $1,375,000, on "April __, 2012" and "July __, 2012," respectively.  *See id.* at 6.

c)   The proposed Second Amendment to Development Agreement took into account the termination of the escrow account, providing that environmental remediation costs in excess of $750,000 would be paid by the University directly to the Developer or any third-party contractor and that rental payments should be made directly to the University by the Developer; provided for mandatory submission dates for the design documents required of the Developer by the Development Agreement; provided for construction of the project in two phases; provided for construction of the project in two phases, as the Developer had requested; and, in accordance with the "walk away" provision of the Term Sheet, provided that "if for any reason (including due to any Unavoidable Delay and/or any action of inaction on the part of the University or the District, whether or not constituting a default or breach on the part of the University), the 'commencement of construction,' as defined in . . . the Development Agreement, has not occurred by

September 15, 2013, the Ground Lease and the Development Agreement shall terminate and be of no further force or effect." *Id.* at 12–14.

65. *The Developer's May 2, 2012, Drafts.* On May 2, 2012, nine days after the University transmitted its draft documents and two days after the date provided by the Term Sheet for execution of the amendments, the Developer responded to the University with its revisions. *See* Joint Ex. 23, Email from Eric Siegel to David Gifford, cc: Norman Jenkins, Bridget Sarikas, Odessa Jackson, Robert Tarola, Timothy Kissler, Ronald Cohen, and Michael Hollander, attaching (1) Termination of Escrow Agreement; (2) Second Amendment to Ground Lease; and (3) Second Amendment to Development Agreement, dated May 2, 2012. The Developer's proposed changes shifted the fundamental financial risks of the project from the Developer to the University by making explicit that the Developer would not make further investments, even rent payments past due, until financing was secured. The Developer's redlines reflect the following changes, *inter alia*:

    a)      to the proposed Termination of Escrow Agreement, the Developer inserted the precise amount currently in the parties' escrow account for release to the University, but made no other changes, *see id.* at 2;

    b)      to the proposed Second Amendment to Ground Lease, the Developer inserted a provision amending the definition of "Closing Date" to be contingent on financing, *id.* at 23; deleted the University's provisions requiring payment of the $1,475,000 in two installments on dates certain and replaced it with a provision making its payment contingent on financing, *id.* at 24–25; inserted the terms for a rental payment schedule, contemplated by the University's April 23, 2012, draft, that would defer the Developer's obligations to pay rent, *id.* at 25–26; inserted an

amendment making execution of a Memorandum of Lease, to be recorded with the District of Columbia, contingent on financing, *id.* at 27; and deleted the phrase "(other than financial inability)" from the "force majeure" (*i.e.*, excuse of performance in the event of an Act of God or the like) clause of the Ground Lease, *id.*; and

c)      to the proposed Second Amendment to Development Agreement, the Developer deleted the portion of the definition of "Unavoidable Delay" providing that inability to obtain financing is not an unavoidable delay, *id.* at 10; amended the definition of "Construction Commencement Deadline" to be contingent on financing, *id.*; and deleted the walk away provision, *id.* at 13. Siegel testified that he deleted the walk away provision in its entirety, notwithstanding this key provision in the Term Sheet, because he "didn't think it was reasonable." Trial Tr. Day 3 PM at 52:7–24.

66. *The University's May 4, 2012, Drafts.* Two days later, on May 4, 2012, Tarola sent an email responding to the Developer's redlines stating, "We have reviewed the documents you sent and note that they depart considerably from the Term Sheet. We also note that payments to Howard as agreed within the Term Sheet are already past due." Joint Ex. 24, Emails Between Eric Siegel and Robert Tarola, attaching (1) Second Amendment to Ground Lease; (2) Second Amendment to Development Agreement, dated May 4, 2012. In the attached proposed amendments, the University continued to seek the $1,475,000 rental payment in two installments, one of $100,000 on May 10, 2012 and the balance on July 31, 2012, and reinserted the proposed walk away provision. *See id.* at 7, 17. The University accepted the Developer's changes regarding recording of a Memorandum of Lease contingent on

financing and, in modified form, its proposed deferred rental payment schedule, but rejected the Developer's other proposals to make its performance contingent on financing. *See generally id.*; *see also* Joint Ex. 25, Email from David Gifford to Eric Siegel, dated May 7, 2012 (attaching blacklines of the University's proposed documents). The entire purpose of the Development Agreement from the outset, as Dr. Ribeau and Tarola explained, was to outsource to a developer, with professional experience in the development arena and real estate community, the responsibilities and risks associated with the development project, for the benefit of the University and surrounding community. *See* Trial Tr. Day 1 PM at 43:17–44:7 (Ribeau) (explaining that the University's motivation was not the profitability of the development project but the "value it added to the community" and the purpose of hiring a developer was "to do things that developers do that really wasn't in our portfolio of things to do"); Trial Tr. Day 5 AM at 106:5–7 (Tarola) (explaining that from "the business perspective" the purpose of the relationship with the Developer was "improving the campus" with "other people's money").

67. *The Developer's May 8, 2012, Drafts.* The Developer responded on May 8, 2012, with proposed revisions to the University's most recently transmitted proposed second amendments to the Ground Lease and Development Agreement. *See* Joint Ex. 26, Email from Eric Siegel to Robert Tarola, cc: David Gifford, Norman Jenkins, Bridget Sarikas, Tim Kissler, Ron Cohen, and Michael Hollander, attaching (1) Second Amendment to Development Agreement; (2) Second Amendment to Ground Lease, dated May 8, 2012. In these drafts, the Developer proposed, *inter alia*, modifying the Construction Commencement Deadline to be October 1, 2013, nearly six months later than the Term Sheet's commencement date of April 15, 2013, *see id.* at 7; deleting the University's proposal for

mandatory submission dates for required design documents, *see id.* at 8; reinserting a change to the definition of "Closing Date" to be the earlier of the date on which the Developer settles on a construction loan or September 30, 2013, *id.* at 19; and inserting a provision requiring payment of the $1,475,000 only on the newly defined Closing Date, *id.* at 21, which ignored the $100,000 partial payment of the second rental payment and effectively made the second rental payment due upon the Developer securing financing, or an outside date fifteen days after the Term Sheet's walk away date of September 15, 2013, which the Developer proposed extending until October 1, 2013, *id.* at 10–11.

68. *Execution of the Termination of Escrow Agreement.* The parties executed the Termination of Escrow Agreement, effective May 10, 2012, releasing the funds in escrow to the University and dissolving the parties' escrow account. *See* Joint Ex. 27, Termination of Escrow Agreement, dated May 10, 2012.

69. On May 15, 2012, in a letter to "Members of the Finance and Executive Committees" of the Howard University Board of Trustees, Tarola relayed that "[l]ate last week [the University] received the first payment from the developer under the term sheet" and that "we are working with the developer to solidify new agreements that would move the project forward." Pl.'s Ex. 13, Confidential Letter from Robert Tarola to Members of the Finance and Executive Committees, dated May 15, 2012, at 6. In that letter, Tarola also thanked Jenkins for "helping to negotiate to a satisfactory resolution." *Id.*

### L.     MAY – DECEMBER 2012: THE UNIVERSITY FORBEARS FROM TERMINATING THE DEVELOPER WHILE ASSISTING THE DEVELOPER IN PURSUING FINANCING

70. Following the Developer's drafts transmitted on May 8, 2012, which reflected terms the University had explicitly rejected, for a period of time, the University neither accepted those

drafts nor proposed revisions to them. While consistently refusing to execute agreements that conditioned the Developer's performance of any of its obligations on securing financing, the University recognized that for the relationship with this Developer to continue, obtaining financing was paramount and therefore the University took steps to assist the Developer in this regard.

71. Jenkins testified that the University's response to those drafts was to give the Developer an opportunity to secure financing for the project. *See* Trial Tr. Day 7 AM at 11:5–16. In fact, during that period, Jenkins assisted the Developer in its efforts to obtain financing. *See id.* at 11:17–12:3; Def.'s Ex. 50, Email from Eric Siegel to Norman Jenkins, attaching clean draft amendment documents, dated May 23, 2012. Specifically, Jenkins "introduced the developer to some of [his] existing partners, [Quadrangle Development Corp.,] who were prominent Washington, D.C. developers, to see if they might be able to land on some sort of arrangement, because that group had a dedicated fund to do development in the Washington, D.C. market." Trial Tr. Day 7 AM at 11:20–12:3.

72. Siegel testified that he "was instructed by Robert Tarola to give regular updates on where we were with the financing, which we did" and expressed his view that "the university, Norman Jenkins, was very generous to putting [sic] us in touch with potential financing sources." Trial Tr. Day 3 PM at 60:9–25; *see also* Pl.'s Ex. 161, Confidential Letter from Robert Tarola to Members of the Finance and Executive Committees, dated July 31, 2012, at 4 ("We have introduced the developer to two interested investors/lenders and are in regular contact about financing progress.").

73. In addition to financing, the University also assisted the Developer in pursuing a tax abatement for the project with the District. *See* Trial Tr. Day 3 PM at 60:9–18 (Siegel). On

November 12, 2012, Tarola sent a letter to the District expressing the University's support for the tax abatement bill, noting that the University "has been working closely with the Developer and the District for some time to bring this project to reality" and "fully supports the Tax Abatement Act as a means to help the project come to fruition." Joint Ex. 28, Email from Robert Tarola to Timothy Kissler and Eric Siegel, attaching Letter from Robert Tarola to the Council of the District of Columbia, dated Nov. 12, 2012, at 2.

74. *The Demolition Permit Applications*. By November 2012, the second amendments to the Ground Lease and Development Agreement remained unsigned, with the parties' differing provisions unreconciled and the Developer still without financing secured. Nevertheless, in early November 2012, Jenkins relayed to Tarola that the Developer was seeking the University's signature for its applications to the District for permits allowing demolition on the Property. *See* Pl.'s Ex. 14, Emails Between Norman Jenkins, Robert Tarola, and Eric Siegel, dated Nov. 6, 2012. Jenkins explained that he told Siegel "we would not sign until we had certainty of funding." *Id*. at 1. Jenkins testified that he recommended that the University "not begin demolition of the building" because "we didn't have a deal" and "the project wasn't capitalized." Trial Tr. Day 7 AM at 12:20–13:3.

75. Early in 2012, the University had recruited a new University Architect, Alan Brangman, who became involved in the Howard Town Center project. *See* Trial Tr. Day 8 AM at 5:6–6:11. Brangman testified that he believed demolition before the second amendments were signed was inadvisable "because that would have been giving up control of the site, and that also would have put the University at risk with respect to activities taking place on the property before it was under the direct and true control of the developer." *Id*. at 9:19–10:2. Brangman further testified that the Developer was "asking to demolish various section of the buildings

that were on the site" notwithstanding the "historic nature of some of those properties." *Id.* at 10:4–7.

**76.** *The Citi Community Capital Term Sheet.* On November 27, 2012, Siegel emailed Jenkins, stating the Developer was "working diligently on the tax abatement and finalizing the capital stack." Joint Ex. 30, Emails from Eric Siegel to Norman Jenkins, dated Nov. 5, 27, 2012, at 1. The email also attached a letter from Citi Community Capital "offer[ing] an opportunity to submit a preliminary application . . . for financing" and attaching a "Term Sheet dated November 21, 2012." *Id.* at 2. This bank Term Sheet set an estimated closing date of May 30, 2013, for the loan, *see id.* at 8, and listed the application fees, *see id.* at 13–14. Vasques testified that in his view, by soliciting the application and related fees from the Developer, Citi demonstrated that "[t]hey were very serious about moving forward to try to get this done." Trial Tr. Day 6 PM at 21:3–11.

**77.** The following day, Tarola signed the demolition permit applications as requested by the Developer, though Jenkins's and Brangman's position remained not to begin demolition on the site until the project was capitalized. *See* Pl.'s Ex. 134, Application for Raze Permit, 2146 Georgia Ave. NW, dated Dec. 3, 2012, at 4; Pl.'s Ex. 135, Application for Raze Permit, 2112 Georgia Ave. NW, dated Dec. 3, 2012, at 4.

**78.** On December 4, 2012, the Developer paid Citi Community Capital $176,750 in fees for an application for a loan. *See* Pl.'s Ex. 165, Email from Alex Diaz, Cohen Companies, to Fabrice Vasques, cc: Ron Cohen, Eric Siegel, Alan Cohen, and Michael Hollander, dated Dec. 4, 2012.

**79.** One week later, Tarola sent a letter to the Developer advising that while the University "signed and authorized [the Developer] to submit an application for a [demolition] permit," it

did so "notwithstanding the existence of unresolved disputes between the University and Developer." Joint Ex. 31, Letter from Robert Tarola to Developer, dated Dec. 11, 2012, at 1. Tarola further explained that the Developer was "not authorized by the University to commence demolition under [the applied-for] permit without further approval by the University" given the failure of the parties yet to reach a "satisfactory resolution" to their disputes. *Id.* at 1–2. The letter made clear that "the University is not waiving any defaults on the part of the Developer." *Id.* at 1. The record contains no response from the Developer to the University's concerns expressed in this December 11, 2012, letter.[14]

80. Notwithstanding the University's expressed concern about the status of the project, including the lack of executed second amendments to the Ground Lease and Development Agreement and lack of secured financing, the Developer sent a letter to the University on December 18, 2012, advising that "the contractor will be mobilizing on Monday, January 7, 2013 to commence asbestos abatement and demolition" and to "[p]lease make sure any equipment, personal items and vehicles have been removed from the building prior to that date." Joint Ex. 32, Letter from Developer to Howard University, dated Dec. 18, 2012.

### M. DECEMBER 2012 – FEBRUARY 2013: THE PARTIES RESUME NEGOTIATIONS, AND THE UNIVERSITY SETS A FINAL DEADLINE FOR THE $1,475,000 RENTAL PAYMENT

81. During late 2012, shortly after the Developer had positive news regarding potential financing from Citi Community Capital, which had authorized the Developer to submit a loan application on December 4, 2012, the Developer restarted its efforts to obtain the District's

---

[14]    The Developer characterizes the University's December 11, 2012, letter as a "reversal of its position to allow demolition to proceed," Pl.'s Prop. Findings Fact Concls. Law ¶ 190, but no evidence supports the Developer's implication that the University authorized the Developer to begin demolition, and, to the contrary, the evidence shows that the University was opposed to the Developer's beginning demolition from the moment the Developer proposed demolition due to the unresolved second amendment issues and the Developer's continuing default in failing to make either installment payment on the second rental payment as required by the parties' Term Sheet.

approval to alter the construction deadlines in the Declaration of Covenants between the District and the University. Specifically, the Developer sent Andre Byers, a District official, emails on December 10 and 11 requesting new deadlines and representing that its suggested deadlines came from "the Second Amendment to the Ground Lease and Development Agreement that [the Developer has] negotiated with Howard University, who agrees to these deadlines." Joint Ex. 33, Emails Between Eric Siegel, Andre Byers, Robert Tarola, and Norman Jenkins, dated Dec. 10, 11, 18, 19, 2012, at 3. On December 18, 2012, Byers forwarded the emails to Tarola inquiring whether he was "familiar with the request below," *id*. at 2, and that same day, Tarola forwarded the emails to Siegel asking him to "advise [Tarola] about this email trail and the reference to a 'second amendment,'" *id*. At this point, no second amendments had been finalized, an issue of such concern to the University that Tarola's letter of December 11, 2012, had instructed the Developer that no demolition on site was authorized.

**82.** *The Developer Resends Its May 8, 2012, Drafts.* On December 19, 2012, in response to Tarola's email, the Developer emailed Tarola, copying Jenkins, transmitting the same draft amendment documents sent by the Developer on May 8, 2012, but noting in the email that the "two-phased construction schedule" conceded to by the University and contained in the transmitted drafts was "now moot because [the Developer is] building the entire project at one time," and further advising that the "University's formal request to the District via Andre Byers to revise [the Covenant] dates is all we need" to get "the paperwork . . . in order for our lender and equity's due diligence to get to closing." *Id*. at 1; *see* Trial Tr. Day 4 PM at 132:3–23.

**83.** On December 27, 2012, Tarola sent Byers a letter advising him that the "University has approved" the new deadlines for construction proposed by the Developer and assuring the District that the University "remains committed to the prompt and successful completion of this Project" notwithstanding that "a number of . . . issues remain unresolved" between the University and the Developer. Joint Ex. 34, Letter from Robert Tarola to Andre Byers, cc: Ronald Cohen, dated Dec. 27, 2012, at 1.

**84.** The same day, Tarola sent the Developer a letter responding to the Developer's December 18, 2012, letter regarding its intent to begin demolition, reiterating the University's position that "[a]lthough [the] continuing discussions have been productive, they have not yet yielded a complete settlement arrangement acceptable to Howard University," and, consequently, the University "cannot at this time agree to the Developer's possession of the Project property, or approve the commencement of any work (including demolition)." Joint Ex. 35, Letter from Robert Tarola to Developer dated Dec. 27, 2012.

**85.** In an email to Siegel, Tarola explained that the parties "need to reach agreement on the ground lease amendment and term sheet payments before [the University] can give [the Developer] access to the property." Joint Ex. 36, Emails Between Eric Siegel, Andre Byers, Robert Tarola, and Norman Jenkins, dated Dec. 10, 11, 18, 27, 2012, Jan. 1, 2013, at 2. In response, on January 1, 2013, the Developer promised to "reach out tomorrow morning . . . about the time frame for receiving the draft Second Amendments to the Ground Lease and Development Agreements for [the Developer's] review" and provided that "the outside date to 'true up' on the initial ground lease payment of $1.425 million [sic] would be May 30, 2013 (the date of closing on the financing with Citi Community Capital . . . )." *Id.* at 1. Again, the Developer was seeking to condition the required rental payments on the securing

of financing, contrary to any provision in the contract documents or in the parties' Term Sheet.

86. *The University's January 11, 2013, Drafts.* On January 11, 2013, David Gifford, outside counsel for the University in the negotiations with the Developer, transmitted revised draft documents requiring, *inter alia*, payment of the $1,475,000 by May 10, 2013, as well as liquidated damages for failure to meet construction deadlines and evidence of financing. *See* Joint Ex. 37, Email from David Gifford to Eric Siegel, attaching (1) Second Amendment to Ground Lease; (2) Second Amendment to Development Agreement, dated Jan. 11, 2013, at 3.[15] These drafts again reflected the University's position, consistent with the original contract documents, that the financial risks rested on the Developer and the Developer's failure to perform was not excused by financing difficulties. In its cover email, the University also reiterated its position that "[t]he submission of these drafts remains merely a part of the negotiations concerning the obligations owed to the University by Developer with a view to compromise and settlement by the parties of their dispute." *Id.* at 1.

---

[15]     The Developer asserts the University's selection of May 10, 2013, for payment of the second rental payment was inconsistent with the Developer's "discussions with Mr. Jenkins and Mr. Tarola that the payment would be tied to a closing date on or before October 1, 2013," but cites no evidence in support of this proposition. Pl.'s Prop. Findings Fact Concls. Law ¶ 215. Nor does such evidence exist in the record, which reflects that while Jenkins and Tarola may have discussed a construction commencement date of October 1, 2013, with the Developer, they never discussed the long overdue rental payment being made that day. *See* Joint Ex. 34, Letter from Robert Tarola to Andre Byers, cc: Ronald Cohen, dated Dec. 27, 2012, at 1; Trial Tr. Day 5 AM at 109:17–110:22 (Siegel) (asserting that in May 2012 Jenkins agreed to a commencement-of-construction deadline of October 1, 2013, though acknowledging that "[t]he only document that memorializes that [discussion] would be [the Developer's own] May 8 draft").

        While the record is unclear as to the University's reasons for selecting the precise date of May 10, 2013, this date in May, but a year earlier, was the date set out in the University's May 4, 2012, drafts of the second amendments as the deadline for payment of the $100,000 installment of the second rental payment and "May 10" may have been a vestige of those prior drafts. *See* Joint Ex. 24, Emails Between Eric Siegel and Robert Tarola, attaching (1) Second Amendment to Ground Lease; (2) Second Amendment to Development Agreement, dated May 4, 2012. In any event, the May 10, 2013, date is generous given the Developer's assertion that it would close on financing no later than May 30, 2013, and the fact that a commitment letter would be issued at any point "if the developer or any party to a transaction requested a commitment, and it was agreed that it was necessary." Trial Tr. Day 7 AM at 45:5–11, 53:10–13 (Dickson).

**87.** Around December 2012, principal responsibility for heading the project had been shifted from Tarola to Kurt Schmoke, then General Counsel for the University, though Tarola nevertheless remained involved in the project. *See* Trial Tr. Day 5 AM at 57:9–18.

**88.** On Friday, January 25, 2013, Tarola scheduled a meeting for the following Monday, January 28, 2013, with Siegel and other members of the University's team to discuss the draft amendment documents sent by the University on January 11, 2013. Pl.'s Ex. 22, Emails Between Eric Siegel and Robert Tarola, *et al.*, dated Jan. 25, 2013. In an email confirming the meeting, Siegel expressed that he would "be there ready to work together to finalize the documents." *Id.* at 1.

**89.** Shortly before the scheduled meeting, in response to an email from Siegel asking where the meeting would take place, Tarola sent Siegel an email, copying the University team, stating that "we have to postpone the meeting" and "are meeting internally first later today." Joint Ex. 39, Emails Between Eric Siegel and Robert Tarola, cc: Odessa Jackson, Norman Jenkins, and Kurt Schmoke, dated Jan. 28, 2013, at 1. Siegel responded stating that he "await[s] next steps" and "advised" that "[t]his will further impact 'construction commencement.'" *Id.*

**90.** *The University's February 1, 2013, Email.* On February 1, 2013, Kurt Schmoke emailed Siegel, copying, *inter alia*, Dr. Ribeau, noting that University "officials . . . met to assess our current position with respect to this development" in light of the University's "concerns about the lack of progress being made" and advised that the "University will take no further action in support of the current developer" unless the Developer "has obtained sufficient financing from a reliable source," the $1,475,000 rental payment "has been made to Howard University by May 30, 2013," and "architectural drawings sufficient to obtain construction permits . . . are developed by [the Developer] and approved by Howard University." Joint

Ex. 40, Emails Between Kurt Schmoke and Eric Siegel, dated Feb. 1, 2013, at 2. Siegel responded within two minutes asking Schmoke to call him immediately. *See id.* at 1. Schmoke subsequently sent an email reflecting that a call had taken place and stating that he "appreciate[s] the fact that [they] agree that if the [Developer] does not obtain financing . . . by May 30, 2013, we . . . part company on this project. . . . [I]t is very clear that if the financing is not obtained the relationship between your company and the university is dissolved." *Id.*[16]

91. In requesting certainty of financing, the University was responding to the Developer's repeated efforts to make its project obligations contingent on its securing of financing. Schmoke testified that he viewed financing as "the number one issue" for the Developer and believed that if financing was secured, "everything else would fall into place." Trial Tr. Day 6 AM at 122:5–20.

92. Tarola testified that, around this time, he "felt the lawyers . . . wanted to kill the deal" given the Developer's intransigence, but, in his view, the February 1, 2013, email from Schmoke "should not have killed the deal" and was not "intended to kill the deal." Trial Tr. Day 2 PM at 104:10–14; Trial Tr. Day 5 AM at 77:5–11.

93. By this point in 2013, Brangman had taken on some of Tarola's responsibilities with respect to the project, though Tarola still remained involved. *See* Trial Tr. Day 8 AM at 5:6–6:22. Brangman testified that he took "on those responsibilities at the direction of Dr. Ribeau,"

---

[16] In a footnote, the Developer takes issue with the University's statements during this litigation that the Developer agreed in the February 1, 2013, phone call between Schmoke and Siegel to make the second rental payment on May 30, 2013, asserting that "[t]he University's representations both to this Court and to the D.C. Circuit are flatly contradicted by the testimony of both Mr. Schmoke and Mr. Siegel that the two men did not discuss the payment on their telephone call." Pl.'s Prop. Findings Fact Concls. Law ¶ 234 & n.6. While the evidence does not show that the timing of the payment was discussed on that call, the University's representation is hardly "baseless," *id.*, given the Developer's own representation in its original Complaint that at some point during discussions in 2013 the Developer and the University "agreed that [the Developer] would not be obligated to tender the Payment called for under the Amendment until May 30, 2013," Pl.'s Compl. ¶ 23.

who "needed somebody to be involved in the project who had experience in real estate development," and "that was not always something that Mr. Tarola was happy with." *Id.* at 6:7–11, 6:20–22.

### N. FEBRUARY – MAY 2013: THE HISTORIC NOMINATIONS ARE FILED, AND THE PARTIES CONTINUE TO NEGOTIATE

94. *The Historic Preservation Nominations Email.* On February 7, 2013, Brangman forwarded to Siegel an email from Rebecca Miller, Executive Director of the DC Preservation League ("DCPL"). *See* Joint Ex. 41, Emails Between Rebecca Miller, Alan Brangman, and Eric Siegel, dated Feb. 7, 8, 2013. In her email, Miller notified Brangman that DCPL had nominated the Bond Bread building and WRECO garage for historic status, which nominations are considered by the DC Historic Preservation Review Board. *See id.* at 2. Miller shared that she "understand[s] that Howard University has plans to raze these buildings" and "would like to propose a meeting to discuss [its] plans and to determine if there is a way to retain these buildings while still carrying out the goals of the University's project." *Id.* In response to Brangman's email, Siegel replied, "Someone must call me to discuss how we jointly address this immediately or this project will come to a screeching halt." *Id.* at 1.

95. The DCPL action to nominate the buildings on the Property could not have been a surprise given those buildings' historic nature, as indicated in the DUKE Plan, which had long required the preservation of at least the façade of the WRECO garage, and a blog post forwarded to the Developer in February 2011, which discussed the Bond Bread building.[17]

---

[17] Apparently as support for its position that the Developer was surprised by the designation of these buildings, the Developer suggests that the DUKE Plan routinely included landmark designations, but notably failed to for these two buildings, which instead referenced "only … the preservation of some" of the WRECO garage. Pl.'s Prop. Findings Fact Concls. Law ¶ 259 ("The DUKE Plan did not include a landmark designation for these buildings."). The Developer has it exactly backward. Testimony at trial revealed that as a general matter the DUKE

Moreover, not long before DCPL filed the nominations, the Developer met with personnel at the District's Historic Preservation Office, at Siegel's request, "to share the project that was being proposed and to just be sure that the Office of Planning was aware of the project pending and that it was moving forward." Trial Tr. Day 2 PM at 10:24–11:2, 11:12–14 (Callcott). "At the initial meeting [with the Developer], . . . the Preservation Office identified . . . both [the WRECO garage and Bond Bread building] as potentially meeting the designation criteria, and that [the Office] wouldn't be surprised if [DCPL] would be interested in having them designated." *Id.* at 11:3–11.

96. Gifford transmitted a draft Second Amendment to the Development Agreement to Siegel on February 8, 2013. *See* Joint. Ex. 42, Email from David Gifford to Eric Siegel, attaching Second Amendment to Development Agreement, dated Feb. 8, 2013.

97. On February 14, 2013, Siegel transmitted a letter to the University, providing in his cover email that "[t]he letter is not offered to be confrontational but simply to set forth the realities of the situation to date while we continue to work together to finalize the Second Amendment documents and keep to an expeditious schedule to move the project forward." Joint Ex. 43, Emails Between Eric Siegel, Robert Tarola, and Kurt Schmoke, dated Feb. 1, 14, 2013, attaching Letter from Developer to Robert Tarola, at 1. The letter asserted that "the Developer has experienced two Unavoidable Delays" precluding the Developer from "adhering to the precise Project Schedule that was submitted . . . on January 31, 2013, and meeting a Construction Commencement Date of October 1, 2013." *Id.* at 5. According to the Developer, the Unavoidable Delays were (1) delays by the University in executing

---

Plan "wanted to leave it open-ended as to whether or not properties would be preserved" subject to review "under the city's historic preservation law," but deemed the WRECO garage so historic that, in an exception to that general rule, it directed that building be preserved. Trial Tr. Day 2 PM at 7:1–22 (Callcott); *see* DUKE Plan at 30.

various documents enabling the Developer to begin demolition on the Property, and (2) the "more troubling . . . recent filing of two historic preservation applications to deem buildings on the property 'historic.'" *Id.* at 7. At the time, the Developer still had not obtained financing for the project, but this fact was not referenced in the letter as a basis for Unavoidable Delay, since lack of financing was expressly excluded as a justification for Unavoidable Delay in the Development Agreement. *See generally id.*; Development Agreement at 7, 18. In blaming the University for delays in beginning demolition, the Developer fails to acknowledge that the parties had not resolved their second amendment disagreements and, in particular, the Developer's proposed changes, which altered fundamentally its second rental payment obligation to make it contingent on financing.

98. The parties exchanged further drafts of the amendment documents, without coming to final agreement on all terms of all documents. *See* Joint Ex. 45, Email from Timothy McCormack to Eric Siegel, attaching (1) Second Amendment to Ground Lease and (2) Second Amendment to Development Agreement, dated Feb. 20, 2013; Joint Ex. 46, Email from Eric Siegel to Timothy McCormack, attaching (1) Second Amendment to Ground Lease and (2) Second Amendment to Development Agreement, dated Feb. 21, 2013; Joint Ex. 47, Email from Timothy McCormack to Eric Siegel, attaching Second Amendment to Development Agreement. The University declined to accept the Developer's persistent demand to condition payment on securing financing. In its draft dated February 21, 2013, the Developer finally dropped its proposed language making payment contingent on financing and agreed to a May 30, 2013, deadline for the $1,475,000 rental payment to "coincide with [the] closing date" for financing. *See* Joint Ex. 46, Email from Eric Siegel to Timothy McCormack,

attaching (1) Second Amendment to Ground Lease and (2) Second Amendment to Development Agreement, dated Feb. 21, 2013, at 6.

**99.** *The University's March 6, 2013, Drafts.* In an email on March 6, 2013, the University's outside counsel noted that the University had accepted the last draft of the Second Amendment to Development Agreement submitted by the Developer and attached a blackline document reflecting only minor changes to the Second Amendment to Ground Lease. *See* Joint Ex. 48, Email from David Gifford to Eric Siegel, attaching (1) Second Amendment to Ground Lease and (2) Second Amendment to Development Agreement, dated Mar. 6, 2013, at 1–6. The University's outside counsel also wrote, "I have been asked to confirm specifically the parties' understanding that the timing for the payment of the $1,475,000 Additional Rent payment will not be affected by the outstanding historical preservation challenge, or any other circumstance, and time is of the essence for the payment of that sum." *Id.* Siegel testified that he did not believe the University's position regarding the rental payment was reasonable "[b]ecause we were still dealing with the historic issues," which impacted the Developer's ability to close on financing. Trial Tr. Day 5 PM at 77:11–79:20. In other words, despite dropping its request for language making its rental payment obligations contingent on financing, and agreeing in its drafts transmitted on February 21, 2013, to a date certain for the rental payment, the Developer continued to operate in accordance with an alternate reality in which its rental payment obligations were contingent on financing, regardless of the requirements of any contract document.

**100.** The following day, the University's outside counsel sent Siegel "an updated version of the Second Amendment to Development Agreement" that incorporated several changes requested by, and favorable to, the Developer. Joint Ex. 51, Email from David Gifford to

Eric Siegel, attaching Second Amendment to Development Agreement, dated Mar. 7, 2013, at 1. Thus, by March 7, 2013, the parties appeared to be close to executing agreements, almost one year after execution of the April 2012 Term Sheet. The Developer threw a proverbial wrench in this progress, however, by demanding new concessions from the University.

101.   *The Developer's Request for Further Changes.*   On March 12, 2013, Siegel sent Brangman "for [his] consideration . . . two changes to the Ground Lease," one of which was "language to address the fact that the D.C. Preservation League has filed the historic preservation applications and the potential impact of historic designation on the Development Program and payment of the initial ground lease payment of $1,475,000." Joint Ex. 52, Emails Between Alan Brangman and Eric Siegel, dated Mar. 12, 13, 2013, at 2. In reply, Brangman told the Developer that its proposal for "[r]eturn of payment" in the case of certain contingencies related to the historic applications was not "going to work" but provided that, instead, the University "might agree to placing the payment in escrow." *Id.* at 1.

102.   On March 14, 2013, Siegel transmitted to Gifford a draft of the amendment to the Ground Lease reflecting the changes discussed with, but not approved by, Brangman. *See* Joint Ex. 54, Email from Eric Siegel to David Gifford, dated Mar. 14, 2013. Brangman and Gifford in separate emails to Siegel informed the Developer that the proposed escrow arrangement for the $1,475,000 rental payment was not acceptable to the University. *See* Joint Ex. 55, Email from Alan Brangman to Eric Siegel, dated Mar. 22, 2013; Joint Ex. 56, Email from David Gifford to Eric Siegel, attaching draft documents, dated Mar. 27, 2013.

103.   On April 1, 2013, "[u]pon returning from spring break," Siegel responded to Gifford's March 27, 2013, email and the attached drafts. Joint Ex. 57, Email from Eric Siegel to David

Gifford, dated Apr. 1, 2013, at 1. He expressed that several of the University's proposed terms were unacceptable to the Developer. In particular, he conveyed that the Developer "cannot agree that the University is entitled to collect $1,475,000 should the Development Agreement and Ground Lease be terminated on May 30 for non-payment, particularly now that there is looming . . . two historic preservation applications that may materially negatively impact the project or, at worst, mark its end." *Id*. Siegel added, "[W]e have already expended over $1 million towards this project" and "[i]f May 30 comes and we fail to make payment as obligated to do so under this Second Amendment, the agreement automatically terminates, and we are out all of the money we have expended." *Id*. Thus, Siegel asserted that, as already "stated in [his] March 7 email," the Developer's proposed "changes are non-negotiable." *Id*. The Developer simply does not acknowledge that this possibility of losing "all of the money [it] ha[s] expended" was a risk assumed by the Developer in the original agreements.

104.    Brangman sent an email expressing the University's views as to the reasonableness of its March 27, 2013, proposed but rejected changes, and the parties decided to meet in person. *See* Def.'s Ex. 109, Emails Between Eric Siegel and Alan Brangman, dated Apr. 9, 2013. After that in-person meeting, the Developer sent a letter to the University, acknowledging that the Developer had been required to preserve the WRECO garage under the DUKE Plan applicable to its development program from its inception, but asserting that the preservation of the Bond Bread building was an unexpected requirement and, accordingly, "must be paid for by the University." Def.'s Ex. 110, Letter from Developer to Alan Brangman, dated Apr. 15, 2013, at 2. The Developer further advised that "the $1,475,000 ground lease payment to

be tendered on or before May 30, 2013 is now a potential issue because we do not know what we are building as a result of these historic applications." *Id.*

105. In a letter dated the following day, Brangman responded stating that "the University does not come to the same conclusions" as the Developer, noting that the governing agreements do not require the University to "absorb any costs associated with the development of this property other than as expressly stated in the project documents," which costs are the Developer's responsibility under those agreements. Def.'s Ex. 111, Letter from Alan Brangman to Ron Cohen, dated Apr. 16, 2013, at 1. With respect to the $1,475,000 payment, the letter provides that "the University views [that] upcoming payment as a commitment to continue with the redevelopment of the property and more importantly as a cure for the fact that a default condition currently exists with respect to the project," asserting that the "University does not in any way see a linkage between your obligation to make that payment as scheduled and the actions of DCPL." *Id.* at 2.

106. *The Developer's Historic Preservation Efforts.* Meanwhile, the Developer worked to account for the historic preservation requirements likely to affect the Property. In particular, the Developer consulted with its architects and historic preservation contractors to get an estimate of the added expense of historic preservation, which estimate was $7,000,000 to $8,500,000. *See* Pl.'s Ex. 117, Email from Eric Siegel to Alan Brangman, dated Apr. 11, 2013, attaching Letter from Alan Cohen to Eric Siegel, dated Apr. 9, 2013, at 2.

107. *Concerns Raised Regarding the Developer's Plans.* The Developer also communicated with multiple individuals regarding the proposals it intended to submit to DCPL in hopes of obtaining DCPL's support before the District's Historic Preservation Review Board. The Developer's proposals included demolishing the entirety of the WRECO garage. *See* Def.'s

Ex. 112, Emails Between Eric Siegel, Sean Cahill, et al., dated Apr. 18, 23, 2013, at 2. In an email to Eric Siegel, Sean Cahill, an architect and member of the Board of DCPL, expressed his view that the Developer's proposal "enter[ed] a very slippery slope" given its reliance on the need for environmental remediation in accordance with city requirements to justify minimal preservation of the historic buildings even though "[t]he contaminants can certainly be remediated with the building in place." *Id*. at 1. After "strongly suggest[ing] [the Developer] rethink this position," Cahill advised that "[a]ll developers have to deal with these issues. Welcome to developing in the District." *Id*. at 1–2. He further expressed his view that the Developer "is starting a war here" and that the "lack of movement on this will be seen as disappointing at best." *Id*. at 2. While Cahill believed in a "solution where both sides are satisfied and supportive of the project" that could be accomplished in a "timely manner," he thought such a solution was not possible "with the design submission attached." *Id*.

108. Notwithstanding Cahill's recommendation, the Developer submitted a plan that, in DCPL's view, "lack[ed] . . . any retention of the WRECO garage" and, thus, was not agreed to by DCPL. Def.'s Ex. 114, Emails Between Eric Siegel and Rebecca Miller, dated May 3, 2013, at 1. Responding to Miller's email rejecting the Developer's proposal, Siegel expressed his view that it was "a shame that this project may die if the financing goes away at this late hour." *Id*.

109. On May 23, 2013, the Historic Preservation Review Board held a hearing at which it considered DCPL's nomination applications for the WRECO garage and Bond Bread building, as well as a proposal by the Developer, dated April 30, 2013, regarding the use of those buildings in its construction. *See* Trial Tr. Day 2 PM at 20:5–22:4 (Callcott). At that

hearing, the Board "designated the two [buildings] as landmarks" and "found that substantial revisions would be needed for [the Developer's proposal] to be an acceptable preservation solution that was consistent with the preservation law." *Id*. at 20:8–16 (Callcott). In the following weeks, the Developer or its architects met with personnel at the Historic Preservation Office several times to develop a new plan for construction on the site. *See id*. at 21:2–22:4 (Callcott). The Developer also "sought a path forward through" the so-called Mayor's Agent process, Trial Tr. Day 4 AM at 26:15–17 (Siegel), which allows "projects of special merit . . . that may not be entirely consistent with the preservation law" to go forward despite "some amount of demolition," if they serve some other public interest, such as "clean[ing] up a site" having "environmental remediation issues," Trial Tr. Day 2 PM at 16:12–17:11 (Callcott).

### O.    MAY 2013: THE DEVELOPER AGAIN REFUSES TO MAKE THE $1,475,000 RENTAL PAYMENT AS REQUIRED

110.    Consistent with its "non-negotiable" position expressed in March and April 2012, two days before the May 30, 2013, deadline for payment of the overdue rent, the Developer transmitted a letter to Brangman communicating that "until the[] historic issues are resolved," it did "not intend to make any further monetary payments to Howard University." Def.'s Ex. 116, Email from Eric Siegel to Alan Brangman, Robert Tarola, and Norman Jenkins, cc: Alan Cohen, Ron Cohen, and Tim Kissler, dated May 28, 2013, attaching Letter from Developer to Alan Brangman, dated May 23, 2013, at 2. The Developer also warned that "[s]hould Howard University determine that it is not advisable to continue working with the Developer," the Developer would nevertheless "hold firm to this property." *Id*. at 3. The Developer further stated that it was "too invested to walk away" from the project. *Id*.

**111.** Having established a belligerent tone of non-negotiable terms and implicitly threatening litigation to "hold" onto the Property, *id.*, the Developer offered the University a path forward that the Developer was willing to pursue. Specifically, the Developer proposed, "[a]s an alternative, if the University is adamant about receiving a lease payment," that the University "consider swapping the adjacent University parking lot for the land subject to the ground lease." *Id.* In this arrangement, the Developer contemplated that the University, not the Developer, would then be responsible for "pursu[ing] remedies with the District" for the "severely constrained site." *Id.*

**112.** *Cohen's May 29, 2013, Email to Siegel and Alan Cohen.* On May 29, 2013, Cohen emailed Siegel and Alan Cohen to inform them that Jenkins was "not an advocate of swapping sites" but that Cohen "d[id]n't know whether he [wa]s posturing." Def.'s Ex. 118, Email from Ron Cohen to Eric Siegel and Alan Cohen, dated May 29, 2013. He advised the two that the University was "trying to schedule a meeting for this Thursday to discuss" and they "should both attend and offer no compromise." *Id.* He further advised them that "[t]he best word to describe the payment if we were to make it is STUPID and that we are not." *Id.*

**113.** That same day, Siegel emailed Jenkins to decline the meeting Cohen had mentioned, citing existing travel plans, and offered to meet instead on June 3, 2013. *See* Joint Ex. 60, Emails Between Norman Jenkins and Eric Siegel, cc: Alan Cohen, Ron Cohen, and Kurt Schmoke, dated May 29, 31, 2013. Jenkins replied clarifying that no meeting had been proposed by the University but that "the university owed [the Developer] a 'thoughtful response' to [its] letter" and "[p]reparation of that response is in process." *Id.*

**P. JUNE – JULY 2013: THE FINAL NOTICES OF DEFAULT AND TERMINATION AND THE DEVELOPER'S RESPONSE**

114.    *The Fourth Notice of Default.* On June 3, 2013, having received no rental payment from the Developer on May 30, 2013, the University sent the Developer a fourth notice regarding its defaults. *See* Joint Ex. 61, Notice of Default and Notice of Intent to Terminate, dated June 3, 2013, at 1. The reason cited for the notice was "that the Developer is in default of the Ground Lease by reason of its failure to pay to the University the sum of $1,475,000.00 due December 8, 2011, . . . which due date was extended by the University through May 30, 2013." *Id.* As required by the Ground Lease, in bold face and all-capitalized type, the letter provided, "PLEASE BE ADVISED THAT THE UNIVERSITY INTENDS TO TERMINATE THE GROUND LEASE IF THAT FAILURE IS NOT CURED BY THE PAYMENT IN FULL OF THE SUM OF $1,475,000.00 BY THE DEVELOPER TO THE UNIVERSITY WITHIN TEN (10) DAYS AFTER THIS NOTICE." *Id.* (emphasis omitted).

115.    The Developer responded to this notice the following day by requesting a meeting and again proposing conditions on the rental payment, including return to the Developer should it decide, within six months, to "walk away" from the property. Joint Ex. 63, Emails Between Alan Brangman and Eric Siegel, dated June 4, 5, 2013, at 2; *see* Joint Ex. 62, Emails Between Alan Brangman and Eric Siegel, dated June 4, 2013. The Developer's proposed conditioned payment of the second rental payment was again rejected by the University. *See* Joint Ex. 63, Emails Between Alan Brangman and Eric Siegel, dated June 4, 5, 2013, at 1.

116.    Not all of the Developer's stakeholders were of the view that the Developer should continue to refuse to make the rental payment. In an email on June 7, 2013, the principal of CastleRock, which shared the Developer's rights and obligations under its agreements with the University, expressed his opinion to Siegel that he did "not think that being in capital 'D'

default is a position where we can stay" and adopting a view, expressed by Tarola, that "[t]he timing is bad, but the payment is required, to keep the purchase option alive. Unfortunately it is a nonrefundable payment, but then again, we have had the property under contract for quite some time." Def.'s Ex. 124, Email from Tim Kissler to Eric Siegel, dated June 7, 2013.

117.    In an email dated June 6, 2013, Tarola informed Siegel that the University "would be happy to talk after Howard receives the ground rent payment to cure the default. Please advise when that will occur." Joint Ex. 64, Emails Between Robert Tarola and Eric Siegel, dated June 6, 2013. Rather than make the payment, the Developer sent Schmoke, on June 10, 2013, a letter detailing the Developer's progress so far on the Property and offering to place the payment funds into an escrow account "so that Howard University knows that the money is there to be paid upon conclusion of the Mayor's Agent process." *See* Joint Ex. 65, Letter from Developer to Kurt Schmoke, dated June 10, 2013 at 1–4. By this date, the Developer still had no firm commitment for financing. [18]

118.    *The Notice of Termination*. On June 14, 2013, the University sent the Developer a notice of election to terminate the ground lease and, three days later, the University terminated the development agreement. *See* Joint Ex. 66, Notice of Election to Terminate Ground Lease, dated June 14, 2013; Joint Ex. 67, Notice of Termination of Development Agreement and Supplemental Development Agreement, dated June 17, 2013.

119.    As of June 19, 2013, the Developer expressed awareness that the University "has determined not to change its position regarding termination," Joint Ex. 68, Emails Between Eric Siegel, Kurt Schmoke, and Alan Brangman, dated June 19, 2013, at 1, but, nevertheless,

---

[18]    In its original Complaint, the Developer represented that "[a]fter receipt of the [June 3, 2013] Default Notice and until June 13, 2013, [the Developer] repeatedly requested that [the University] execute the Second Amendment." Complaint ¶ 36. No evidence in the trial record supports this representation.

on June 21, 2013, wrote a check payable to Closeline Settlements in the amount of $1,475,000, deposited in an interest bearing account for the benefit of the Developer. *See* Joint Ex. 71, Email from David Carmen to Ron Cohen, Alan Cohen, and Eric Siegel, dated June 22, 2013, reflecting email to Kurt Schmoke attaching letter from Closeline Settlements, dated June 21, 2013, at 2.[19]

120. On June 22, 2013, the Developer engaged David Carmen, a "personal friend" of Cohen, Trial Tr. Day 3 AM at 73:17–18 (Cohen), to transmit via email versions of the amendment documents signed by the Developer, as well as proof of the Developer's deposit with Closeline, *see* Joint Ex. 69, Email from David Carmen to Ron Cohen, Alan Cohen, and Eric Siegel, dated June 22, 2013, reflecting email to Kurt Schmoke attaching proposed Second Amendment to Development Agreement; Joint Ex. 70, Email from David Carmen to Ron Cohen, Alan Cohen, and Eric Siegel, dated June 22, 2013, reflecting email to Kurt Schmoke attaching proposed Second Amendment to Ground Lease; Joint Ex. 71, Email from David Carmen to Ron Cohen, Alan Cohen, and Eric Siegel, dated June 22, 2013, reflecting email to Kurt Schmoke attaching letter from Closeline Settlements, dated June 21, 2013.

121. Carmen "is a government relations specialist" and knew Schmoke from when Schmoke served as the mayor of Baltimore. Trial Tr. Day 6 AM at 136:23–137:5 (Schmoke). While Cohen testified that Carmen "never got any money" from the Developer, Trial Tr. Day 3 AM at 75:15–18, Siegel clarified, and the evidence shows, that Carmen was retained at a cost of at least $75,000, and as much as over $100,000, *see* Trial Tr. Day 4 AM at 36:16–21; Def.'s

---

[19] The Developer characterized the Closeline account as an "escrow account" throughout much of this litigation, notwithstanding that the University was never a party to the account as required for a "true escrow," Def.'s Ex. 133, Email from Elliot Liss, Closeline Settlements, to Eric Siegel, dated June 19, 2013, but has at last dropped that misleading contention. *See, e.g.*, Pl.'s Mem. Supp. Mot. TRO and/or Prelim. Inj. at 10, ECF No. 6-1; Pl.'s Resp. Def.'s SMF ¶ 110, ECF No. 90.

Ex. 10, Grid Note, at 3 (reflecting two payments in 2013, totaling over $100,000, to the Carmen Group).

122. The draft documents transmitted by Carmen and signed by the Developer reflected additional changes to the versions of these documents approved by the University, including extending the date for payment of the $1,475,000 to June 24, 2013, extending the project deadlines, modifying the construction design, and providing for contingent performance based on the historic designation process, never agreed to by the University. *See generally* Pl.'s Ex. 296 (redline comparison with last draft of the Ground Lease sent by the University); Pl.'s Ex. 297 (same as to Development Agreement). Despite these significant changes to the drafts sent by the University, throughout this litigation the Developer and its counsel have repeatedly minimized these unilateral proposals and suggested that the Developer accepted the University's proposed drafts wholesale. *See, e.g.,* Trial Tr. Day 1 AM at 26:23–24:6 (counsel for the Developer) ("On June 22nd, the developer sent second amendments to the University signed by the developer that accepted the last draft from the University, other than to have a provision that said that: To the extent the Mayor's agent process requires a change in the deadlines, the parties would negotiate those changes but otherwise accepts the terms the University demanded . . . ."); Trial Tr. Day 1 AM at 125:17–126:4 (Cohen) (asserting that after the Developer signed the June 22, 2013, drafts, "everything was agreed to," "that second amendment—we didn't draft it, their attorney did," and all the university had to do was "sign the agreement that's been floating around between Mr. Gifford of Howard's law firm and Eric").

123. In any event, these documents executed by the Developer lasted less than a week before the Developer withdrew them. In a letter to the University dated June 27, 2013, the

Developer withdrew its signed proposed second amendment documents and asserted that it would "keep the $1,475,000 tendered" in the Closeline account. Def.'s Ex. 142, Letter from Developer to Kurt Schmoke, dated June 27, 2013. Nevertheless, the University agreed to a meeting with the Developer on July 2, 2013, but remained unsatisfied that the Developer would fulfill its obligations to the University, given the Developer's continued refusal to make the long overdue rental payment and inability to provide proof of financing. *See* Trial Tr. Day 6 AM at 140:10–141:1 (Schmoke); Trial Tr. Day 6 AM at 62:1–63:11 (Siegel).

### Q. JULY 2013 – JANUARY 2014: THE DEVELOPER FILES SUIT, LOSES, AND EVADES THIS COURT'S JUDGMENT

124. As noted *supra* Part I.B, the Developer filed this lawsuit on July 15, 2013, against the University, and summary judgment was granted in favor of the University's counterclaim and claim against CastleRock Partners on December 19, 2013.

125. After the Developer filed an appeal to the D.C. Circuit, the University filed an application, on January 3, 2014, for a writ of attachment for the $1,475,000 held by Closeline, to satisfy its judgment against the Developer. *See* Appl. Writ Attachment, ECF No. 46. The writ was issued by the Clerk of this Court on January 6, 2014, Writ Attachment J., ECF No. 48, and served on Closeline on January 8, 2014, *see* Aff. Service Writ, ECF No. 50. The funds were unable to be attached to satisfy the judgment, however, because, at the Developer's direction, Closeline returned the $1,475,000 to the Developer on January 6, 2014, the same date the writ had been issued. *See* Def.'s Mot. Suppl. Rec. App., ECF No. 64.[20]

---

[20] The University's unsuccessful efforts to attach the Developer's funds to pay the judgment award were discussed in the January 2017 decision in this litigation. *See HTC III*, 2017 WL 421909, at *4 n.6. In its response to the writ of attachment, Closeline included a copy of the check returning the $1,475,000 to the Developer, which showed that the check "had been deposited into the Developer's account with Industrial Bank." Def.'s Mot. Suppl. Rec. App. at 4. In a further attempt to attach the funds in satisfaction of the judgment in its favor, the University

### R.     THE DEVELOPER'S ALLEGED DAMAGES

126.    Through an expert witness, the Developer presented testimony that, assuming the

Developer's legal entitlement to damages for the alleged breach of contract, the values

applicable to calculation of the Developer's damages would be $14,400,000 for the

leasehold, $4,100,000 for the cost of delay as of June 1, 2017, and $6,200,000 for the lost tax

abatement. *See* Trial Tr. Day 6 PM at 60:18–65:10 (Duffy); Pl.'s Ex. 277, Retrospective

Market Value Appraisal – Leasehold, prepared by Integra Realty Resources, dated Feb. 5,

2016, at 5.

### S.     CREDIBILITY ASSESSMENT

127.    Given this Court's "opportunity to judge the witnesses' credibility," FED. R. CIV. P.

52(a)(6), the witnesses' demeanor at trial informs the factual findings set out above, as well

as the conclusions of law that follow.

128.    With two exceptions, the witnesses who testified at trial were credible. They testified in

a straightforward, careful manner about their knowledge of the project and, for those with

expert or industry knowledge, their understanding of practices and procedures relevant to the

legal issues presented in this case, acknowledging the limitations of their knowledge as

appropriate.

129.    The two witnesses who lacked credibility as to many issues addressed in their testimony

were Ronald Cohen and Eric Siegel. Cohen avoided answering questions that he reasonably

would have had knowledge to answer. For example, when asked by the University's counsel

---

served a writ of attachment on Industrial Bank, which explained in response that the Developer had transferred those funds to Property Management Account Services, LLC ("PMAS"), "an affiliate of the Developer." *Id.*; *see* Pl.'s Resp. Def.'s Mot. Suppl. Rec. App. at 9, ECF No. 65 (acknowledging that the check for $1,475,000 to Closeline was "clearly made out by 'Property Mgmt Acct Svcs LLC,' i.e., PMAS, not [the Developer]"). The University then deposed PMAS, and PMAS's deponent—Eric Siegel—testified that "the funds on deposit with Closeline Settlements were the property of PMAS (not the Developer) and PMAS had never relinquished its ownership of those funds." Def.'s Mot. Suppl. Rec. App. at 4.

whether the University's assertion, on August 30, 2011, that the Developer had "failed to execute the CBE Agreement required by the covenants," was correct, Cohen made counsel repeat the question before opining, "I don't know whether or not it was or it was not sitting here. That wasn't something I was overseeing." Trial Tr. Day 2 AM at 38:7–14. When pressed by the Court as to whether he had "any reason to doubt that the statement in this letter is correct," Cohen again demurred before ultimately testifying "[i]t appears to be correct." *Id.* at 38:15–23. In another pointed example of evasion, when asked whether he recognized the handwriting on a letter to the Developer from the University as Siegel's, Cohen said, "I have no idea, quite honestly," defying reasonable belief, given the close working relationship between Cohen and Siegel, as well as Cohen's repeated assertions that Siegel was the point person for the Developer on the project. Trial Tr. Day 2 AM at 13:5–7 (testifying as to Joint Ex. 9). Indeed, Siegel later confirmed that the handwriting in question was his. *See* Trial Tr. Day 3 AM at 144:11–16 (Siegel testifying that the handwriting on Joint Exhibit 9 was his). At other points, Cohen provided inaccurate or misleading answers favorable to the Developer. For example, when asked whether Carmen had been compensated for his involvement with the project, Cohen testified assertively, "No, he never got any money. Never paid anything. He is a friend." Trial Tr. Day 3 AM at 75:15–18. The evidence shows, however, that Carmen was retained at a cost of at least $75,000, and as much as over $100,000, *see* Trial Tr. Day 4 AM at 36:7–21 (Siegel testifying Carmen was paid $75,000); Def.'s Ex. 10, Grid Note, at 3 (reflecting two payments to the Carmen Group totaling over $100,000); *see also* Def.'s Ex. 9, Grid Note (reflecting advances from PMAS, another Cohen affiliate, *see supra* note 20; Trial Tr. Day 1 PM at 102:23–25, to the Developer). Cohen's failure to acknowledge these payments is particularly damaging to his

credibility given his involvement in managing the money associated with the various Cohen Companies affiliates under his control. *See* Trial Tr. Day 1 PM at 102:13–103:23 (testifying as to the "grid note" reflected in Def.'s Ex. 9 and describing it as "a constant running ledger entry so at all times, I could pick up the phone, we knew exactly how much each of our entities were owned by whom and what the interest rate was that was accruing").

**130.** Siegel's testimony was at times credible and other times not credible. While Siegel was generally responsive to questioning, he demonstrated a tendency to rationalize, split hairs, or feign ignorance in an effort to provide answers favorable to the Developer. For example, when asked on direct examination about the Developer's response to the University's February 3, 2012, notice, Siegel stated he warned the University to preserve its records because he "was concerned based upon our prior dealings with the university that . . . records might be lost." Trial Tr. Day 3 PM at 29:19–30:3. Absolutely no evidence was presented, however, that the University ever lost records in connection with this project. In addition, when asked about the same communications on cross, Siegel first disclaimed familiarity with the term "litigation hold letter" used by the University's counsel, testifying, "I don't know what that means, that term, 'litigation hold.' I don't know what that means, I really don't." Trial Tr. Day 4 PM at 42:22–43:1. While, in response to the University's rephrased question, asking whether the Developer sent its response "to ensure the preservation of those documents in the event of future litigation," Siegel testified "[t]hat's correct," in almost the same breath he again disclaimed raising the specter of litigation, testifying that he "didn't perceive [the response] as a threat" of litigation but "was basically indicating to them that they should hold on to their materials because we may have a dispute here that's going to rise to the level of litigation. I wasn't threatening litigation." *Id.* at 43:10–44:2. These

80

conflicting assertions strain credulity, rendering much of Siegel's testimony less than credible.

## III. CONCLUSIONS OF LAW

In reaching conclusions of law, the Court evaluates the evidence to determine whether the litigants have established each element of their respective claims by a preponderance of the evidence. *See Concrete Pipe & Prods. Calif., Inc. v. Constr. Laborers Pension Trust S. Calif.*, 508 U.S. 602, 622 (1993); *Clark v. Feder Semo & Bard, P.C.*, 895 F. Supp. 2d 7, 29 (D.D.C. 2012) ("The Court reviews the evidence under the 'default rule for civil cases,' the 'preponderance of the evidence' standard." (quoting *Cigna Corp. v. Amara*, 563 U.S. 421, 444 (2011))); *see also Ascom Hasler Mailing Systems, Inc. v. United States Postal Service*, 885 F. Supp. 2d 156, 181 (D.D.C. 2012). "The burden of showing something by a 'preponderance of the evidence,' the most common standard in the civil law, 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden to persuade the judge of the fact's existence.'" *Concrete Pipe & Prods. Calif., Inc.*, 508 U.S. at 622 (quoting *In re Winship*, 397 U.S. 358, 371–72 (1970) (Harlan, J., concurring)). "[T]he factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Id.*

### A. LIABILITY FOR BREACH OF CONTRACT

Under District of Columbia law, "[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015) (emphasis omitted) (quoting *Tsintolas Realty Co. v. Mendez*, 984

A.2d 181, 187 (D.C. 2009)). "Breach is an unjustified failure to perform all or any part of what is promised in a contract entitling the injured party to damages." *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C. 1970) (internal quotation marks omitted). For example, "a contract is breached if a party fails to perform when performance is due." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1004 (D.C. 2008). A breach is material, such that the non-breaching party is "able to elect the alternative rights and the remedies available to him," when the non-breaching party receives "something substantially less or different from that for which he bargained." *Fowler*, 262 A.2d at 347 (internal quotation marks omitted).

With respect to the first and second elements, *i.e.*, a valid contract between the parties giving rise to obligations, for the reasons stated previously, three such contracts exist: the Ground Lease, as amended, the Development Agreement, as amended, and the Term Sheet. *See HTC III*, 2017 WL 421909, at *6 (concluding the Term Sheet is a binding preliminary agreement); *HTC I*, 7 F. Supp. 3d at 67 & n.4 (identifying the uncontested Ground Lease, Development Agreement, and corresponding first amendments to those agreements). The questions whether and which party was in breach of any agreements, and the appropriate remedy, if any, are addressed *seriatim* in the discussion that follows.

**B.   THE DEVELOPER WAS IN DEFAULT ON THE GROUND LEASE AND DEVELOPMENT AGREEMENT AT THE TIME THE TERM SHEET WAS EXECUTED**

The Developer has never expressly conceded in this litigation that it was in default on the Ground Lease and Development Agreement, as alleged by the University in notices sent in September 2011 and February and March 2012, by, *inter alia*, failing to make the $1,475,000 rental payment by March 15, 2011, as required by the agreements. Yet, the April 2012 Term Sheet speaks for itself on this issue. In signing the Term Sheet, both parties acknowledged that

the agreement was "For Settlement Purposes" with the intent to "cure . . . the monetary default" by the Developer. Term Sheet at 1. Thus, in its Proposed Findings of Fact and Conclusions of Law, the Developer acknowledges, as it must, the existence of "prior defaults" by the Developer. *See* Pl.'s Prop. Findings Fact Concls. Law ¶ 401.

A plain reading of the operative agreements also supports the conclusion that the Developer was in default at the time the Term Sheet was executed. "D.C. courts 'adhere to an objective law of contracts,'" such that "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite meaning." *Hensel Phelps Constr. Co. v. Cooper Carry Inc.*, 861 F.3d 267, 272 (D.C. Cir. 2017) (quoting *Carlyle Inv. Mgmt. L.L.C. v. Ace Am. Ins. Co.*, 131 A.3d 886, 894–95 (D.C. 2016)). Pursuant to the clear and definite language of the Ground Lease, the Developer was required to pay $1,475,000 by March 15, 2011, subject to no contingencies or limitations whatsoever. While the University agreed to extend the time of the payment to December 8, 2011, no payment was forthcoming on that date, and the evidence shows that no further extension was given by the University prior to three notices of default in September 2011, February 2012, and March 2012. Consequently, the Court finds that the Developer was in breach of its agreements with the University prior to the signing of the Term Sheet.

### C. THE DEVELOPER EXHIBITED BAD FAITH IN ITS NEGOTIATIONS WITH THE UNIVERSITY ALMOST IMMEDIATELY FOLLOWING EXECUTION OF THE TERM SHEET

As explained previously, the Term Sheet constituted a binding preliminary agreement to negotiate in good faith toward amendments to the Ground Lease and Development Agreement, which amendments would constitute modifications to the original agreements such that the

Developer's defaults would be cured. Accordingly, whether either or both parties breached their duty to negotiate in good faith was a critical question identified in the latest summary judgment decision and, given the fact-intensive nature of the question, left for trial. *See HTC III*, 2017 WL 421909, at *8–9.

Under D.C. law, "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate standards of decency, fairness or reasonableness." *Allworth v. Howard Univ.*, 890 A.2d 194, 201–02 (D.C. 2006) (quoting Restatement (Second) of Contracts § 205 cmt. a). "[B]ad faith may be overt or may consist of inaction," involving "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Id.* (quoting Restatement (Second) of Contracts § 205 cmt. d). Yet, "[b]ad faith means more than mere negligence." *Id.* (quoting *Gupta v. New Britain Gen. Hosp.*, 687 A.2d 111, 122 (Conn. 1996)).

In the context of a binding preliminary agreement to negotiate in good faith, like the Term Sheet, while parties may in good faith disagree on open terms of the contract being negotiated, and, as a result, decide mutually to abandon the negotiation, the requisite good faith is lacking where "a party unilaterally renounc[es] the deal, abandon[s] the negotiations, or insist[s] on conditions that do not conform to the preliminary agreement." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1131 (D.C. Cir. 2015) (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)). Applying this understanding of good and bad faith, the D.C. Circuit concluded in *Banneker Ventures* that a plaintiff had stated a

claim for breach of the duty to negotiate in good faith where the defendant "directed cessation of negotiations and interjected new terms and conditions that were not part of [the applicable] Term Sheet." *Id.* Similarly, in *Teachers Insurance & Annuity Association of America v. Tribune Company*, a party was found to have breached the duty to negotiate in good faith "by refusing to negotiate unless the lender agreed to modify the deal by accepting a new condition" not contained in the binding preliminary agreement. 670 F. Supp. at 507.

Here, each party argues that it acted in good faith, while the other acted in bad faith, in their negotiations over the second amendments to the Ground Lease and Development Agreement pursuant to the Term Sheet. The Developer, apparently conceding that its proposed terms conflicted with those contained in the Term Sheet, contends that it nevertheless acted in good faith, noting that "[t]he Second Amendment terms drafted by the Developer were proposed in response to real[i]ties on the ground and in an effort expeditiously to commence construction on the Project," including "the unexpected loss of J.P. Morgan Financing." Pl.'s Prop. Findings Fact Concls. Law ¶ 414. By contrast, according to the Developer, the University showed bad faith in its negotiations, including by proposing terms that diverged from those contained the Term Sheet. Skipping over the University's proposed drafts of April 23, 2012, and May 4, 2012, *see supra* Part II.K.64, 66, the Developer points to the draft amendments circulated by the University on January, 11 2013, to assert that the University "sharply revis[ed] its own latest draft and insert[ed] provisions unfavorable to Developer and not contemplated by the Term Sheet, . . . show[ing] disregard for the reasonable expectations of the parties," Pl.'s Prop. Findings Fact Concls. Law ¶ 426. The Developer also contends that the University exhibited bad faith in early 2013 by (1) "placing Mr. Brangman in charge" notwithstanding that Tarola had negotiated the Term Sheet, (2) making Schmoke the "final decision-maker with respect to the

June 3, 2013 notice of termination," even though he "testified that he was '***not even aware*** of the Term Sheet'"; and (3) "abrupt[ly] cancel[ing], at the behest of Mr. Schmoke, . . . the planned meeting with the Developer in late January 2013." *Id.* ¶¶ 426–31 (emphasis in original).

The University, on the other hand, contends that the Developer's "bad faith is demonstrated by its response to the University's April 23, 2012 drafts," which response included, *inter alia*, (1) "[f]ail[ure] to pay the sum of $100,000 by April 20, 2012, as called for by the Term Sheet; (2) failing to "respond to the University's drafts until after the April 30, 2012 execution deadline contemplated by the Term Sheet"; (3) "not immediately sign[ing] the Termination of Escrow Agreement"; (4) proposing terms that conflicted with the Term Sheet, including numerous terms that predicated the Developer's performance on its obtaining financing; and (5) deleting terms proposed by the University that were consistent with the Term Sheet, including the provision that the overdue rent would be paid in two installments and the walk-away provision contained in the Term Sheet. Def.'s Prop. Findings Fact Concls. Law ¶ 316.

The evidence strongly supports the University's view. Notably, the Developer does not contend that the University exhibited bad faith in the negotiations that immediately followed the execution of the Term Sheet, arguing instead that the Developer engaged in those negotiations in good faith and pointing only to later actions of the University as demonstrative of bad faith on the University's part. The Developer's position is untenable, however, in light of the evidence showing it acted in bad faith, by willfully failing to perform, evading the spirit of the deal, and abusing its power to specify terms, almost immediately after execution of the Term Sheet.

Under the Term Sheet, the Developer was to pay the University, without contingency or limitation, $100,000 ten days after the execution of the Term Sheet. *See* Term Sheet at 2. The

Term Sheet was executed on April 10, 2012, *see* Trial Tr. Day 2 AM at 135:24–136:8 (counsel for both parties stipulating that the Term Sheet was fully executed by April 10, 2012), and, yet, the Developer *never* made the $100,000 payment, let alone by April 20, 2012, as required under the parties' agreement. Cohen testified that he told Jenkins that he was "just not in a position to pay this money" because the Developer was "almost $2 million out-of-pocket," and he "fully underst[oo]d" why Jenkins was "upset" given that Cohen "went back on a promise" to the University. Trial Tr. Day 1 AM at 103:4–10.

Through his testimony, Siegel suggests that the Developer's blatant failure to make the $100,000 payment is excused by the fact that "no one, neither Mr. Tarola nor anyone else from the university raised that issue" with him. Trial Tr. Day 3 PM at 37:25–38:5. In the first place, this testimony is misleading because someone from the University, Jenkins, communicated the University's displeasure to the Developer through Cohen, *see* Trial Tr. Day 1 AM at 103:4–10 (Cohen), and in its April 23, 2012, and May 4, 2012, proposed amendments, the University included provisions for the $100,000 payment, *see supra* Part II.K.64, 66. More importantly, the Developer willfully breached a term of the Term Sheet regardless of whether the University attempted to hold the Developer immediately accountable for that breach. The Developer's decision not to fulfill even this relatively minor obligation under the Term Sheet evidences a "willful rendering of imperfect performance" constituting bad faith. *Allworth*, 890 A.2d at 201–02 (quoting Restatement (Second) of Contracts § 205 cmt. d).

The Developer also appears to have willfully failed to comply with the Term Sheet's imperative to "[e]xecute Ground Lease Amendment and Development Agreement Amendment by Monday, April 30, 2012," Term Sheet at 2, responding to the University's first drafts, sent on April 23, 2012—a Monday—nine days later, after the April 30, 2012, deadline, *see* Joint Ex. 23,

Email from Eric Siegel to David Gifford, cc: Norman Jenkins, Bridget Sarikas, Odessa Jackson, Robert Tarola, Timothy Kissler, Ronald Cohen, and Michael Hollander, attaching (1) Termination of Escrow Agreement; (2) Second Amendment to Ground Lease; and (3) Second Amendment to Development Agreement, dated May 2, 2012. No evidence was presented to explain the Developer's failure to respond expeditiously, in accordance with the Developer's own understanding of the Term Sheet's intent, to the University's drafts. *See* Trial Tr. Day 3 PM at 35:22–36:4 (Siegel) ("Q: What was your expectation as of time of the signing of the term sheet as to when the ground lease amendment and development agreement was going to be able to be executed? A: My expectation [was] it would be executed by the 30th. We were going to be expediting getting it done.").

The Developer further demonstrated bad faith by proposing terms that conflicted with the Term Sheet, thereby reflecting "evasion of the spirit of the bargain" and "abuse of a power to specify terms." *Allworth*, 890 A.2d at 201–02 (quoting Restatement (Second) of Contracts § 205 cmt. d). No provision of the Term Sheet makes the Developer's performance of any of its obligations contingent on financing. *See generally* Term Sheet. In this way, the Term Sheet was consistent with the underlying Ground Lease and Development Agreement, which also declined to predicate any party's performance on the obtaining of financing and, in fact, specifically provided that the failure to obtain financing was not an "Unavoidable Delay" such that extension of existing performance deadlines could be sought. *See* Development Agreement at 7, 18. Tarola testified that while the University was aware of the Developer's desire to obtain financing for the project, he "understood that the developer had some substantial assets and should be able to pay what was due to the University; so [he] expected it to be paid and, indeed, . . . was looking for cash as a way of showing good faith to continue the project." Trial Tr. Day 5 AM at 17:19–

18:4. Indeed, Tarola "felt that the developer needed to show commitment to the project in the form of cash contributed toward moving that along . . . . [T]he cash was not important to Howard University, being a billion-dollar company, but it was important to make sure that we had the commitment to move forward with the project." *Id.* at 18:11–19. Plainly, the "spirit of the bargain" was that the University would receive rental payments from the Developer during the period that the Developer had exclusive rights to develop the Property, without those rental payments being tied to the Developer's financing for the entire project.

The Developer asserts, in essence, that its proposal making performance contingent on obtaining financing was reasonable in light of "real[i]ties on the ground," such as the "unexpected loss of J.P. Morgan financing" sometime between April 10, 2012, and April 19, 2012. Pl.'s Prop. Findings Fact Concls. Law ¶ 414. While the Developer's approach may have seemed reasonable from its perspective as a real estate developer, this was not the bargain to which it had agreed and was entirely unreasonable in light of the Term Sheet and the underlying Ground Lease and Development Agreement. Although the Term Sheet does not specifically provide that the Developer would bear the risks of financing, the Ground Lease and Development Agreement do, disavowing failure to obtain financing as a reason for delay and explicitly providing for payment of the $1,475,000 rent on the earlier of settlement on a construction loan or March 15, 2011. To be sure, the Developer failed to secure the HUD funding it had hoped would finance the project only after the Ground Lease and Development Agreement were signed, and, in light of those difficulties, might understandably have asked to modify its agreements with the University to account for the obtaining of financing. Yet, despite the parties' awareness of past issues related to financing, the Term Sheet reflects no such modification. Viewed in that context, the parties plainly struck a bargain in which the

Developer, and the Developer alone, bore the risks associated with seeking financing for the entire project. Given the parties' bargain, the Developer's proposals making its performance contingent on financing constitute bad faith.

Bad faith is further shown by the Developer's deletion of terms in the University's April 23, 2012, draft that were specified in the Term Sheet. Notably, the Developer mounts no excuse for its deletion of the term specifying that the $1,475,000 payment would be made in two installments. With respect to the walk away provision in the University's April 23, 2012, drafts, Siegel testified to his view that it was "an overreach and so burdensome," he "didn't think it was reasonable, and no rational person would think it was reasonable." Trial Tr. Day 3 PM at 52:7–24. He is incorrect. The University's proposed provision merely elaborated upon a term assented to by both parties when they signed the Term Sheet. While reasonable push back against the University's proposal was possible in light of the Term Sheet's failure to specify all conditions of the contemplated walk away provision, the Developer's wholesale deletion of any such provision from the amendment documents was unreasonable. Siegel testified to his view that a reasonable elaboration upon the Term Sheet's walk away provision would have treated the specified walk away date of September 15, 2013, as subject to extension based upon the occurrence of Unavoidable Delay, as defined in the agreements. *See* Trial Tr. Day 6 AM at 79:17–81:9. The dubiousness of his view notwithstanding, Siegel never proposed such a revision to the University.

The evidence shows that the Developer did not want the deal agreed to in the underlying agreements or the Term Sheet. Yet, the Developer plainly wanted *a* deal with the University.[21]

---

[21] The deal desired by the Developer—namely, to avoid putting at risk any further funds, including the second rental payment, until financing for the entire project was secured—may be most readily apparent in its proposal to the University the day following its receipt of the June 3, 2013, notice of default. In an email, the Developer proposed several new conditions on the second rental payment, including return to the Developer should the

In that regard, this case is different from cases involving bad faith in which the bad faith is deployed in hopes of ending the relationship between the parties because, for example, a better deal could be found elsewhere. *See, e.g., Stanford Hotels Corp. v. Potomac Creek Assocs., L.P.*, 18 A.3d 725, 731, 736 (D.C. 2011) (upholding trial court's determination that party acted in bad faith where "the parties did, in fact, come to agreement on all . . . terms" of the contemplated final agreement and, thus, it would have been signed "but for [the breaching party's] bad faith refusal to do so once" a "more advantageous alternative" became available). Far from trying to extricate itself from the deal to develop the Property, the Developer's apparent aim was to make it difficult for the University to walk away, such that the University would submit to the Developer's desired terms notwithstanding prior signed agreements prescribing terms more favorable to the University.

The Developer miscalculated here, since the University did not fold in the face of the Developer's bullying threats of litigation and "non-negotiable" demands. Nevertheless, the Developer did succeed in delaying execution of the second amendment agreements, which under the Term Sheet would have triggered the payment and construction obligations the Developer sought to avoid until financing was secured. By failing to abide by even the simplest terms in the Term Sheet, such as making the $100,000 payment, and proposing terms to make the Developer's performance contingent on securing financing, the Developer exploited the flexibility agreed to by the University in the Term Sheet to the Developer's singular advantage.

As the party owing money, the Developer wielded a modicum of power over the University in these negotiations. With respect to the rental payment, the University faced three possible courses of action: (1) pursue voluntary collection of the payment from the Developer;

---

Developer decide, within six months, to "walk away" from the property. Joint Ex. 63, Emails Between Alan Brangman and Eric Siegel, dated June 4, 5, 2013, at 2.

(2) institute a legal action to recover the payment; or (3) forfeit the payment. Having just negotiated the Term Sheet, the Developer could have reasonably assumed that the University favored the first course of action. Indeed, the Developer knew, and the University likely surmised, that a lawsuit against the Developer would have been an exercise in futility, given that the Developer's status as an LLC holding no funds to satisfy its $1,475,000 obligation to the University rendered it practically judgment-proof.[22] Accordingly, the Developer was in a position to "hold up" the University by refusing to make the payment except on its own terms.

This "hold up" approach is traceable through the entirety of the Developer's dealings with the University, both before and after the Term Sheet. Given the reflected intent of the parties to reset their relationship by executing the Term Sheet, the parties' actions prior to the execution of that document, without more, are not a basis to excuse performance under the Term Sheet. Nevertheless, the Developer's prior behavior provides useful context, shedding light on the Developer's overarching strategy and the reasons for the University's response.

The primary tactic used by the Developer prior to the Term Sheet's execution was threatening litigation against the University in the event that the University terminated the agreements, aware that the Developer's inadequate capitalization put the University in a position of having, as far as the rental payment is concerned, nothing to gain and further delay to incur if litigation ensued.

---

[22] The Developer's status as an inadequately capitalized shell company is an ongoing demonstration of bad faith. LLCs are a legitimate corporate form, and the societal benefits of such entities are significant. Dickson testified that the use of such entities in transactions like this one is "typical[]," explaining that "single-asset entities are established as borrowers" so that "the borrower[] contains one asset," the advantage from a "liability standpoint" being that "on a transaction of this size, the asset couldn't be pulled into bankruptcy." Trial Tr. Day 7 AM at 49:25–50:7. Yet, even a single-asset entity must be capitalized to the extent necessary to satisfy its obligations to the project it was created to support. *See Lawlor v. District of Columbia*, 758 A.2d 964, 975 (D.C. 2000) (noting inadequate capitalization as factor in determining whether a given entity's corporate form should be respected). Consequently, abuse of the corporate form to render a company judgment-proof is impermissible and reflects bad faith.

The Developer first alluded to litigation at least as early as February 2011, in response to the University's letter pointing out the Developer's failure to meet the construction deadlines contained in the Declaration of Covenants. *See* Joint Ex. 8, Letter from Developer to Troy Stovall, dated Feb. 1, 2011, at 1. After asserting "that neither the District nor the University set forth realistic deadlines three years earlier," accusing the University of improperly intervening in the Developer's communications with the District, and requesting modifications to the project plans at considerable expense to the University, the Developer stated its assumption "that this venture is heading toward litigation" and averred that the Developer was "prepared to vigorously defend [its] actions and efforts to date." *Id.* Later that year, in response to a letter from the University requesting assurances from the Developer that it would perform pursuant to the parties' first modification to the underlying agreements by, *inter alia*, tendering the $1,475,000 payment on December 8, 2011, the Developer declined to give assurances, instead reciting the Developer's version of events and advising the University to "[c]onduct [it]sel[f] accordingly." Joint Ex. 12, Letter from Developer to Troy Stovall, dated Sept. 15, 2011, at 1–7.

Likewise, in response to the University's February 3, 2012 notice, the Developer sent a letter advising that the University is "on notice that it should take all necessary steps to preserve the written and electronic records associated with the Howard University Town Center project" and that "[f]ailure to preserve such documents shall subject the University to a claim for spoliation of evidence in the District of Columbia, in addition to legal pursuit of any other rights and remedies the Developer may have against the University," and repeated the threat, "Conduct yourselves accordingly." Def.'s Ex. 36, Email from Eric Siegel to Robert Tarola, cc: Dr. Hassan Minor, Michael Hollander, Timothy Kissler, and mvahey@dccouncil.us, attaching Letter from Developer to Robert Tarola, dated Feb. 7, 2012, at 2–3. At trial, Siegel testified that he "didn't

perceive [the February 7 letter] as a threat" while acknowledging that he was "indicating . . . we may have a dispute here that's going to rise to the level of litigation." Trial Tr. Day 4 PM at 43:2–44:2. The Developer's characterization is nothing more than a distinction without a difference, and its practice of raising the specter of litigation against the University, with the concomitant threatened delays in developing the project, in response to valid demands of the University for the Developer's performance, evidences bad faith.[23]

Another, similar, tactic used by the Developer in furtherance of its "hold up" strategy was to hint that it would cause the Property to lie dormant, rather than walk away from the Property and enabling the University to find a new Developer, if the University did not agree to the Developer's proposals. After the University acquiesced to the Developer's request for an extension of the second rental payment deadline to December 8, 2011, but three months before that deadline came to pass, the Developer requested further modification of the deal, warning the University that "[o]therwise," the parties would "find [them]selves mired in dispute, and the project will remain dormant for the foreseeable future." Joint Ex. 12, Letter from Developer to Troy Stovall, dated Sept. 15, 2011, at 7. The Developer also highlighted the monetary costs to the University of not acceding to the Developer's demands, opining that "the University has foregone approximately $1,000,000 in potential lease revenue upon delivery of this project by failing in a timely manner to come to terms with the economic realities of the environment we currently operate in and by modifying ground lease terms accordingly so that we can break ground expeditiously." *Id*. These observations by the Developer were designed to bully the University into compliance with the Developer's proposed contract terms, even though those

---

[23]     In his testimony at trial, Cohen manifested a callous indifference to the University's concerns about the Developer's failure to fulfill its obligations to the project, despite the obvious importance of that project to the University and surrounding community. *See* Trial Tr. Day 2 AM at 112:6–22 (Cohen) (describing the University's notices of default as "posturing" not warranting payment of the funds due).

terms were either contrary to, or not covered in, any governing document, another sign of bad faith.

A third tactic in furtherance of its "hold up" strategy, and one particularly pointed at teeing up litigation, was the Developer's practice of blaming delays on the University, in writing, rather than acknowledging the Developer's own failure to perform as required by the operative agreements. As noted, the bargain struck by the University and the Developer clearly provided for the Developer's making the $1,475,000 payment with or without settlement on a construction loan. *See* Ground Lease at 2, 5. It also specifically defined a category of events constituting "Unavoidable Delays" that would extend the project deadlines, which category expressly excluded delay due to lack of financing. *See* Development Agreement at 7. Notwithstanding these provisions, the Developer sought modification of its original bargain with the University after losing the HUD funding, including extension of its deadline to make the $1,475,000 payment to December 8, 2011. The Developer deployed a myriad of questionable, if not spurious, justifications for the modification, including that (1) the project deadlines were "not realistic" to begin with, despite executing the agreements incorporating those deadlines; (2) the time it took for the University and its consultant to developer an environmental remediation plan; and (3) the University's action in sharing certain environmental documentation with a governmental entity, which action was permitted by the applicable agreement and the University believed was required by law. *See* Pl.'s Ex. 72, Letter from Ronald Cohen to Diane Branch, dated Dec. 2, 2010, at 2–3; Pl.'s Ex. 46, Letter from Troy Stovall to Ronald Cohen, dated Dec. 9, 2010, at 1–2. The evidence, however, shows that the actual reason for the Developer's modification request to delay the second rental payment was, at bottom, its inability to secure financing, *see* Trial Tr. Day 3 AM, 127:18–128:17 (Siegel) (testifying that in December 2010,

the Developer met with the University, apprised it of the unavailability of HUD financing, and raised the "difficulty in getting conventional financing for an entire city block project and the need to potentially phase the project if [the Developer] could not secure financing for an entire city block"); Trial Tr. Day 3 PM at 9:7–20 (Siegel) (testifying that in April 2011, the Developer was not ready to request formal modification by the District of the project deadlines because, notwithstanding the University's rejection of a two-phase project proposal, the Developer still hoped to build the project in two phases).

A party to a contract doubtless may uphold its obligation to act in good faith while simultaneously requesting modification of an agreement. Nevertheless, the Developer's actions in (1) threatening litigation outright; (2) threatening to cause the Property to "remain dormant," whether because of litigation or merely through delay on the Developer's part, if the University did not accede to the Developer's demands for modification; and (3) casting aspersions on the University to obscure the reason for its requested modification, *i.e.*, an inability to obtain financing—which inability was specifically contemplated by the governing agreements and rejected as a reason for the delay sought by the Developer—cross the line between hard bargaining and bad faith.

Viewed in the context of the Developer's prior behavior, the Developer's failure to abide by the Term Sheet is, unfortunately, unsurprising, and merely reflects more of the same. Equally unsurprising, the Developer continued to pursue its strategy of bullying the University into maintaining a relationship with the Developer, notwithstanding its defaults, after it breached the Term Sheet.

The Developer adhered to its "hold up" strategy. In November 2012, while still pursuing financing, the Developer took the unusual step of undertaking to begin demolition on the

Property, even though the Developer was unwilling to enter into an agreement acceptable to the University or honor its existing commitments to the University, including making the $1,475,000 payment. Jenkins testified that it would have been unusual for the Developer to begin demolition without a "deal" between the parties or financing. Trial Tr. Day 7 AM at 12:20–13:3. No special expertise in real estate development is required to see that allowing one party to begin work on a project absent a final agreement memorializing the parties' respective obligations would make it more difficult for the other party to extricate itself from the relationship, even if legally entitled to do so. *See id.* at 13:4–7 (Jenkins) ("Q: . . . If the Developer had begun demolition without an agreement, did you feel that would put the University in a less advantageous position? A: Yes."). The Developer also continued to threaten litigation. Just two days before the May 30, 2013, deadline for making the second rental payment, the Developer emailed the University to inform it that it would not make the rental payment but even so, "[s]hould Howard University determine that it is not advisable to continue working with the Developer," the Developer would nevertheless "hold firm to this property." Def.'s Ex. 116, Email from Eric Siegel to Alan Brangman, Robert Tarola, and Norman Jenkins, cc: Alan Cohen, Ron Cohen, and Tim Kissler, dated May 28, 2013, attaching Letter from Developer to Alan Brangman, dated May 23, 2013, at 3.

In addition, the Developer continued to abuse its bargaining power, representing that it would show no flexibility regarding terms while refusing to walk away from the project. For example, the Developer asserted in March and April 2013 that its proposals were "non-negotiable," Joint Ex. 57, Email from Eric Siegel to David Gifford, dated Apr. 1, 2013, at 1, later informing the University that while it would not make the payment required by May 30, 2013, it was "too invested to walk away," Def.'s Ex. 116, Email from Eric Siegel to Alan Brangman,

Robert Tarola, and Norman Jenkins, cc: Alan Cohen, Ron Cohen, and Tim Kissler, dated May 28, 2013, attaching Letter from Developer to Alan Brangman, dated May 23, 2013, at 3.

Even after receiving the June 3, 2013, notice of default, the Developer clung to its "my way or no way" approach. The Developer's action in signing versions of the second amendment documents, albeit not ones conforming to the reasonable expectation of the University, demonstrates its willingness to bully the University to the point of termination before acceding to any of the University's terms, however reasonable those terms, or even if required by existing agreements. The Developer's persistence in avoiding putting its funds at risk, even in the face of a court order, was on display when the Developer evaded this Court's December 19, 2013, judgment in favor of the University by removing from the Closeline account the $1,475,000 payment owed to the University. *See supra* Part II.Q.

The Developer's bad faith is also apparent in its dealings with entities other than the University. The Developer proposed to DCPL an unreasonably limited preservation of the historic structures on the Property, including demolition of the WRECO garage, which had been marked for preservation pursuant to the DUKE Plan since before the Developer became involved with the Property. *See* Def.'s Ex. 114, Emails Between Eric Siegel and Rebecca Miller, dated May 3, 2013, at 1. When that proposal was rejected, the Developer made the self-serving assertion that it "approached these recently-file[d] applications with a sincere attempt to arrive at an appropriate architectural solution" and, in what amounts to a thinly veiled attempt to shift blame to DCPL, noted its view that "[it] is a shame that this project may die if the financing goes away at this late hour." *Id.* [24]

---

[24]    The instant litigation aside, the Cohen Companies have been found to act in bad faith in litigation brought by other parties who have attempted business dealings with the limited liability entities they operate. The Cohen Companies' actions are well documented in decisions of both state and federal courts in Maryland, its primary place of business. For example, in January 2014, a jury found another Cohen Companies' affiliate liable for breach of

Accordingly, the Court finds the Developer acted in bad faith in its negotiations pursuant to the Term Sheet, a finding bolstered by the Developer's conduct throughout its involvement in the Howard Town Center development project.

### D. THE DEVELOPER'S BAD FAITH CONSTITUTED A MATERIAL BREACH OF THE TERM SHEET, REINSTATING THE UNIVERSITY'S NOTICES OF DEFAULT AND RELEASING THE UNIVERSITY FROM ITS OBLIGATION TO NEGOTIATE PURSUANT TO THE TERM SHEET

Having concluded that the Developer acted in bad faith in negotiating with the University in April and May 2012, the effect of that bad faith on the obligations and rights of the parties must be assessed.

First, it must be determined whether the Developer's failure to negotiate in good faith constitutes a material breach of the Term Sheet. If so, the University's obligations under the Term Sheet would be discharged. *See Ashcraft & Gerel v. Coady*, 244 F.3d 948, 950 (D.C. Cir.

contract and tortious interference with contractual relations, *i.e.*, that its conduct forced the other party into litigation with a third party, warranting an award of punitive damages. *121 Assocs. Ltd. P'ship v. Tower Oaks Boulevard, LLC*, No. 0906 Sept. Term 2014, 2015 WL 7076013, at *1 (Md. Ct. Spec. App. Nov. 12, 2015), *cert. denied sub nom. Tower Oaks Blvd. v. Ronald Cohen Invs.*, 136 A.3d 818 (Md. 2016). Finding that the Cohen Companies' affiliate had no assets as a result of its principals' bad faith efforts to evade judgment, the trial judge permitted garnishment of other Cohen-related assets to satisfy the judgment. *Id.* at *7 (finding Cohen's "hand off" of funds from Closeline upon the issuance of the writ of attachment of those funds by this Court, *see supra* note 20—"was a sham simply to avoid the coming judgments").

While the appellate court reversed the jury's verdict on the tortious interference claim, finding the evidence insufficient, it affirmed the breach of contract claim. Moreover, while the appellate court disallowed garnishment of the targeted Cohen-related assets, noting the appellees had never named those assets as parties and could not "transform the proceeding into a direct cause of action" against them, the appellate court also opined that the appellees "may have had a valid claim against" the Cohen-related assets had they instituted an action against them. *Id.* at *13. Notably, none of the appellate court's holdings disturb the trial court's findings that, *inter alia*, (1) in structuring his companies, Cohen "elected to move the pieces around the board . . . to stiff the plaintiffs and not pay them"; (2) the Cohen Companies' behavior "is beyond sharp elbowed business practices" but rather "borders on unlawful," apparently meaning criminal; and (3) "the level of absolute ability to manipulate and to run the levers of power go beyond frankly anything that [the Judge had] seen in the civil courtroom in a long time." Memorandum of Decision at 9, *In re Ronald Cohen Mgmt. Co.*, Ch. 11 Case No. 14-23399, (Bankr. Md. Feb. 6, 2015), ECF No. 69 (quoting Mot. Hearing Tr., *Tower Oaks Boulevard, LLC., et al. v. CW Capital LLC et al.*, Case No. 368256, Aug. 19, 2014). These "detailed findings" were deemed persuasive by the U.S. Bankruptcy Court considering a Cohen Companies' affiliate's petition for bankruptcy, leading that Court to "the conclusion that the Debtor and its principal[, Ronald Cohen,] are acting in bad faith" and "filed this case with [a] bad faith motive," supporting its decision to dismiss the petition outright for bad faith filing. *Id.* at 8, 10.

2001) ("[A] party's continuing obligations under a contract are conditioned on there being no 'uncured material failure by the other party to render any such performance due at an earlier time.'" (quoting Restatement (Second) of Contracts § 237)); *Kriesch v. Vilsack*, 931 F. Supp. 2d 238, 253 (D.D.C. 2013) (where a party breaches an agreement intended to resolve an earlier breach, "only a material breach would permit rescission of the Settlement Agreement and reinstatement of [the non-breaching party's] claims" (internal quotation marks omitted)). While neither party addresses the question whether such breach is material, the Developer emphasizes its "partial performance" under the Term Sheet, noting that "the Term Sheet . . . created new obligations, beyond simply an obligation to negotiate," and that the Developer "released for the University's immediate use, and the University accepted, the balance of the $525,000 payment that otherwise would have remained in escrow" and "took other actions and spent considerable sums in reliance on the parties' agreement to move forward." Pl.'s Prop. Findings Fact Concls. Law ¶¶ 399–400.

Under District of Columbia law, the following factors are significant in determining whether a breach is material:

> a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Greyhound Lines, Inc. v. Bender*, 595 F. Supp. 1209, 1224 (D.D.C. 1984) (quoting Restatement (Second) of Contracts § 241 (1981)) (applying District of Columbia law). In addition, "[t]he earlier the breach the more likely it will be regarded as material"; "[a] willful breach is more

likely to be regarded as material than a breach caused by negligence or by extraneous circumstances"; and "[a] quantitatively serious breach is more likely to be considered material." *Id*. (quoting J. Calamari & J. Perillo, Contracts §§ 11–22 (2d ed. 1977)).

Consideration of these factors leads inescapably to the conclusion that Developer's breach of its obligation to negotiate in good faith toward amendments to the Ground Lease and Development Agreement easily qualifies as a material breach of that agreement. Bad faith was evident a mere ten days following execution of the Term Sheet, when the Developer willfully declined to make the $100,000 payment required, and again eleven days after that in the Developer's first proposal for amendments to the Ground Lease and Development Agreement. The Developer's bad faith completely deprived the University of the speedy, good faith negotiation of amendments to the Ground Lease and Development Agreement contemplated by the Term Sheet, not to mention payments owed the University as part of the "cure of the monetary default" provided for in the Term Sheet. Term Sheet at 1. Moreover, the Developer's bad faith by definition fails to comport with standards of good faith and fair dealing. Consequently, the Developer's bad faith constitutes a material breach of the Term Sheet.

As a result of the Developer's material breach of the Term Sheet, the University's obligations under the Term Sheet are discharged, notwithstanding the Developer's partial performance by acting to terminate the escrow account and release the funds therein to the University. Nonetheless, the Developer emphasizes the Term Sheet's declaration that the "letters entitled 'Notice of Default and Notice of Intent to Terminate,' dated February 3, 2012, and again on March 6, 2012 are ***hereby withdrawn***," Pl.'s Prop. Findings Fact Concls. Law ¶ 143 (quoting Term Sheet at 1) (emphasis added by Developer), urging that this pronouncement of an abstract "withdrawal" constitutes an irrevocable erasure of the Developer's myriad defaults and the

notice duly given of them, *see id.* ¶ 401. These two words, "hereby withdrawn," are a thin reed to support the outcome urged by the Developer in light of other language in the Term Sheet and extrinsic evidence contravening its position. The parties' clear purpose behind including that language in the Term Sheet was to acknowledge that the University would waive the Developer's defaults and the accompanying notices thereof in exchange for—*i.e.*, contingent on—the Developer's "cur[ing] of the monetary default" by payment of the overdue rent, as well as the signing of amendments to the underlying project documents. Term Sheet at 1. Since the Developer was in material breach of its obligations under the Term Sheet, the University was under no continuing obligation to deem the Developer's defaults waived. Accordingly, following the Developer's material breach of the Term Sheet, the Developer was returned to a status of actionable default under the project documents for, *inter alia*, its failure to make the $1,475,000 rental payment as required.

This understanding of the effect of the Developer's breach is prescribed by a recent decision of the D.C. Court of Appeals. In *District of Columbia v. Young*, that court explained that "[w]here . . . a settlement agreement provides for future payments in satisfaction of a claim, there is no accord and satisfaction until all the payments have been made," explaining that until that point, "the agreement is a mere executory accord" such that "if the debtor breaches the executory accord by failing to make all the payments due, his part performance does not preclude the creditor from resurrecting the original claim that was to have been extinguished by the settlement." 39 A.3d 36, 40 (D.C. 2012) (internal quotation marks omitted). Given the Term Sheet's intent to cure the Developer's monetary default, that agreement is comparable to an "accord and satisfaction," for which failure to satisfy all the required conditions, notwithstanding partial performance, "resurrect[s] the original claim that was to have been extinguished." *Id.* As

there, the Developer's material breach of the Term Sheet reinstated the University's claims against the Developer intended to be "cure[d]" by the Term Sheet.

Another result of the Developer's material breach of the Term Sheet is that the University was no longer bound to negotiate pursuant to the Term Sheet and in accordance with its terms. That is, unlike a party to a unbreached preliminary agreement to negotiate in good faith, the University was entitled to "insist[] on conditions that do not conform to the preliminary agreement." *Banneker Ventures*, 798 F.3d at 1131. Consequently, the Developer's contention, even assumed to be true, that the University's proposals in January and February 2013 contained "provisions unfavorable to Developer and not contemplated by the Term Sheet," and that those proposals reflect bad faith, is unavailing. Pl.'s Prop. Findings Fact Concls. Law ¶ 426. Given the Developer's material breach of the Term Sheet in April 2012, the University was not bound to negotiate pursuant to that agreement. Likewise, the Developer's arguments that the University displayed bad faith by (1) placing Brangman, who had "no involvement in the Term Sheet," in charge of negotiations, even though Tarola was available, and (2) designating Schmoke "the final-decisionmaker with respect to the June 3, 2013 notice," since he "testified that he was ***not even aware*** of the Term Sheet," also fail. *Id.* ¶ 429 (emphasis in original). In light of the irrelevance of the Term Sheet after the Developer's rapid material breach of that agreement, the University did not "disregard . . . the parties' contractual obligations in the course of ongoing negotiations" by reassigning responsibility for the project. *Id.* ¶ 430. To the contrary, the University's decision to do so makes good business sense in view of Tarola's complete failure to secure good faith performance from the Developer even after extended negotiations and concessions on the part of the University.

Also unavailing is the Developer's contention that the University demonstrated "bad faith behavior" through "its abrupt cancellation . . . of the planned meeting with the Developer in late January 2013 to meet face-to-face and bring resolution to the negotiation of the Second Amendment documents." *Id.* ¶ 431. As explained, following the Developer's breach of the Term Sheet, the University was no longer bound by the Term Sheet to execute amendment documents. In addition, the evidence shows that the meeting had been scheduled on almost as short notice as it was canceled, and that the University instead met internally to discuss a way forward with the Developer, notwithstanding the latter's multiple breaches and bad faith. *See* Joint Ex. 39, Emails Between Eric Siegel and Robert Tarola, cc: Odessa Jackson, Norman Jenkins, and Kurt Schmoke, dated Jan. 28, 2013, at 1; Joint Ex. 40, Emails Between Kurt Schmoke and Eric Siegel, dated Feb. 1, 2013, at 2. Consequently, none of the Developer's arguments accusing the University of bad faith is supported by the evidence.

### E. THE UNIVERSITY'S TERMINATION OF THE GROUND LEASE AND DEVELOPMENT AGREEMENT WAS PROPER

The appropriateness of the University's termination of the Developer in June 2013 is now addressed.

The University did not immediately pursue its entitlement, in view of the Developer's ongoing failure to cure its defaults, to terminate the Ground Lease and Development Agreement. Rather, while declining to accept the Developer's proposals making much of its performance under the agreements contingent on the obtaining of financing, the University opted to give the Developer additional time to secure financing. *See* Trial Tr. Day 3 PM at 60:9–25 (Siegel) (testifying he "was instructed by Robert Tarola to give regular updates on where we were with the financing, which we did" and expressing his view that "the university, Norman Jenkins, was very generous [in] putting us in touch with potential financing sources"); *see also* Pl.'s Ex. 161,

Confidential Letter from Robert Tarola to Members of the Finance and Executive Committees, dated July 31, 2012, at 4 ("We have introduced the developer to two interested investors/lenders and are in regular contact about financing progress."). By doing so, the University exercised its prerogative to, effectively, extend the period in which the Developer would have been able to cure its defaults, including the failure to make the $1,475,000 rental payment. At that time, the University officials involved in the project believed that if the Developer obtained financing, the Developer would honor its other commitments to the University. *See* Trial Tr. Day 6 AM at 122:9–20 (Schmoke) (testifying he viewed financing as "the number one issue" for the Developer and believed if financing was secured, "everything else would fall into place"); Trial Tr. Day 7 AM at 23:17–24; 24:14–24 (Jenkins) (acknowledging that "financing was a challenge" for the Developer and that he recommended the University be "flexible" with respect to the dates for performance while the Developer sought financing); *see also* Def.'s Ex. 61, Emails Between Eric Siegel and Robert Tarola, dated Sept. 24, 2012 (Siegel stating "we are busily working toward completion of the capital stack so that we can honor o[u]r commitments").[25]

Throughout the course of its dealings with the Developer, however, the University never agreed to condition the Developer's performance on its obtaining financing, repeatedly emphasizing that, by continuing a working relationship with the Developer, it was "not waiving any defaults on the part of the Developer." Joint Ex. 31, Letter from Robert Tarola to Developer,

---

[25]    Paradoxically, the Developer's unwillingness to execute second amendment agreements without conditioning its rental payment obligations on secured financing likely made more difficult its pursuit of financing. Vasques testified that without an agreement setting forth firm deadlines, Citi Community Capital would not close on financing with the Developer. *See* Trial Tr. Day 6 PM at 24:6–11 ("Q: Based on your experience as a finance broker, if the operative documents setting forth the construction commencement date and the end of the construction completion date were not yet signed between the developer and the land owner under a ground lease, would Citi close a loan? A: No."). Thus, the Developer's representation to the University that the "University's formal request to the District via Andre Byers to revise [the Covenant] dates is all [the Developer] need[s]" to get "the paperwork . . . in order for our lender and equity's due diligence," Joint Ex. 33, Emails Between Eric Siegel, Andre Byers, Robert Tarola, and Norman Jenkins, dated Dec. 10, 11, 18, 19, 2012, at 3, appears to be wishful thinking since the fully executed agreements were necessary to secure funding.

dated Dec. 11, 2012, at 1; *see also* Joint Ex. 17, Notice of Default and Notice of Intent to Terminate, dated Feb. 3, 2012, at 4 (providing "the University is not waiving any of the rights and remedies available to the University at law and in equity on account of the Developer's failure to timely cure the Developer's defaults" and "[n]o failure to exercise and no delay in exercising, on the part of the University, any right, remedy, power or privilege, shall operate as a waiver thereof"). The University's refusal, in December 2012, to permit the Developer to begin demolition on the Property absent a "satisfactory resolution" to their dispute reflects its ongoing concern that the Developer be held to account for its defaults, notwithstanding the University's generosity in assisting the Developer with various aspects of their efforts to move the project forward. Joint Ex. 31, Letter from Robert Tarola to Developer, dated Dec. 11, 2012, at 1–2; Joint Ex. 35, Letter from Robert Tarola to Developer, dated Dec. 27, 2012 (explaining "[a]lthough [the] continuing discussions have been productive, they have not yet yielded a complete settlement arrangement acceptable to Howard University," and, consequently, the University "cannot at this time agree to the Developer's possession of the Project property, or approve the commencement of any work (including demolition)").

The Developer asserts that "[t]he University lacked the right unilaterally to set the date for the $1.475 million payment under the Term Sheet" because "the University bargained away its rights to demand payment of $1.475 million as of pre-Term Sheet dates when it bound itself to the Term Sheet." Pl.'s Prop. Findings Fact Concls. Law ¶ 450. Consequently, the Developer focuses its efforts on showing that "[t]here was never an agreement to make the payment on that date independent of executed Second Amendment documents." *Id.* ¶ 447.[26] Yet, the

---

[26]     The Developer's present efforts contradict its earlier representation that the parties agreed to the May 30, 2013, deadline for the payment. *See supra* note 16 (quoting the assertion in the Developer's original Complaint that the parties "agreed that [the Developer] would not be obligated to tender the Payment called for under the Amendment until May 30, 2013," Pl.'s Compl. ¶ 23).

Developer's argument rests upon the premise that no material breach of the Term Sheet by the Developer had occurred at the time the University demanded payment. As explained above, that assumption is incorrect. Given the Developer's breach of the Term Sheet, which was to cure its default under the Ground Lease and Development Agreement, the pertinent question is whether the University was entitled to set a deadline of May 30, 2013, for cure of the Developer's default. While the Developer does not directly address the scenario in which it is found to have acted in bad faith, it suggests the University was required to obtain the Developer's agreement to any such deadline, or wait indefinitely for the Developer to sign second amendments. *See id.* ¶¶ 447–51. The law, in accordance with common sense, says otherwise.

Case law from the District of Columbia discussing deadlines in land sale contracts offers clear instruction on this point. District of Columbia law recognizes that, in contracts requiring performance on a date certain, unless the contract provides that time is of the essence, failure by one party to comply precisely with a deadline will not necessarily excuse the other party's performance. *See Drazin v. American Oil Co.*, 395 A.2d 32, 34 (D.C. 1978) (quoting *Soehnlein v. Pumphrey*, 37 A.2d 843, 845 (Md. 1944) ("[E]quity treats [such deadlines] as formal rather than essential.")). Yet, "time can become of the essence when not originally in the contract by a refusal of one party to grant a further extension after such extended date, or when one party serve(s) notice on the other fixing a reasonable time within which the deal must be closed." *Id.* (internal quotation marks and citations omitted). "Once time is unilaterally made of the essence by explicit notification of such intent to the other party, the notification must provide a reasonable time for that party to tender performance." *Id.*; *see also* 3A Corbin, Contracts § 723, at 383 (1960) ("If a definite date for performance is specified in the agreement, but performance on time is not of the essence, either party has the power to make on that date or some subsequent

date, performance essential and a condition of his own duty by giving notice to that effect, provided that the notice leaves a reasonable time for rendering performance.").

In this case, the University in 2011 and 2012 provided multiple notices to the Developer that it would be or was in default by reason of missing the deadline for making the $1,475,000 rental payment required by the Ground Lease to be paid no later than March 15, 2011, which due date was extended by agreement of the parties to December 8, 2011. While the operative agreements provided only a ten-day period in which the Developer could cure these defaults, the University extended the ten-day period by abstaining from further action to terminate the agreements. Yet, on February 1, 2013, by means of an email from Schmoke to the Developer, the University exercised its option to make time of the essence by unilaterally notifying the Developer that the default on the payment had to be cured by May 30, 2013. *See* Joint Ex. 40, Emails Between Kurt Schmoke and Eric Siegel, dated Feb. 1, 2013, at 2 (specifying that the "University will take no further action in support of the current developer" unless, *inter alia*, the $1,475,000 rental payment "has been made to Howard University by May 30, 2013").

The notice provided by the University was clear and provided a reasonable amount of time of four months for the Developer to cure. Under District of Columbia law, "[t]he specific words 'of the essence' or any like phrase, need not appear, but rather it is sufficient that the meaning behind those words becomes apparent to the other party." *See Drazin*, 395 A.2d at 35. Schmoke's emails did not use the words "time is of the essence," but advised the Developer of its obligation to cure its default by making the overdue payment on that date by providing that the "University will take no further action in support of the current developer" absent such payment. Joint Ex. 40, Emails Between Kurt Schmoke and Eric Siegel, dated Feb. 1, 2013, at 2. Moreover, nearly three months before the May 30, 2013, deadline for the second rental payment

of $1,475,000, on March 6, 2013, the University's outside counsel followed up on Schmoke's deadline and expressly advised the Developer that "time is of the essence for the payment of that sum." Joint Ex. 48, Email from David Gifford to Eric Siegel, attaching (1) Second Amendment to Ground Lease and (2) Second Amendment to Development Agreement, dated Mar. 6, 2013, at 1. Consequently, the notice provided by the University was sufficient, under District of Columbia law, to alert the Developer of the new deadline and that time was of the essence.

In addition, the deadline set by the University provided a reasonable time for the Developer to cure its default: approximately four months. The new deadline must be considered not only reasonable, but downright solicitous of the Developer given that the Developer had represented that (1) its failure to make the payment was a result of its inability to obtain financing and (2) it would close on financing on May 30, 2013. *See* Joint Ex. 36, Emails Between Eric Siegel, Andre Byers, Robert Tarola, and Norman Jenkins, dated Dec. 10, 11, 18, 27, 2012, Jan. 1, 2013, at 1 (Developer assuring the University that "the outside date to 'true up' on the initial ground lease payment of $1.425 million [sic] would be May 30, 2013 (the date of closing on the financing with Citi Community Capital . . . )"). In view of the fact that lenders typically issue commitment letters locking in financing "a week or two away" from the closing date, the new deadline for the $1,475,000 set by the University reflects a good faith attempt by the University to give the Developer every advantage in curing its default. Trial Tr. Day 7 AM at 53:6–17 (Dickson).

The Developer argues that even assuming the May 30, 2013, deadline was a valid one—it was, after all, the deadline the Developer's original complaint in this case said was operative, *see* Pl.'s Compl. ¶ 23—the University was required to extend it in light of the historic designation applications filed in February 2013, which occurrence the Developer contends constitutes an

"Unavoidable Delay" extending the time for performance under the agreements. *See* Pl.'s Prop. Findings Fact Concls. Law ¶¶ 440–46. While doubtful that the historic designation applications amounted to an "Unavoidable Delay," given, *inter alia*, the Developer's awareness of the likelihood of the event occurring, *see* Def.'s Prop. Findings Fact Concls. Law ¶¶ 363–67, and unclear that the concept of Unavoidable Delay could be applied to an "existing breach" such as the already long overdue rental payment, *see id.* ¶ 371, those questions need not be addressed because the Ground Lease does not recognize Unavoidable Delay as a reason to extend the $1,475,000 payment deadline, *see id.* ¶¶ 368–70; *see generally* Ground Lease.

Having concluded that the University was entitled unilaterally to set a deadline of May 30, 2013, for the Developer to cure its monetary default, whether the notice provided in June 2013 was adequate under the Ground Lease must be addressed. The D.C. Circuit set out its interpretation of the Ground Lease's notice requirement in its decision in this case.

> Section 16.2 of the Ground Lease provides the University must send two notices to the Developer before it may terminate the lease. First, the University must issue a notice advising the Developer it is "in default with respect to" a rental payment. If the Developer does not cure the default within ten days, then the University may treat the default "as a breach of th[e] Lease" (i.e., an "Event of Default"). After an "Event of Default" occurs, the University may terminate the Ground Lease by issuing a second notice and waiting an additional ten days: ["][P]rior to exercising any right to terminate this Lease on account of any Event of Default, Landlord shall provide Tenant . . . with a written notice (in addition to any notice of default provided for in this Section 16.2 . . . ), specifying . . . that Landlord intends to terminate the Lease if the Event of Default is not cured within ten (10) days.["]

*HTC II*, 788 F.3d at 328–29.

Addressing the University's argument that the Developer's failure to pay $100,000 alone could form a basis for the University's termination of the Ground Lease in June 2013, the D.C. Circuit concluded it could not. After outlining the above notice requirement, the D.C. Circuit concluded with respect to the Developer's failure to pay the $100,000 that the University "did

not follow this two-step process when it purported to terminate the Ground Lease in June 2013" because it sent only "a combined 'Notice of Default' and 'Notice of Intent to Terminate' on June 3 and then terminated the lease on June 14." *Id.* at 329.

The Developer urges that the same conclusion should be reached as to the $1,475,000 payment, relying upon the D.C. Circuit's description of the "notice regime" and application of that regime to the $100,000 payment, detailed above. Pl.'s Prop. Findings Fact Concls. Law ¶¶ 457–64. In doing so, the Developer treats the June 3, 2013 Notice of Default as the first notice of default as to the $1,475,000 payment, asserting no second notice was ever given and, thus, that no "failure to make a payment that continues for a period of ten (10) days after written notice from the University," as required by the Ground Lease before termination, ever occurred. *Id.* ¶ 460. The Developer's invocation of the D.C. Circuit decision vacating this Court's prior judgment against it is misplaced, however, since the Developer's application of that precedent to the issue at hand approaches the inane. The Developer's argument hinges on the position that the June 3, 2013 notice of default was the first notice of the Developer's default as to the $1,475,000. That position is unsupportable. As the Developer acknowledges, the University sent two notices of default in 2012. *See id.* ¶ 439.[27] While the Developer argues that both those notices were irrevocably withdrawn and their accompanying defaults waived by the Term Sheet, that argument has been rejected. *See supra* Part III.D. Since the Developer breached the Term Sheet, the University was no longer required to deem the Developer's defaults, and the notices accompanying them, waived or "withdrawn." The Developer's contrary position reflects an

---

[27] The Developer also sent a notice of default in September 2011, but that notice did not include as an existing default the Developer's failure to make the $1,475,000 rental payment, as the December 8, 2011, deadline, extended from March 15, 2011, at the Developer's request, had not yet come to pass. *See* Joint Ex. 13, Notice of Default, dated Sept. 26, 2011, at 3–4 (asserting the Developer "is in anticipatory breach," though not default, of its obligation to pay $1,475,000 by December 8, 2011).

unreasonable reading of the Term Sheet, which referred to the notices of default as "withdrawn" as a way of expressing, perhaps inartfully, waiver of those defaults in the case of complete cure by the defaulting party.

The Developer's interpretation would import to the two cherry-picked words "hereby withdrawn" a power to cause the notices to evaporate, regardless of whether the agreement in which they appear is honored. In other words, through the lens of the Developer's alternate reality, the effect of the Term Sheet is that University would waive its notices of default, even if denied the benefit of the bargain for such waiver by the Developer's bad faith failure to perform its obligations under the Term Sheet. As explained, this interpretation is simply incorrect.

Assuming, however, that the Developer were correct, and the Term Sheet caused the February and March 2012 notices of default no longer to be effective for purposes of termination of the Ground Lease, even in the face of the Developer's bad faith and material breach of the Term Sheet, its notice argument would nevertheless fail. District of Columbia law eschews overly formalistic application of notice requirements to prevent an injured party to a contract from extricating itself from that contract, so long as sufficient notice to the breaching party has been given. *See, e.g., Sun Secured Financing LLC v. ARCS Commercial Mortg. Co.*, 730 F. Supp. 2d 132, 138 (D.D.C. 2010) (citing *Mason v. Curro*, 41 A.2d 164, 165 (D.C. 1945)) ("District of Columbia courts have shown some willingness to excuse purely technical deficiencies in notice."). Thus, even if the University did not technically comply with every requirement of the two-step notice regime, substantial compliance would nevertheless suffice.[28]

---

[28] The Developer appears to acknowledge that as long as the University substantially provided "two-step notice," such that the Developer was given "two distinct notices and cure periods," any technical deficiencies should be excused, arguing only that the University "fail[ed] to provide two-step notice" which, according to the Developer, is "not a 'purely technical deficiency in notice,' which courts have found occasion to excuse." Pl.'s Prop. Findings Fact Concls. Law ¶ 463–64 (quoting *Sun Secured Financing*, 730 F. Supp. 2d at 138).

Here, the Developer was made aware numerous times after the signing of the Term Sheet that the University considered the Developer in default, and thus, that it was then occupying the first cure period contemplated by the Ground Lease's notice requirement. *See, e.g.*, Joint Ex. 31, Letter from Robert Tarola to Developer, dated Dec. 11, 2012, at 1; Def.'s Ex. 111, Letter from Alan Brangman to Ron Cohen, dated Apr. 16, 2013, at 2 ("[T]he University views [the Developer's] upcoming payment as a commitment to continue with the redevelopment of the property and more importantly as a cure for the fact that a default condition currently exists with respect to the project."). Notice of this need to cure was unequivocally given on February 1, 2013, when the University informed the Developer of the May 30, 2013, deadline for the second rental payment. *See* Joint Ex. 40, Emails Between Kurt Schmoke and Eric Siegel, dated Feb. 1, 2013, at 1. These numerous notices were more than sufficient to alert the Developer to its precarious position of needing to cure its default or be subject to one final "Notice of Default and Notice of Intent to Terminate" and ten-day cure period before termination.[29]

---

[29] The multiple formal, written communications putting the Developer on notice of its ongoing status of default and impending final opportunity to cure leave no doubt as to the lack of viability of the Developer's notice argument. Even considering a scenario in which the notice given by the University did not substantially comply with the "two-step process" described by the D.C. Circuit, however, the Developer has not shown an entitlement to the relief it seeks on that ground. District of Columbia law recognizes that a contract's notice requirements may "merely impose[] a duty," as opposed to a "condition precedent" to termination, such that an "alleged failure to comply with most entitles the plaintiffs to recover damages for the lack of notice." *Sun Secured Financing*, 730 F. Supp. 2d at 139. In other words, a termination without required notice may nevertheless be effective. Under District of Columbia law, "there is a presumption in favor of construing doubtful language in a contract as language of promise rather than as language of condition," which presumption avoids "the consequence that a slight failure to perform wholly destroys all rights under the contract." *Wash. Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 549 (D.C. 2000) (citing *New York Bronze Powder Co. v. Benjamin Acquisition Corp.*, 716 A.2d 230, 234 (Md. 1998); Williston on Contracts § 38.13 (4th ed. 2000)). "[T]he question of whether a provision in a contract constitutes a condition precedent is one of construction dependent on the intent of the parties as revealed by the contract itself and, if necessary, by extrinsic evidence." *Sun Secured Financing*, 730 F. Supp. 2d at 139 (quoting *Wash. Props., Inc.*, 760 A.2d at 550). One consideration courts take into account when deciding whether to construe a provision of a contract as a condition precedent is whether doing so would further "fairness and justice." *Wash. Props., Inc.*, 760 A.2d at 550 (citing Calamari & Perillo, The Law of Contracts § 11.8 (4th ed. 1998); Catherine M.A. McCauliff, Corbin on Contracts § 32.1 (1999)). For the reasons enumerated and expounded upon at length in this opinion, fairness and justice would not be served by treating the purported non-compliance on the part of the University with the Ground Lease's notice requirements, which the Developer acknowledges were "detailed," Pl.'s Prop. Findings Fact Concls. Law ¶ 464, as a condition precedent warranting voiding of its termination of the Developer.

Consequently, the Developer had been in the first "cure" period required by the Ground Lease for many months by the time the June 3, 2013, notice was sent, which notice triggered the second cure period of ten days. The University appeared to understand the June 3, 2013, notice as the penultimate notice of default required, titling the notice a "Notice of Default and Notice of Intent to Terminate," Joint Ex. 61, Notice of Default and Notice of Intent to Terminate, dated June 3, 2013, rather than simply a "Notice of Default," as it had entitled its very first notice of default in September 2011, Joint Ex. 13, Notice of Default, dated Sept. 26, 2011, at 1, and referring to the failure to make the $1,475,000 payment as an "EVENT OF DEFAULT," as would be appropriate only in a second notice of default, according to the D.C. Circuit's description of the Ground Lease's notice regime, Joint Ex. 61, Notice of Default and Notice of Intent to Terminate, dated June 3, 2013, at 2 (emphasis omitted).[30] The University waited the requisite ten days before terminating the Ground Lease and Development Agreement. *See* Joint Ex. 66, Notice of Election to Terminate Ground Lease, dated June 14, 2013; Joint Ex. 67, Notice of Termination of Development Agreement and Supplemental Development Agreement, dated June 17, 2013. Accordingly, the University's termination complied with the requirements of the operative agreements and is, thus, unquestionably valid.[31]

---

[30] The Developer cites the June 3, 2013, notice's statement that the December 8, 2011, "due date" for the rental payment "was extended by the University through May 30, 2013," as support for its argument that the University "did not claim that there existed an 'Event of Default' under the Ground Lease" as of May 30, 2013. Pl.'s Def.'s Prop. Findings Fact Concls. Law ¶ 460. The Developer's knack for cherry picking two-word phrases to support the Developer's position when construed in utter isolation, in contravention of overwhelming evidence supporting the University's position, as the Developer did with its focus on the word "withdrawn" in the Term Sheet, again gets the Developer nowhere, given other language in the very same notice, discussed above, including the language cited in the text informing the Developer verbatim of an "Event of Default," the prior notices of default, and the University's repeated warnings to the Developer that the Developer remained in default and thus within a cure period extended only at the University's pleasure.

[31] The University suggests that the D.C. Circuit's interpretation of the Ground Lease's notice requirement is incorrect, asserting that the second notice of default applies only in the event of a "leasehold mortgagee." Def.'s Prop. Findings Fact Concls. Law ¶¶ 339–40. Given that the University's notice complied with the D.C. Circuit's more stringent interpretation of the notice required under the Ground Lease, the thorny question of whether this Court would be bound by an incorrect determination of the D.C. Circuit on the notice required by a contract governed by D.C. local law need not be addressed.

### F. THE DEVELOPER NEVER ATTEMPTED TO CURE ITS DEFAULT, NOR IS IT EXCUSED FROM DOING SO

The Developer argues it "attempt[ed] to cure its purported default" and was "precluded by the University" from doing so. Pl.'s Prop. Findings Fact Concls. Law ¶ 465. According to the Developer, the governing agreements required that the rental payment be made into an escrow account, and "had the University cooperated" by "enter[ing] into a new escrow agreement," the Developer could have cured. *Id.* ¶ 472. The Developer's arguments must be rejected.

First, to the extent the Developer argues its failure to cure is excused by impossibility, *see* Pl.'s Prop. Findings Fact Concls. Law ¶ 471, that argument is rejected as explained in this Court's January 31, 2017, memorandum opinion, *see HTC III*, 2017 WL 421909, at *9–10. By dissolving the existing escrow account pursuant to the Term Sheet, the parties manifested and operationalized their understanding that the $1,475,000 payment would be made directly to the University. Consequently, the Developer's protestations that it had no means to cure its monetary default are entirely disingenuous. Notably, the Developer has never argued it was impossible for the Developer to make the $100,000 payment required by the Term Sheet, even though, pursuant to the Term Sheet, the payment should have been made following the dissolution of the parties' escrow account. *See* Term Sheet at 1–2.

Second, the Developer, quite simply, made no attempt to set up an escrow account with the University for the purpose of curing its failure to make the $1,475,000 payment on May 30, 2013. Rather, the Developer suggested the creation of a new escrow account, in contravention of the parties' intent manifested in the Term Sheet, for the Developer's own benefit. The Developer had proposed in March 2013 that the University agree to a new escrow account into which the $1,475,000 would be placed, "pending and subject to further negotiations," in the

event that any portion of the Property were designated historic. *See* Joint Ex. 54, Email from Eric Siegel to David Gifford, dated Mar. 14, 2013, at 6. The University rejected that proposal as contrary to the understanding of the parties reflected in the Term Sheet. *See* Joint Ex. 55, Email from Alan Brangman to Eric Siegel, dated Mar. 22, 2013; Joint Ex. 56, Email from David Gifford to Eric Siegel, attaching draft documents, dated Mar. 27, 2013. On June 10, 2013, the Developer repeated its offer, rejected at least once already, to set up an escrow account into which to place the $1,475,000 payment. *See* Joint Ex. 65, Letter from Developer to Kurt Schmoke, dated June 10, 2013 ("We are happy to post the ground lease payment in escrow so that Howard University knows that the money is there to be paid upon conclusion of the Mayor's Agent process."). While at trial Siegel testified that, by this letter, he "offered to place the money in escrow pursuant to the contract documents that required us to do so," the Developer's letter nowhere cited any such contract requirement as a reason for the University to set up a new escrow account with the Developer. Trial Tr. Day 6 AM at 20:3–10. Nor would invocation of an escrow requirement have been reasonable at that time, given that the parties already manifested their understanding that, going forward, rental payments were to be made directly to the University by terminating the escrow account between the parties. Thus, by suggesting that an escrow account be created on June 10, 2013, the Developer sought a new condition on the rental payment, not to cure unequivocally its monetary default.

The Developer did set up an account with Closeline on June 21, 2013. It only did so, however, after the applicable cure period had expired, and, as explained in prior opinions, the Developer's payment into that account constituted neither a payment into an "escrow account" with the University nor a payment directly to the University. Yet again, the Developer's action in opening the Closeline account reflects a desire to avoid putting its funds, including the second

rental payment, at risk without first securing financing for the project and a refusal to comply with agreed-to terms not desirable to the Developer. Consequently, the Developer never attempted to cure, let alone actually cured, its default.

### G.     APPROPRIATE REMEDY

In light of the Developer's breach of contract, the University is entitled to the damages it requests: the $1,475,000 rental payment and its attorney's fees, in an amount to be determined following the submission of further evidence regarding those fees. *See* Def.'s Prop. Findings Fact Concls. Law ¶¶ 399–402. Given the Developer's breach of the Term Sheet's obligation to negotiate in good faith, the University would also have been entitled to recoupment of its investment of "time, money, and effort in negotiating" with the Developer over the amendments. *Stanford Hotels*, 18 A.3d at 740. The University never requested or provided evidence of any such damages, however, so they will not be awarded.

The University also requests forfeiture of the lease. *See* Def.'s Prop. Findings Fact Concls. Law ¶¶ 373–84. The Developer again presses its argument, rejected in this Court's December 2013 memorandum opinion, that forfeiture of the Ground Lease is not an appropriate remedy. *See* Pl.'s Prop. Findings Fact Concls. Law ¶¶ 474–88; *HTC I*, 7 F. Supp. 3d at 83–87. For the reasons stated in the December 2013 memorandum opinion, the Developer's argument is again rejected. In fact, the evidence presented at trial offers additional support for the remedy of forfeiture. Before imposing forfeiture, the following factors are considered: whether the breach was willful; whether the lessee acted in good faith; whether one of the parties violated fundamental principles of fair dealing; whether the landlord has given adequate notice to the tenant of the default and reasonable time to comply; and whether prejudice has accrued to the landlord by reason of the breach. *See Entrepreneur, Ltd. v. Yasuna*, 498 A.2d 1151, 1160–61

(D.C. 1985). As has been discussed, the Developer demonstrated willfulness and bad faith in its breaching of the parties' various agreements; the University gave the Developer more than sufficient notice and time to cure; and, as the Developer itself has represented, the University experienced significant monetary prejudice, *see* Joint Ex. 12, Letter from Developer to Troy Stovall, dated Sept. 15, 2011, at 1–7 (asserting $1,000,000 as the loss to the University in lease revenue as of the date of the letter), as well as prejudice to its ability to carry out its mission of serving the University and surrounding community, as a result of the Developer's breach. On the present record, forfeiture is unquestionably appropriate.

### H.    PIERCING THE CORPORATE VEIL

During trial, the parties were directed to discuss in their conclusions of law whether, in the event the Developer were found liable, the corporate veil should be pierced to satisfy the judgment against it. *See* Trial Tr. Day 6 AM at 37:5–8.

"Normally the corporation is an insulator from liability . . . [b]ut there are occasions when the limited liability sought to be obtained through the corporation will be qualified or denied." *Anderson v. Abbott*, 321 U.S. 349, 361–62 (1944). "[C]ourts may look past a corporation's formal existence to hold shareholders or other controlling individuals liable" in the event that "the incentive value of limited liability is outweighed by the competing value of basic fairness to parties dealing with the corporation." *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C. Cir. 1982). In the District of Columbia, "[a] 'party seeking to disregard the corporate entity must prove by affirmative evidence that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetuate fraud or wrong.'" *Lawlor v. District of Columbia*, 758 A.2d 964, 975 (D.C. 2000) (quoting *Vuitch v. Furr*, 482 A.2d 811, 815 (D.C. 1984)). "Although no single factor controls, courts generally inquire, *inter alia*, whether corporate formalities have been

observed; whether there has been commingling of corporate and shareholder funds, staff and property; whether a single shareholder dominates the corporation; whether the corporation is adequately capitalized; and, especially, whether the corporate form has been used to effectuate a fraud." *Id.*

The Developer contends that the University "chose not to pursue" relief against any Cohen Companies asset or individual, as would require consideration of whether the corporate veil should be pierced, and "is thus not entitled to this relief." Pl.'s Prop. Findings Fact Concls. Law ¶ 519. As support for this contention, the Developer cites *Simon v. Circle Assocs., Inc.*, in which the District of Columbia Court of Appeals opined that "[d]ue process considerations would ordinarily require [in a suit against a corporation] that [an] alleged alter ego be joined in the action." 753 A.2d 1006, 1010 n.4 (D.C. 2000). The Developer further argues that "on the merits, the University has failed to carry its burden of proof at trial as to any veil-piercing," Pl.'s Prop. Findings Fact Concls. Law ¶ 520, noting the lack of evidence respecting the factors relevant to a veil-piercing determination. The University does not address whether its failure to bring a claim against any individual during this lawsuit precludes veil-piercing relief, arguing only that, on the merits, the evidence adduced thus far supports veil-piercing and "[b]ased on th[o]se facts, the University is entitled to discovery in support of its claim that this Court should disregard the separate forms of the Developer and its affiliates." *See* Def.'s Prop. Findings Fact Concls. Law ¶¶ 403–07.

While the substantive legal analysis for veil-piercing "is actually remarkably uniform across jurisdictions," the procedures required before a Court may pierce the corporate veil differ. *See* Sam F. Halabi, *Veil-Piercing's Procedure*, 67 Rutgers U. L. Rev. 1001, 1001, 1010 (2015) (arguing the "procedural fluidity" of veil-piercing, rather than substantive differences, explain

the "'incoherence' of veil-piercing law"). For example, courts differ as to (1) whether "plaintiffs [must] bring an independent cause of action for piercing the corporate veil" or request it as "a remedy for an underlying action" and (2) whether veil-piercing claims are waived "if not specifically pled before trial." *Id*. at 1008. Neither of these questions has been addressed in District of Columbia law, and a dearth of authority delineating the acceptable procedures for piercing the corporate veil exists more generally.

"[W]hen necessary for the disposition of a case brought to it for decision," a federal court must decide questions of state law. *Meredith v. City of Winter Haven*, 320 U.S. 228, 237 (1943) (imposing this requirement notwithstanding that "the highest court of the state had not answered [the state law questions], the answers were difficult, and the character of the answers which the highest state courts might ultimately give remained uncertain"). With respect to whether the veil may be pierced in this case, *Simon* is persuasive, if not dispositive, authority for the proposition that under District of Columbia law, a targeted asset or individual must be named before veil-piercing may be considered. Accordingly, veil-piercing is not appropriate in this case given its current procedural posture, wherein no other Cohen Companies asset or individual has been made a party to the University's counterclaims.

The University should not lament, nor the Developer celebrate, that conclusion, however, on the erroneous assumption that the University has waived its right to veil-piercing in this matter. As noted by a federal district court in a different jurisdiction, a procedural rule that "would force [litigants] to join parties and present ve[i]l-piercing claims, and courts to adjudicate them, in any case where a [litigant] has an inkling that piercing may be appropriate" would raise "concerns for judicial efficiency and economy." *Careccia v. Macrae*, No. 05CV1628ARR, 2005 WL 1711156, at *5 (E.D.N.Y. July 19, 2005); *but see* Halabi, *supra*, at 1019–20 ("The general

set of sanctions rules of civil procedure impose for failure to reasonably bring as many claims and parties together in the same dispute *should* counsel toward a requirement that veil-piercing be pleaded early in litigation."). These concerns are significant.

While District of Columbia law is silent on the specific issue, it has spoken loudly on the purpose of veil-piercing doctrine, repeating throughout the pertinent case law its core "considerations of justice and equity." *Lawlor*, 758 A.2d at 975; *Bingham v. Goldberg. Marchesano. Kohlman. Inc.*, 637 A.2d 81, 93 (D.C. 1994); *Vuitch*, 482 A.2d at 815; *see also Labadie*, 672 F.2d at 96 (inquiring whether "if the acts are treated as those of the corporation alone . . . an inequitable result [will] follow"). Justice and equity demand a procedural rule that preserves the University's right to its judgment, without wasting resources or punishing a failure to predict the need for veil-piercing. In light of *Simon*'s requirement that veil-piercing subjects be named as parties to a suit, and in the absence of controlling precedent, the Court holds that under District of Columbia law, a judgment-winner, unable to satisfy its judgment against a corporate adversary, may initiate a fresh action seeking veil-piercing against the adversary's shareholders or purported alter egos. Consequently, in the event the University is unable to satisfy its judgment through attachment of assets belonging to the Developer or CastleRock, it may file a separate action requesting veil-piercing. Any such action will be fairly straightforward given the instant decision, including the Court's observations regarding the inadequacy of the Developer's capitalization, *see supra* note 22, and the University may then be entitled to the additional discovery it presently seeks.

This case highlights the injustice that may flow from a rule barring veil-piercing for litigants that fail to join parties and raise veil-piercing at the outset of an action to recover against a corporation. To the extent the University failed to predict a need for veil-piercing, the

Developer is to blame. The Developer touted, to the University and to this Court, the funds in the Closeline account as a reason for the University to continue its relationship with the Developer, prior to its decision to hand off those funds to PMAS, as it has done in other cases. *See supra* notes 20, 24. The University reasonably could have assumed that a party acting in good faith and under the microscope of litigation would not have acted so blatantly to evade a judgment against it. Under the rule announced in this case, the cost of the University's reasonable but erroneous assumption as to the Developer's honesty and integrity is justly laid at the feet of the Developer.

## IV. CONCLUSION

For the aforementioned reasons, the Developer is not entitled to judgment on its claim, the University is entitled to judgment on its counterclaim and third-party complaint, and judgment is, for the second time in this litigation, entered in favor of the University on the ground that its termination of the Ground Lease and the Development Agreement was effective and is a permissible forfeiture of all rights of the Developer, and that the University is entitled to damages in the amount of $1,475,000, along with interest and fees in an amount to be determined after the submission by the University, as requested, *see* Def.'s Prop. Findings Fact Concls. Law ¶ 423, of evidence supporting that award by September 5, 2017.

An appropriate Order accompanies this Memorandum Opinion Setting Forth Findings of Fact and Conclusions of Law.

Date: August 14, 2017

_____
BERYL A. HOWELL
Chief Judge